# In the United States Court of Federal Claims

## No. 14-711C
### Filed: September 8, 2017

* * * * * * * * * * * * * * * * **  *
|  |  |
|---|---|
|  | * |
| **STROMNESS MPO, LLC,** | * |
|  | * |
| Plaintiff, | * |
|  | * |
| v. | * |
|  | * |
| **UNITED STATES,** | * |
|  | * |
| Defendant. | * |
|  | * |

**Trial; Lease Agreement; Fifth Amendment Taking; Holdover Tenancy; Contract Interpretation; Breach of Contract; United States Postal Service; Reformation.**

* * * * * * * * * * * * * * * * *  *

    **Stephen B. Hurlbut**, Akerman LLP, Washington, D.C., for plaintiff. With him was **Harold J. Hughes**, Ford and Hugh, LLC, Lehi, UT.

    **Anand R. Sambhwani**, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., for defendant. With him were **Jessica L. Cole**, Trial Attorney, Commercial Litigation Branch, **Meen-Geu Oh**, Trial Attorney, Commercial Litigation Branch, **Martin F. Hockey, Jr.**, Assistant Director, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Chad A. Readler**, Acting Assistant Attorney General, Civil Division, Department of Justice, Washington, D.C. Of counsel was **Shoshana O. Epstein**, Office of the General Counsel, United States Postal Service.

## O P I N I O N

<u>**HORN, J.**</u>

    Plaintiff, Stromness MPO, LLC (Stromness MPO), filed a complaint in the United States Court of Federal Claims alleging that the United States Postal Service (USPS) breached the terms of two lease agreements between the parties, violated the duty of good faith and fair dealing, and effected a taking of plaintiff's property in violation of the Fifth Amendment to the United States Constitution. In its complaint, plaintiff appeals two USPS contracting officers' final decisions denying plaintiff's certified claim and a supplemental certified claim. Plaintiff seeks declaratory and monetary relief, including reformation of the leases, the fair market rental value of the leased property, reimbursement of real property taxes, and compensation to restore and remediate the leased property. A trial was held and post-trial briefings on the legal and factual issues raised in the case were filed by both parties. After a review of the trial testimony, the exhibits entered into the record, and the submissions filed by the parties, the court makes the following findings of fact.

**FINDINGS OF FACT**

The dispute between the parties in the above-captioned case revolves around a postal facility in Magna, Utah, which was constructed by plaintiff and leased by the USPS.[1] Plaintiff, Stromness MPO, is one of several businesses owned by members of the Stromness family. For several decades, the Stromness family businesses have constructed and leased buildings for the USPS and other entities within the United States federal government, including the Magna postal facility located in Magna, Utah, which is at issue in this case. At the trial conducted in the above-captioned case, the court heard testimony from two members of the Stromness family, Frederick ("Freddie") Stromness, the managing member of Stromness MPO and President of Build Inc., another Stromness family business, and Richard ("Richie") Daniel Stromness, the Director of Real Estate and Facilities for Stromness MPO, who is the son of Frederick Stromness.

In February 1996, the USPS determined that it needed a new postal facility in Magna, Utah, after the USPS Salt Lake District Office requested a new construction lease project. The Salt Lake District Office initially requested a postal facility that was approximately 16,000 square feet in size, however, the District did not meet the criteria to justify a building of that size. The USPS Denver Facilities Service Office supported the Districts in their facility needs, including the construction and leasing of new postal facilities for the Salt Lake District Office. Based on a site visit, the Denver Facilities Service Office determined that the postal "facility project would not rank high enough on the Area's NCO Priority List to justify a facility of this size," and, as a result, the Salt Lake District Office chose to build a smaller facility in order to meet the immediate space deficiencies.[2] To address the District's request for a postal facility, the USPS created a building plan for the facility that contemplated an expandable building, which could be built in phases,

---

[1] In addition to plaintiff, the Stromness family businesses relevant to the above-captioned case include Build Inc. and MPO Leasing, because these two businesses were Stromness MPO's predecessors-in-interest related to the Magna postal facility. In response to questions posed by the court, defendant acknowledged in its submission to the court on February 3, 2016 that Build Inc. and MPO Leasing each assigned its lease to Stromness MPO. Defendant stated, "we possess no evidence that calls into question the legitimacy of the assignments," "the assignments provided by Stromness appear to pre-date the filing of this case," and, "Stromness has established privity of contract as of the filing of this case."

[2] Contracting officer Edward Bavouset explained at trial:

> All new leases and real estate acquisitions and major construction projects were administered by the facility service office. The functional level at the district office, which would have been referred to as administrative support offices, typically only held and handled what was called repair and alteration projects at the local level to manage and maintain their existing facilities.

specifically Phases I, II, and III, depending on the future needs of the USPS.[3] During the trial, the parties jointly moved to admit into evidence drawings that illustrate the phases of the expandable building plan, including the following "MASTER PLAN":



Joint Exhibit 67, page 399

(capitalization in original). The drawing indicated that Phase I would measure 16,640 square feet in size, including 8,250 square feet of enclosed space and 8,390 square feet of covered parking. Phase II would measure 16,359 square feet in size, including 8,390 square feet of enclosed space and 7,969 square feet of covered parking. Phase III would

_____

[3] At trial contracting officer Edward Bavouset explained, "the expandable building was just kind of a pilot-type program that was being tried by this particular district. But it was a building that could be expanded at a later date should the Postal Service desire to pursue that option." The Salt Lake District Office requested the expandable building concept be used on the Magna postal facility so that, if growth projections did materialize, the building then could be expanded, as needed.

measure 9,626 square feet in size, including 4,992 square feet of enclosed space and 4,634 square feet of covered parking.

On December 16, 1996, to satisfy the Salt Lake District's request for a facility, the USPS issued a solicitation for the construction and lease of a post office in Magna, Utah. The solicitation requested offerors "to provide bids for both Phase I and Phase I & II combined" of the expandable building plan, even though at the time the USPS only intended to award a contract for the construction and lease of Phase I.[4] The contracting officer for the Magna Main Post Office, Edward Bavouset, testified at trial that "Phase 1 would have been for the project that was approved through the appropriate approving authorities for a new construction lease facility of approximately 6,500 square feet. Phase 2 was the expandable building portion of that," such that "when the Postal Service asked for both Phase 1 and Phase 2, Phase 1 proposal was based on what was approved. Phase 2 was anticipation of whether or not any future approval would come for that."[5] The solicitation provided that "the successful offeror providing the best Phase I offer was considered" for the contract award because funding had only been approved to complete Phase I of the project. Contracting officer Edward Bavouset explained at trial that "[t]he combination of Phase 1 and Phase 2 proposals was informational only, so the Postal Service had that information should they decide to pursue that option at a later date."

In soliciting proposals, the USPS described Phase I and Phase I and II, combined, as follows:

> Phase I consists of 6,498 sq. ft. of useable workspace/lobby space; 1,338 sq. ft. of useable dock space; and 8,171 sq. ft. of useable covered parking and grounds. Phase I & II combined consists of 14,668 sq. ft. of useable workspace/lobby/ground storage; 1,338 sq. ft. useable dock space; and 7,212 sq. ft. useable covered parking space.

---

[4] At trial Frederick Stromness testified that the building plans were incorporated into the Magna Main Post Office solicitation and the Magna Main Post Office lease.

[5] The trial transcript refers to the building phases with Arabic numerals 1 and 2, as well as Roman numerals I and II, while the documentary evidence submitted to the court and the parties' filings identify the phases with Roman numerals I and II. To align with the documentary evidence and the parties' written references in their submissions to the court, the court utilizes Roman numerals to identify the phases, unless quoting directly from the parties' submissions or exhibits or trial testimony.

The drawings submitted to the court included the following depiction of the Phase I space:



Joint Exhibit 67, page 388

As the above drawing indicates, Phase I included the Phase I enclosed building and the adjacent Phase I covered parking Sheet A-1, as referred to in the drawing above and depicted on page 397 of Joint Exhibit 67, illustrated a more detailed floor plan of the Phase I space:



Joint Exhibit 67, page 387

According to the Phase I floor plan, the front area of the building would include the counter, an office, and a work area, and the back area of the building would include the women's restrooms, the men's restrooms, and a work room.

Plaintiff's predecessor-in-interest, Build Inc., submitted two proposals in response to the solicitation, one for Phase I of the project, as well as one for Phases I and II, combined. In the evaluation of proposals, the USPS explained:

> Build Inc. has built many post offices for the USPS and has always provided very satisfactory buildings in a timely manner. . . . According to Charlie Hubbert, the construction Project Manager, the builder is easy to work with and responsive to any instructions which are given. The project manager has worked with this particular builder for over ten years on NCL [New Construction Lease] projects in Idaho and Utah and feels he is "fair and ethical".

6

After reviewing the six proposals received in response to the solicitation, the USPS determined that Build Inc. "provided the most acceptable, Best and Final offer" for Phase I.

Magna Main Post Office Lease

On January 27, 1997, the USPS and Build Inc. executed a contract for the construction and lease of the "Magna – Main Post Office," or the Phase I space, for a base terms of 20 years, beginning on April 1, 1998 and continuing until March 31, 2018. Joint Exhibit 1 indicates that Richard John Stromness,[6] the president of Build Inc. at the time, signed the Magna Main Post Office contract on January 21, 1997, but contracting officer Edward Bavouset signed the contract on January 27, 1997. The Magna Main Post Office lease was identified as "SALT LAKE COUNTY Project: E20321," and designated by a specific finance number, "495270-002." The parties generally both refer to the lease for the "Magna – Main Post Office" executed on January 27, 1997 as the "Phase I" lease.[7] (capitalization in original).

The Magna Main Post Office lease award was only for the construction of Phase I and the building plan awarded under the lease was the Phase I plan, as depicted above and in Joint Exhibit 67 on page 388. At trial, Frederick Stromness, the current President of Build Inc., testified that the USPS only awarded a lease for Phase I:

Q. And the Postal Service only awarded Phase I, correct?

A. [Frederick Stromness] That's correct, just Phase I.

According to the terms of the Magna Main Post Office lease, the lessor, Build Inc., agreed to lease to the USPS the following premises: "[t]he Westerly most 115,486 Square Foot Parcel of Land identified as Salt Lake County Parcel No. 14-20-379-004. . . . Together with the Southwest ½ of the Vacated County Road consisting of a 9,805 Square

---

[6] Richard John Stromness, who was the President of Build Inc. at the time the Phase I lease was signed, is now deceased and was the father of Frederick Stromness and the grandfather of Richard Daniel Stromness. At the time the amended complaint was filed in this case, Frederick Stromness was the President of Build Inc.

[7] Throughout their submissions to the court and during the trial proceedings, the parties have used various names and labels to refer to the Magna Main Post Office lease executed on January 27, 1997, including "MPO Lease" and "Phase I Lease." Similarly, the parties have used differing titles with regard to the lease for the District Training Center space, which was executed on January 18, 2000, as discussed in more detail below. The parties generally have referred to the District Training Center lease as the "Phase II Lease." In order to maintain consistency, uniformity, and clarity, the court refers to each of these two lease agreements using the titles identified in the separate lease agreement documents, specifically, the court will refer to the Magna Main Post Office lease and the District Training Center lease.

Foot Parcel of Land." The Magna Main Post Office lease stated that upon the described premises:

[I]s a SINGLE STORY FRAME BUILDING and which property contains areas, spaces, improvements, and appurtenances as follows:

| AREA | SQ. FEET |
|------|----------|
| Net Floor Space | 6,498 |
| Platform | 1,338 |
| Parking and Maneuvering | 13,860 |
| **Other:** | |
| Driveway | 50,047 |
| Landscaping | 43,085 |
| Sidewalks | 5,030 |
| Enclosed Cvd. Pkg. | 8,171 |
| **Total Site Area:** | 134,553 |

(emphasis and capitalization in original). The USPS agreed to pay Build Inc. an annual rent of $199,488.00 for the space. The lease provided that, as part of the rental consideration, Build Inc. was required to furnish the heating system, air conditioning equipment, light fixtures, sewerage system, electrical system, and water system.

The Magna Main Post Office lease included "General Conditions," such as Section A.21, "ALTERATIONS," which stated, in pertinent part:

The Postal Service shall have the right to make alterations, attach fixtures and erect additions, structures or signs in or upon the premises hereby leased (provided such alterations, additions, structures, or signs shall not be detrimental to or inconsistent with the rights granted to other tenants on the property or in the building in which said premises are located); which fixtures, additions or structures so placed in, upon or attached to the said premises shall be and remain the property of the Postal Service and may be removed or otherwise disposed of by the Postal Service.

(capitalization in original). Section A.22, "APPLICABLE CODES AND ORDINANCES" was another provision identified in the "General Conditions" of the Magna Main Post Office lease, which stated:

The Lessor, as part of the rental consideration, agrees to comply with all codes and ordinances applicable to the ownership and operation of the

building in which the rented space is situated and to obtain all necessary permits and related items at no cost to the Postal Service.

(capitalization in original). At trial, Frederick Stromness testified that Section A.22 required Build Inc. to meet all codes and ordinances as of the time of construction:

[Q]. As of the time of construction, it's you're understanding that the building has to meet all codes and ordinances, correct?

A. [Frederick Stromness] Yes, sir.

Q. And that includes all local codes and ordinances, correct?

A. Yes, sir.

Q. And by signing the lease, you agreed to Section A.22, correct?

A. Yes, sir.

Contracting officer Edward Bavouset testified:

[I]n this situation, the Postal Service was only a tenant here and not the owner of the facility, so the owner of this facility does not have any immunity from noncompliance. Yes, they have to comply with all local building codes. And we placed that responsibility on them in the general conditions of the lease under the previous paragraph you cited, A22.

Additionally, the construction was to comply with the requirements of the USPS handbook "RE-5," which contained security requirements for the facility. At trial, contracting officer Edward Bavouset explained that the RE-5 handbook, "covers security requirements for all postal facilities, and basically to meet Postal Service security requirements as identified by the Postal Service inspection service." Contracting officer Edward Bavouset testified that security is necessary to maintain the integrity of the United States mail "in order for the general public to be secure when they place any piece of mail in the United States Postal Service . . . ." According to the trial testimony, the USPS expects that all mail types will be secured from public access.

The Magna Main Post Office lease also included a "Construction Rider," "Maintenance Rider," "Tax Rider Reimbursement of Paid Taxes," and an "Option to Purchase Rider." The Construction Rider provided that "[n]o changes will be allowed in the building plan." Frederick Stromness confirmed, at trial, that the terms of the Magna Main Post Office lease disallowed changes to the building plan:

Q. And the building plan that was awarded under this lease was the Phase I plan, correct?

A. [Frederick Stromness] That's correct.

Q. So read in context, it would be fair to say that no changes will be allowed in the building -- the Phase I building plan, correct?

A. That's correct.

The Construction Rider stated that "[c]hanges or modifications which may be required during construction must be approved in writing by the contracting officer prior to proceeding with such changes." The Construction Rider identified Charlie Hubbert, as the "A/E Project Manager" and the contact person for any questions regarding the construction plans and specifications.

The Construction Rider included an attachment, which stated:

**DOCUMENTS FOR THIS PROJECT HAS [SIC] BEEN 100% DESIGNED.**

Within thirty (30) days after having received a copy of the accepted Lease, the lessor shall submit four (4) sets of the plans and specifications. These construction documents must be reviewed, stamped, and signed by an architect/engineer (A/E)-firm, licensed to practice in the State of Utah, and hired and paid for by the Lessor. . . . No changes will be allowed in the building plan.

(emphasis and capitalization in original). At trial, Keith LaShier, the manager of the Denver Facilities Service Office at the time the Magna Main Post Office lease was executed, explained the requirement for stamped drawings. He testified that stamped drawings are intended to demonstrate that a facility meets code requirements and that "[s]tamped drawing are provided by an architect who is involved or an architect/engineering firm involved in the preparation of the detailed drawings for a particular building, that could get licensed and certified."

The Tax Rider for the Reimbursement of Paid Taxes stated:

The Lessor agrees to pay all general real estate taxes levied on the land and buildings hereby demised. Upon final payment of the annual taxes due, the Postal Service will reimburse the Lessor, as additional rent, for all general real estate taxes applicable to any period of time within the term of this Lease.

The Tax Rider defined general real estate taxes as "those which are assessed on an ad valorem basis, against all taxable real property in the taxing authority's jurisdiction without regard to benefit to the property, and for the purpose of funding general government services."

At the time the Magna Main Post Office lease was executed, the USPS was the only anticipated tenant of the facility. During the trial, defendant's counsel asked Frederick Stromness about the intended use of the postal facility:

10

Q. Mr. Stromness, as of January '97 when this lease was executed, who were the expected tenants of the facility?

A. [Frederick Stromness] US Postal Service.

Q. Anybody else?

A. Not anticipated at that time.

Q. So if the Postal Service was the only tenant, the Postal Service would have exclusive right to the bathrooms, correct?

A. Yes, sir, at that time.

Q. And if the Postal Service is the only tenant, the Postal Service would have exclusive right to the parking, correct?

A. Yes, sir.

. . .

Q. And if the Postal Service is the only tenant, it's your understanding the Postal Service would have exclusive rights to the hallways, correct?

A. Correct.

As depicted in the Phase I floor plan included above, the planned Phase I space included the men's and women's restrooms as well as covered parking.

After the parties executed the Magna Main Post Office lease and a pre-construction meeting was held, in May 1997, Build Inc. began a four-month period of surcharging the soil on which the postal facility would be built.[8] At the trial held in the

---

[8] During the trial in the above-captioned case, Frederick Stromness explained "surcharging":

> [E]xtra-weight surcharge, if you will, in the form of imported soil is placed over the existing site where buildings are going to be. Prior to that soil -- extra soil surcharge being placed, you would put a settlement plate . . . . So what you're doing is squeezing the water out of the soils. And you do this because what you're trying to do with this surcharge is mimic the weight of the building. So when you remove the surcharge, then you construct the building. And it -- it does eliminate settlement in the building, and, of course, that's important because nobody wants a building to have settlement cracks.

Frederick Stromness also testified that "[i]t was a requirement to surcharge for both phases, for both Phase I and Phase II."

above-captioned case, Frederick Stromness testified that, during the four-month surcharging process, the Manager of the Administrative Services Office for the Postal Service's Salt Lake District Office, Wayne Christensen, told Build Inc. to "[b]uild Phase II," in addition to Phase I, and stated that he would "find the funding."[9] In response to defendant's interrogatories during discovery in this case, Frederick Stromness stated,

> Wayne Christensen, the Manager, Administrative Services, for the Postal Service's Salt Lake District told Dick [Richard John] Stromness (now deceased) in the presence of Frederick Stromness, his son and the managing member of Stromness MPO, LLC, Plaintiff in this matter, that he wanted Phase II constructed, that he would have funding for Phase II, and that if Dick Stromness built Phase II, Mr. Christensen would find a way for the Postal Service to pay for it.

Build Inc. proceeded to construct the Phase I and II combined space between May 1997 and January 1998, at Wayne Christensen's alleged agreement. The parties have stipulated that Build Inc. "proceeded to build Phase I and II combined as opposed to Phase I only," even though the Magna Main Post Office lease was for the construction and lease of Phase I only. According to the testimony of the contracting officer, Edward Bavouset, during construction of the Magna Main Post Office, Mr. Bavouset asked the Salt Lake City Administrative Services Manager, Wayne Christensen, if Build Inc. was constructing Phase II, and Wayne Christensen explained that, to his knowledge, only Phase I was being built.

Frederick Stromness testified during the trial that he believed Wayne Christensen had contracting authority to authorize the construction of Phase II, however, Frederick Stromness later realized that belief was erroneous:

> I felt at the time that reasonably Wayne had the authority -- the authority, and I didn't question it again. But I obviously understand that I'm not going to prevail on anything that Wayne's direction gave me, but I'd just say that I believed it to be reasonable that if Wayne was giving that direction, he was working with others in the Postal Service to gain the approval he needed or was needed from the Postal Service as a whole. I -- I'm not-- I'm not trying to argue with you, sir, the course of action was the correct course of action. It was not.

. . .

---

[9] Although the court was never informed why, neither party elected to have Wayne Christensen, who apparently was alive at the time of the trial, testify during the trial in the above-captioned case. Based on testimony received at trial, it appears that Wayne Christensen was a USPS employee at the time the Magna Main Post Office lease was executed, and that, subsequently, he became an employee of the Stromness family entities.

As we've established in the record, that myself and the Stromness group took Wayne's -- Christensen's direction and accepted it as valid. I also acknowledged that that direction was not a commitment from the Postal Service.

Frederick Stromness explained in his testimony:

In the early '97 time frame, we relied on Wayne Christensen and the direction we received. By later in 1997, Mr. Bavouset, Mr. Long and even others had 'well informed' us, is the term I'm using, that Mr. Christensen didn't have the authority and what we did was a mistake and an error. I acknowledge that.[10]

Similarly, during the trial, defendant's counsel asked Keith LaShier, the Manager of the Denver Facilities Service Office, about Wayne Christensen's role with regard to the Magna Main Post Office lease:

Q. Could he [Wayne Christensen] make modifications to the contract?

A. [Keith LaShier] No.

Q. Could he expand the facility to double the size?

A. No.

Q. And he could not do so because he did not have contracting authority, correct?

A. Correct.

The contracting officer for the Magna Main Post Office lease, Edward Bavouset, also testified that Wayne Christensen did not have the authority to direct the construction of Phase II:

[Q.] Assuming Wayne Christensen had informed Build, Inc. to proceed with Phase 2 construction, based on your experience as a contracting officer, would that be considered a contract modification to the Phase 1 lease?

---

[10] According to the trial testimony of Keith LaShier, the manager of the USPS Denver Facilities Service Office between 1992 and 2007, it appears that, "at some point while he was in Salt Lake city," Wayne Christensen had contracting officer authority up to $2.5 million, however, Wayne Christensen did not have contracting officer authority to execute a lease for the construction and leaseback for a postal service facility.

A. [Edward Bavouset] No, it would not, for a number of reasons, but primarily Mr. Christensen did not have contracting authority in this matter to make any changes on behalf of the United States Postal Service.

Q. But Build, Inc., what if Build, Inc. doesn't know whether Wayne Christensen had contracting officer authority or not?

A. Well, it's my understanding they know who the contracting officer was on this, they had been informed who the contracting officer is on this project, and they had substantial experience in dealing with the Postal Service before. So I think they had a pretty good understanding.

Q. And based on your understanding as a contracting officer, could there by a contract modification to the Phase 1 lease that was not written? Or let me restate that because that may be construed as leading. I don't mean to do that. Based on your understanding as a contracting officer, did contract modifications have to be in a particular form?

A. Yes, it would have had to have been written and executed by both parties.

Q. Does the Postal Service enter into oral contracts or modifications?

A. No.

Based on the testimony offered at trial, including the testimony of Frederick Stromness who identified that Stromness MPO erred in following Wayne Christensen's alleged "direction," a term chosen by Frederick Stromness, the court finds that Wayne Christensen did not have contracting officer authority to authorize construction or to authorize any changes to the existing Magna Main Post Office lease on behalf of the USPS, including the alleged "direction" to construct Phase II. Thus, because there was not an authorized change in the contract, or any other contractual document between plaintiff and the USPS authorizing the construction of the Phase II space, Build Inc. did not have authorization to construct Phase II.

As construction of the Magna Main Post Office was underway, on November 14, 1997, USPS project manager Charlie Hubbert held a meeting with Richard John Stromness regarding the construction of the Magna Main Post Office, during which Mr. Hubbert learned about changes to the building plans that Richard John Stromness was carrying out, including the construction of the Phase II space. During the trial, Frederick Stromness testified that, as of November 24, 1997, plaintiff was "taking steps to build out Phase II" even though Build Inc. "had not received authorization from Ed Bavouset [the contracting officer] or anybody in the Denver FSO [Facilities Service Office] to build out that Phase II" space. On November 24, 1997, Charlie Hubbert, wrote a letter to Build Inc. indicating his awareness that the contractor had taken steps to build Phase II and directing Build Inc. to complete Phase I as specified in the contract. The letter stated:

I realize that you have taken steps to build a shell on phase II, that you have expended additional money to do that. What I'm telling you is phase I must

be completed as specified and short-cuts in phase I will not be allowed to make up for the short fall you have in constructing phase II.

In the letter Mr. Hubbert also wrote: "You have said on numerous occasions that you are going to build and it will be safe and up to code. They are not the only requirements. The requirements that you have are to build this building as per plans and specifications." Mr. Hubbert explained that it was imperative for Build Inc. to "construct the building as per the plans and specifications," in order "[t]o protect the integrity of the competitive bid process and to be fair to other bidders." Mr. Hubbert wrote in the letter that he would "have on site a contract architect, mechanical engineer, structural engineer, civil engineer, and electrical engineer to ensure that the project is built per the plans and specifications."

In December 1997, a different USPS project manager, Michael Long, visited the Magna Main Post Office construction site and confirmed that Build Inc. was constructing Phase II. Contracting officer Edward Bavouset stated at trial that, when Michael Long reported that Phase II actually was being built, it caused him "to question everything about the project." Upon learning and confirming that Build Inc. had started construction on Phase II of the postal facility, on December 30, 1997, contracting officer Edward Bavouset visited the construction site and advised Build Inc. that it was not in compliance with the contract and was not authorized to build Phase II.

In a letter to Build Inc. on January 2, 1998, contracting officer Edward Bavouset stated that he had "concerns that the project is not being developed according to the terms and conditions of the lease awarded to you [Build Inc.] on January 21, 1997." Contracting officer Edward Bavouset further wrote:

> As you acknowledged during our on-site meeting, any deviations you have taken from the requirements of your contract are at your own risk and are not contractual commitments of the Postal Service. These deviations were not requested, nor authorized by the contracting officer. Furthermore, I want to clearly relay to you that the only person authorized to make changes to the subject contract is me, as contracting officer.

At trial, contracting officer Edward Bavouset was asked about the January 2, 1998 letter and explained that, during his onsite meeting with Build Inc., "[t]hey [Build Inc.] basically told me they took those deviations for their own benefit. They had on-site crews, and Mr. [Richard John] Stromness stated he did not want to have to go through remobilization." Frederick Stromness also was asked about the January 2, 1998 letter at trial, and he testified that the letter accurately described that Build Inc. had deviated from the requirements of the Magna Main Post Office lease and that those deviations were at its own risk:

> Q. Now, I want to point your attention to the third paragraph of this letter. It reads: As you acknowledged during our on-site meeting, any deviations you have taken from the requirements of your contract are at your own risk and are not contractual commitments of the Postal Service. Did I read that correctly?

A. [Frederick Stromness] You did.

Q. And your understanding was this was a true statement, correct?

A. Yes, sir.

Q. And in other words, Build Inc. had acknowledged that the deviations in proceeding with Phase II construction were at its own risk, right?

A. Yes, sir.

The January 2, 1998 letter also provided that the project manager, Charlie Hubbert, was being replaced by contracting officer representative Michael Long. A letter on January 12, 1998 later explained: "Michael Long is the Project Manager designated on January 2, 1998 for this project and he will serve as the single-point-of-contact between the lessor and the USPS during the remainder of the construction of the facility."

On January 12, 1998, the USPS sent another letter to Build Inc. directing it to stop work on the Magna Main Post Office project. The letter to Build Inc. stated that only the contracting officer could make changes to the contract and that "**[t]here have been no contract modifications made to the agreement to lease to date.**" (emphasis in original). The letter stated that "the building configuration being constructed is Phase II/Alternate Bid 1 in lieu of Phase I as contracted to be constructed by the agreement to lease." Contracting officer Edward Bavouset testified that the construction of Phase II "changed the layout of the floor plan." The January 12, 1998 letter instructed Build Inc. to "provide a preliminary revised floor plan by January 16, 1998 showing your [Build Inc.'s] recommendation to implement the intent of the Phase I drawings into the Phase II shell presently constructed." The letter directed that "**[n]o further work** shall proceed until the revised floor plan has been submitted and approved by the Contracting Officer." (emphasis in original).

At trial, defendant's counsel questioned contracting officer Edward Bavouset about the intent of the phase I drawings, as referred to in the January 12, 1998 letter:

Q. I'd like to talk to you about your use of the phrase "intent of Phase 1 drawings." What was the intent of the Phase 1 drawings with respect to the use of the bathrooms?

A. [Edward Bavouset] They were there for exclusive use of the United States Postal Service.

Q. What was the intent of the Phase 1 drawings with respect to the use of the hallways?

A. The same, for the United States Postal Service.

Q. And what was the intent of the Phase 1 drawings with respect to the use of the parking?

16

A. Once again, it would have been for the benefit of the United States Postal Service.

Following the issuance of a stop work order on January 12, 1998, Build Inc. and the USPS worked towards a resolution to address the unauthorized construction of the Phase II space. At trial, contracting officer Edward Bavouset testified that he "was making efforts to negotiate terms and conditions with Mr. Stromness . . . to hopefully see a successful completion of this project so we could turn over a functioning post office to our operational client." Contracting officer Edward Bavouset stated that, "as a result of Build, Inc. proceeding with Phase 2 without authorization, it impacted what we actually had contracted for. So we needed to make sure that the Postal Service could be made whole on what we contracted for, and Build, Inc. is representing here that that would not be a problem."

Build Inc. and the USPS exchanged correspondence between January 1998 and October 1998 to address the future of the Magna Main Post Office project. As part of these discussions and at the request of the USPS, on March 27, 1998, Build Inc. submitted two alternative price proposals, the first for a modified Magna Main Post Office lease, and the second for an annual lease of the entire Phase II space:

1. **Revised annual lease on Phase I. This price is inclusive of:**

- Concrete paving in place of asphalt paving

- Fencing

- Investigative Mezzanine Office

- CCTV System Based on $175,000.00

- Approximately 1,500 Sf of additional space

**Total = $234,851.00 Annual Rent**

2. **Annual lease on Phase 2 complete. This price is also inclusive of:**

- Concrete paving in place of asphalt paving

- Additional Fencing

- Investigative Mezzanine Office

- CCTV System Based on $175,000.00

**Total = $323,231.00 Annual Rent**

(emphasis in original). In a letter sent on March 30, 1998 from Build Inc. to the USPS regarding the two price proposals, Build Inc. explained:

Pursuant to your request to explain the monetary difference between Phase II pricing at bid time and the Phase II pricing currently being requested, Build Inc. offers the following comments:

. . .

Build Inc. solely elected to construct the Phase II portion of the Magna, Utah facility to permit more efficient construction based on economy of scale and to avoid demolition to a portion of the Phase I structure, landscaping, sitework and drainage features at a later date. It was Build Inc.'s intent to either utilize the Phase II portion of the structure as additional office space for its expanding construction operations or to lease all or a portion out as a professional office space or storage space.

When Frederick Stromness was asked about the March 30, 1998 letter at trial, he explained:

So now, by the time we get to the March 30th, 1998, we're-- we're in the position of no longer claiming that Mr. Christensen directed this work, even though that was true in '97, in early '97. We learned of our mistake. So now we've constructed Phase II. Stromness has constructed Phase II. The post office is aware of it, and we're having a conversation with Mr. Bavouset and explaining to him what we're going to do with this space.

. . .

And I think our purpose in sending this to Mr. Bavouset is -- particularly that paragraph, is to tell him, We [sic] want to use the space ourselves. We want to be able to lease it to others. You know, we made a mistake. Let's work through this, which we did.

On June 3, 1998, approximately six months after the USPS issued the stop work order, the USPS sent a letter to Build Inc. indicating that it was considering four options as to how to proceed with the Magna postal facility including, (1) approval of the project as originally awarded with no changes; (2) approval of the Magna Main Post Office space, as modified; (3) approval of Phase II; or (4) termination of the Magna Main Post Office lease for default.

While the stop work order was in place and the USPS was considering how to proceed with the Magna Main Post Office lease, the USPS determined that it needed additional space in the Magna postal facility. In a memorandum dated June 8, 1998, Keith LaShier, the manager of the Denver Facilities Service Office at the time, explained the need for additional space at the Magna postal facility:

The District had requested a closed merchandising Postal Store on their original DAR [Decision Analysis Report]. Subsequently, it was determined that there was sufficient revenue to justify an open merchandising concept. Approval has been obtained from HQ Retail to provide for the open

merchandising layout. By converting from "closed" to "open" merchandising additional square footage in the building is needed.

…

Initially it was believed it was not necessary to have a CCTV [Closed Circuit Television] system and Inspection Service surveillance rooom [sic]. Later, instructions from the Inspection Service indicated this system was required to be built into the original building structure. This requirement further added to the additional space requirements.

A subsequent memorandum, dated June 19, 1998, also signed by Keith LaShier, stated that "having Lessor/contractor perform according to the original contract award will not accommodate postal requirements. Floor space necessary for open merchandising negatively impacts workroom space." The memorandum described a "modified Phase I," which would include "an additional 1,500 square feet to accommodate space requirements" for a revised annual rent of $234,851.00, and stated "the modified Phase I (additional annual rent of $35,451) proposal would meet operational requirements." Keith LaShier explained that the additional 1,500 square feet would be located in "what would have previously been considered Phase II space." The USPS approved "Amendment No. 1" to the Magna Main Post Office lease to include an additional 1,500 square feet of space and increased annual rent of $234,851.00.

Having determined that additional square footage would be used in the Magna Main Post Office, the USPS and Build Inc. negotiated "Amendment No. 1" to the Magna Main Post Office lease. During these negotiations, the USPS notified Build Inc. that there was no approval or funding to lease the entire Phase II space, but that the USPS would be amenable to discussing Build Inc.'s ability to lease the unused portion of Phase II to another tenant. Contracting officer Edward Bavouset and Build Inc. negotiated various terms of "Amendment No. 1," including the square footage to include in the Magna Main Post Office modified space, as well as rental amounts for the modified Magna Main Post Office space and for the new Phase II space. During these negotiations, in a letter dated September 25, 1998 and signed by Frederick Stromness, Build Inc. explained:

Build Inc. constructed the phase II portion of the project for <u>site settlement</u> reasons based upon generally accepted engineering principles, which were reviewed with the geotechnical consultant. Build Inc. was <u>very clear</u> at all times that the USPS had no obligations to lease the space available in phase II. Build Inc. was also <u>very clear</u> at all times that there would be no difficulty implementing phase I into the phase II shell. On January 12, 1998, the USPS requested a floor plan indicating how phase I would be implemented into the phase II building as constructed. Build Inc. immediately complied and the submitted floor plan was and still is acceptable to all of the parties involved.

(emphasis in original). Ultimately, these negotiations resulted in "Amendment No. 1" to the Magna Main Post Office lease. According to Frederick Stromness, the amendment to

the Magna Main Post Office lease was the result of discussions between Frederick Stromness and the USPS, specifically contracting officer Edward Bavouset, "over the course of a number of months." Exhibits submitted as evidence during trial demonstrate that, during these negotiations, the USPS and Build Inc. both contributed to the language of the final Magna Main Post Office lease amendment for the additional space.

On October 26, 1998, ten months after the USPS issued the stop work order on January 12, 1998, the USPS and Build Inc. executed "Amendment No. 1" to the Magna Main Post Office lease, which the parties refer to as the "Phase I Lease Amendment." On August 25, 1998, the USPS issued a Notice to Proceed letter to Build Inc. for the Magna Main Post Office.

The Magna Main Post Office Lease Amendment

"Amendment No. 1" to the Magna Main Post Office lease was signed by Mr. Keith LaShier, on behalf of the USPS. At trial, Mr. LaShier explained that he signed the amendment, instead of contracting officer Edward Bavouset, because "Mr. Bavouset was negotiating directly with the contractor to resolve the disputes. And since he was negotiating, it would be inappropriate for him also to be the contracting officer, so we had to have a separation of duties." Contracting officer Edward Bavouset stated that "it would not be fair and reasonable for me to sign something I negotiated that was involved in the negotiations as a contracting officer."

According to the parties, there is not a true and original version of the Magna Main Post Office lease document as it existed before "Amendment No. 1" to the Magna Main Post Office lease. The Magna Main Post Office lease amendment was executed on the same document as the original Magna Main Post Office lease, such that the same, single document represents the Magna Main Post Office lease, as originally executed in 1997, and the subsequent Magna Main Post Office lease amendment, which was executed in 1998. At trial, the parties agreed, that, when MPO Leasing and the USPS amended the Magna Main Post Office lease, "they made changes on the Phase I Lease, so we don't have the Phase I Lease as it existed separately and then the Phase II Lease Amendment. They appear together in the same document with -- with sequential agreement." The parties agree "that [Joint Exhibit] JX 1 is a complete Phase I Lease and Phase I Lease Amendment."

The Magna Main Post Office lease amendment explained that, "[a]s a result of the USPS requiring additional net interior space, and the Lessor proceeding with Phase II construction, without authorization, a situation was created that requires amending said lease. Lessor has acknowledged that he proceeded with Phase II construction without authorization." "Amendment No. 1" provided that "[t]he additional net interior square footage provided under this lease amendment shall be 1,500 square feet."

The lease amendment stated the following:

WHEREAS the Postal Service desires and Lessor is willing to: Amend the original lease to include additional square footage, and the following

improvements; perimeter security fencing, change from asphalt to concrete in all paved areas, and CCTV Inspection Service system and Criminal Investigation Room (Lessor's lease cost for the CCTV & Criminal Investigation Room are based on $175,000, which is included in the new amortized lease rate.)

The original square footage, as awarded was 6,498 net square feet floor space, 1,338 net square feet platform, and 8,171 net square feet enclosed covered parking, for a total of 16,007 net square feet under roof and available for postal use.

(capitalization in original). The lease amendment included "Exhibits 'A' & 'B'." Exhibit A identified the revised square footage and space, and the additional 1,500 square feet of net interior space was "identified on the attached floor plan (exhibit 'A') as 'new area.'" The lease amendment described the additional 1,500 square footage: "This additional finished square footage (1,500) is located in the area that was originally identified as covered enclosed parking (8,171 net sq.ft.) and was covered in the original lease." In addition to the 1,500 of "new area," the lease amendment stated, "[t]he Lessor shall provide approximately 255 net sq.ft. of space identified as 'corridor' on the attached floor plan (exhibit 'A'). This space was also part of the original lease, and identified as covered enclosed parking."[11]

The lease amendment described the new net interior square footage of the modified Magna Main Post Office space:

The new net interior sq. ft. will reflect the original number of 6,498, plus 1,500 sq. ft. (additional required footage for postal operations) and 255 sq. ft. (corridor space) for a total net interior square footage of 8,253. It is specifically noted that the net interior square footage available for postal operations is 7,998 net interior square feet. The additional 255 (corridor space) is necessary for the functional use of the facility.

The lease amendment continued:

Additionally, the Lessor shall provide use of the women's bathroom and locker room (661 sq. ft.), and carrier vestibule (425 sq. ft) and maintenance storage area east of the carrier vestibule. This use is necessary due to Lessor proceeding with Phase II construction, and the fact that the Postal Service has agreed to allow the Lessor to lease the previous controlled enclosed carrier parking, and, is structured to minimize modifications by

---

[11] Exhibit B to the lease amendment identified certain items that would be "compensated in a lump sum amount of $51,000.00."

Lessor. Furthermore, it is noted that this space was included in the original lease and identified as covered enclosed parking.

At trial, Keith LaShier discussed use of the restrooms, carrier vestibule, and the maintenance storage area according to the lease amendment:

Q. And when you signed this lease amendment, it was typically the case that the Postal Service would require exclusive use of the restrooms, correct?

A. [Keith LaShier] Yes.

Q. And this Lease Amendment did not change the previous understanding of the original Phase I Lease that the restrooms were for the US -- use of the Postal Service, correct?

A. No change.

Q. So to clarify, yes, there was no change to the previous understanding that their restrooms were for the use of the Postal Service, correct?

A. That's correct.

Q. And are you familiar with the carrier vestibule?

A. Yes.

Q. The carrier vestibule in the Magna facility was for the intended use of -- intended exclusive use of the Postal Service, correct?

A. Yes.

Q. And the maintenance storage area was for the exclusive use of the Postal Service, correct?

A. Yes.

"Amendment No. 1" also stated that covered parking on the East and West side of the facility was available for postal use. Pursuant to the lease amendment, "[o]ther modified space as a result of the Phase II work, including the site, covered parking, men's restrooms, platform, carrier loading, covered parking, etc., is included under this lease and amendment."

The revised annual rent amount for the modified Magna Main Post Office space was $234,851.00, and "Amendment No. 1" provided for starting rental payments retroactive to April 1, 1998. According to the testimony of Frederick Stromness at trial:

The higher rent of [$]234,851 is a result of the negotiation between Mr. Bavouset and myself where -- you know, if we read the lease, you'll see

where they required additional space and different things, and we incorporated some of those items into the -- amortized over the lease period; and other items there was a lump sum payment. So there was some give-and-take on how we -- the Postal Service got everything it wanted, and the lease amount is [$]234,851.

Exhibit A of the Magna Main Post Office lease, as amended, depicted the revised floor plan:[12]

---

[12] When viewed in its color version, the floorplan diagram in Exhibit A to the Magna Main Post Office lease, as amended, depicts certain areas colored yellow and blue, as well as two red "X" areas. There was no contemporaneous explanation in the Magna Main Post Office lease amendment for the use of yellow and blue on certain areas of the diagram, and other contemporaneous evidence does not provide any guidance. Although Frederick Stromness testified at trial that the yellow and blue areas on the diagram depict "shared" space that could be leased to a non-postal tenant, there is no other evidence before the court to explain the meaning of these colors, and, as a result, the purpose of the yellow and blue colors remains unclear.  With regard to the red "X" areas, the Magna Main Post Office lease amendment explains that this area depicts the square footage that was not available for use by the USPS when the Magna Main Post Office lease amendment was executed by the parties. As such, the court understands that the red "X" area is designated as space that was not available for postal use at the time the Magna Main Post Office lease was amended on October 26, 1998.



Joint Exhibit 73, page 484

The revised floor plan was different than the Phase I floor plan contemplated in the original Magna Main Post Office lease, as depicted above and illustrated in Joint Exhibit 67 at page 388, because of the additional unauthorized construction carried out by Build Inc. In constructing the Phase II space, Build Inc. did not adhere to the original Phase I building plan. As a result, the location of various rooms and utilities differed from the Phase I building plan. As Exhibit A illustrates, the women's restroom and locker room is located in the area that was intended to be covered parking under the Phase I building plan. Similarly, the carrier vestibule and the maintenance storage areas also are located in the area that was intended to be covered parking under the Phase I building plan.

"Amendment No. 1" described the area in the building that would "not be available for postal use," which was estimated to be "approximately 5,000 net sq. ft." Contracting officer Edward Bavouset explained at trial that, under the original Magna Main Post Office lease, "the Postal Service solicited for and contracted for exclusive space of the entire location," however, because Build Inc. also constructed the entire Phase II area, and the USPS could not justify leasing the entire Phase I and II area combined, the USPS would not occupy the entire space. Pursuant to the lease amendment, the USPS would not occupy the space marked with the red "X"s in Exhibit A, which, under the original Magna Main Post Office lease, was designated as covered parking space.

> The area located above the "new area", and identified by "red x" on the attached floor plan (exhibit "A") will not be available for postal use. This area is approximately 5,000 net sq. ft. Even though this area was included in the original lease, identified as covered enclosed parking, it will not be available since the Lessor proceeded with Phase II construction.

The lease amendment prescribed: "[t]he Lessor shall secure the unoccupied space in any manner he deems appropriate." At the time the lease amendment was executed, there was not an approved project for the USPS to rent the additional, unoccupied space. Although this specific portion of the building would not be available for postal use, the lease amendment stated: "However, it is specifically noted that the Postal Service will not be deprived of use as intended in the original lease."

After the execution of "Amendment No. 1," the parties referred to the "red 'x'" space that was not leased by the USPS as the "Phase II" space. Mr. LaShier testified that the use of the term "Phase II" in the lease amendment was different than the "Phase II" referred to in the solicitation and the original building floor plan.

At trial, contracting officer Edward Bavouset explained the difference between the space contracted for in the original Magna Main Post Office lease and the space as modified by the lease amendment:

> Well, under the original lease and solicitation, the Postal Service solicited for and contracted for exclusive space of the entire location. As a result of the lessor's actions proceeding with Phase 2, which was not authorized, it created some problems for us. So as a result of this lease amendment, we took off what has previously been identified in Exhibit JX-73 as identified by the red Xs on the right side, space that the Postal Service would not occupy. And that's what was covered under this lease addendum.

Frederick Stromness explained the square footage included in the Magna Main Post Office lease, as amended:

> [T]he bigger yellow box is definitely leased by the Postal Service, and it [the lease] lists two of the other areas. I might be able to tell just by looking at the square footages. But in the actual lease, there's language that states that Stromness is going to provide that area in order that functional use of

25

Phase I can be obtained by the Postal Service in the Phase I-Phase II combined building. So this was part of the negotiation that Mr. Bavouset and I had, that we agreed to provide space that wasn't included specifically in their square foot rental. And I believe the way it turned in the lease -- . . . but that's in exchange for allowing Stromness to lease the Phase II space.

When Frederick Stromness was questioned further about his understanding of the square footage included in the Magna Main Post Office lease, as amended, he testified that the USPS was leasing the additional 1,500 square feet of new area but that Build Inc. was "donating" the use of the women's restroom, the carrier vestibule, and the corridor area:

Q. Are you saying, in effect that they [the USPS] were leasing the big yellow box, but you were donating the two blue boxes and the smaller yellow box?

A. That's my -- that's my testimony.

In addition to modifying the square footage of the Magna Main Post Office, the lease amendment explained that the lessor would be able to lease the "'Phase II' space" subject to the following conditions:

a)   Lease use shall be compatible with postal use and shall not be considered a competing business;

b)   any lease shall contain a termination clause (nine months notice) to the Postal Service's benefit, in the event the Postal Service requires said space;

c)   Postal Service shall have right of first refusal for subject space, right of first refusal shall be exercised by Postal Service within 60 days upon notification by Lessor of lease for subject space;

d)   In the event said space is leased, Lessor shall install a demising wall separating postal and leased space, said wall shall be constructed to RE5 security requirements, tenants shall not have any access to postal space, including secured parking and maneuvering area;

e)   Up to 10 parking spaces shall be available for tenant in public customer parking area;

f)   Postal Service shall not have any liability concerning legal actions, claims, and torts as a result of tenant's and/or tenant's customer's use of leased space.

All systems, utilities, and access supporting the unoccupied postal space shall not affect, or be a part of this lease.

At trial, Keith LaShier was asked about the reference in paragraph d) to "postal space":

> Q. The reference to the portion of (d) in the last paragraph on page 6, it states: Tenant shall not have any access to postal space. Do you see that?
>
> A. [Keith LaShier] I do.
>
> Q. The reference to "postal space" refers to all space that the post office is renting, correct?
>
> A. Yes.
>
> Q. And the bathrooms constitute postal space, correct?
>
> A. Right.
>
> Q. And the maintenance area, new area and corridor would all be postal space, correct?
>
> A. Correct.
>
> Q. And in your understanding, is the space -- if the space was rented to a third party, they would not have access to the bathrooms, correct?
>
> A. Based on this language, yes.
>
> Q. And you signed this language, right?
>
> A. I did.

Frederick Stromness testified that the lease amendment permitted Build Inc. to lease the Phase II space and contemplated "shared space":

> So we've been granted the right by the agreement to lease the entire Phase II space, which includes some space the Postal Service is using in Phase I and other space that Stromness has given. And I'm saying that I believe -- my interpretation is that the Phase I Magna Main Post Office lease, with its addenda, anticipates shared space.

Additionally, the lease amendment referred to a Closed Circuit Television (CCTV) system. After the execution of the original Magna Main Post Office lease, the USPS Inspection Service determined that a CCTV system was required to be built into the original building structure. This requirement further added to the additional space requirements. At trial, Frederick Stromness explained that the USPS determined it needed CCTV installed throughout the facility and the CCTV cameras were "included in the lease. We had to amortize that, I believe." Defendant's counsel questioned Frederick Stromness about the payment for the CCTV system:

Q. Do you see the "whereas" clause references a CCTV and criminal investigation room? Do you see that?

A. [Frederick Stromness] I do.

Q. And the C -- this CCTV was baked into the rent that the Postal Service was paying to Build Inc.; is that correct?

A. Yes, sir.

Q. And the Postal Service is continuing to pay amounts under the Phase I Lease Amendment; is that correct?

A. Yes, sir.

Q. And Stromness is claiming damages for some CCT cameras -- some CCTV cameras; is that correct?

A. Yes, sir.

Q. And those are the same CCTV cameras that are promised under this lease agreement, correct?

A. Yes, sir.

The lease amendment also modified the Tax Rider attached to the original Magna Main Post Office lease. The lease amendment explained that, if the unoccupied space was leased by the lessor, as permitted by the lease, than the reimbursement of taxes for the property would be prorated according to the following formula:

tenant leased space (5,000 net sq. ft.) divided by 16,007 net sq. ft. = 31 percent of tax bill that the Lessor shall be responsible. Additionally, since the Postal Service has the benefit of the additional Phase II items, as stated above, the Lessor percentage responsibility shall be reduced an additional 10 percent to reflect this benefit.

At the time the lease amendment was executed, there was no visible separation, such as a wall or partition, between the modified Magna Main Post Office space and the unoccupied space. According to Frederick Stromness, "[t]he space was open between the space the post office was leasing and utilizing and the space that the Postal Service determined they did not want to lease at the time the Phase I lease was signed, which is October of '98." Referring to Exhibit A, attached to JX 73, Frederick Stromness stated:

The walls did not exist at the time of the lease. And I will clarify by stating that below the left side of the larger yellow box that has the words "new area" upside down in them, specifically more below the area -- the word "area," you will see four office spaces. Those walls were in place, but the other half of the yellow box below "new," there was no wall.

Three days after the lease amendment was executed, a "Design Variation/Clarification Request" (DVCR) was issued to Build Inc. This DVCR stated: "The 'extra' space not leased by the USPS, must be enclosed – this can be done with an 8' high chain-link fence."[13] According to contracting officer representative Michael Long, the United States Inspection Service requested the construction of the fence "to ensure the safety of the mail," and "Build Inc. constructed the fence" as "part of their modified contract."

On February 2, 1999, contracting officer representative Michael Long inspected the modified Magna Main Post Office space. Contracting officer representative Michael Long explained that, when he was conducting the inspection, he saw a "chain-link fence erected that was about 12 feet high that delineated the Phase I modified space from the Phase II space." Mr. Long stated that he did not inspect the unoccupied Phase II area on the other side of the fence because "[t]here wasn't any way for us to actually access that space because the chain-link fence," and "it was not really relevant to the acceptance of the Phase I modified space" to inspect the Phase II space. At trial, Frederick Stromness, however, had no recollection about a fence separating the Magna Main Post Office space from the remaining Phase II space: "I never saw a fence, nor did I see any indication of a permanent-type separation being fastened to the floor with any bolts. There's no damage to the floor in that area, as I routinely visited the space for maintenance or other reasons."

The USPS "accepted" the modified Magna Main Post Office space and took "beneficial occupancy" of the space identified in the Magna Main Post Office lease, as amended, on February 6, 1999. Thereafter, "[o]n or around October 1, 1999, Defendant agreed to a name change for lessor under the Phase I Lease from Build, Inc. to MPO Leasing," such that, after October 1, 1999, the lessor was MPO Leasing.

On January 10, 2001, the USPS and MPO Leasing executed "Amendment No. 2" to the Magna Main Post Office lease, as amended.[14] This amendment was intended to "[c]hange the existing Reimbursement Tax Rider to a Percentage Reimbursement Rider, to more accurately reflect Main Office occupancy of Parcel #14-20-379-006-000." "Amendment No. 2" changed the property tax percentage for the Magna Main Post Office to 66.5%. The amendment stated: "The Postal Service will reimburse Lessor 66.50% of the total paid Real Property Taxes . . . ."

---

[13] At trial, contracting officer representative Michael Long explained that the architectural engineering firm Frank Murdock & Associates issued the DVCR, and that the firm was contracted by the USPS to "look after . . . the design of this project as well as the construction."

[14] Contracting officer Edward Bavouset signed lease "Amendment No. 2" on January 11, 2001.

District Training Center Lease

In November 1999, approximately eight months after the USPS took beneficial occupancy of the modified Magna Main Post Office space, the Salt Lake District requested a training center space to support their employees and staff throughout the entire District. Subsequently, in order to fulfill this request, the USPS decided to lease the unoccupied Phase II space at the Magna postal facility. In a memorandum dated December 14, 1999, the USPS acknowledged that "[t]he Salt Lake City District is in dire need of a training facility to provide the ongoing and incidental Postal training required," and determined that "[i]n reviewing available space throughout the Salt Lake City area . . . the space available for lease at 8574 W. 2700 S. in Magna, Utah would most suit our training needs; is available at fair market value; and could be ready expeditiously." The December 14, 1999 memorandum explained that the USPS needed the "facility to be functional as close to January 10th as possible."

The USPS and MPO Leasing negotiated a lease for the District Training Center space between December 1999 and January 2000, and, on January 18, 2000, contracting officer Edward Bavouset and MPO Leasing executed a lease. The parties refer to the District Training Center lease as the "Phase II" lease.[15] The lease agreement identified the "Facility Name/Location" as "SALT LAKE CITY – DISTRICT TRAINING CENTER," and the agreement also indicates that it was labeled "Project: E35434." (capitalization in original). The District Training Center lease provided that "[t]he Lessor hereby leases to the Postal Service and the Postal Service leases from the Lessor the following premises, hereinafter legally described in paragraph 8." Paragraph 8 provided the legal description of the premises as:

> A portion of the Westerly most 115,486 square foot Parcel of Land identified as Salt Lake County Parcel No. 14-20-379-004 together with the Southwest 1/2 of the vacated County Road consisting of a 9,805 square foot parcel of land. Located in Salt Lake County, UT. Also know [sic] as 8450 W 2700 South, Magna, UT. 84044-9998.

During the lease negotiations, MPO Leasing sent a fax identifying the square footage for the training center as "5,143.5." At trial, Frederick Stromness was asked about this fax and the square footage calculation:

> Q. And you would agree that the calculation, for what appears to be the district training space, adds up to 5143, setting aside the partial feet or inches; is that correct?

> A. I'll agree with that.

---

[15] As discussed above, the court notes that the way in which the parties referred to the amendments and the Phase I and Phase II leases was not always consistent. To bring uniformity, and in reliance on the actual lease document, the court refers to this agreement as the District Training Center lease.

. . .

Q. And regardless of who prepared these specific calculations, you sent them to the Postal Service to represent the calculation for the Magna facility, correct?

A. Yes.

Q. And you would not provide the Postal Service inaccurate information regarding calculations at the Magna facility, correct?

A. Correct.

As executed, however, the District Training Center lease stated that, upon this land parcel, was a "one story brick/block building" described as follows:

| AREA | SQ. FEET |
|---|---|
| Net Floor Space | 5,374 |
| Platform | |
| Parking and Maneuvering | 2,000 |
| **Other:** | |
| Driveway | |
| Landscaping | |
| Sidewalks | |

Hallways, restrooms, parking shared by tenants.

**Total Site Area:**        7,374

(capitalization and emphasis in original). When Frederick Stromness was asked about the discrepancy in the square footage numbers at trial and why the District Training Center lease described the space as 5,374 square feet and not 5,143 square feet, he was unable to offer an explanation. Nor did defendant offer any witnesses to explain the basis for the 5,374 square foot measurement in the executed District Training Center lease.

Attached to the District Training Center lease was Exhibit A, admitted as Joint Exhibit 2 page 43, which depicted the floor plan for the District Training Center space:



Joint Exhibit 2, page 43

The District Training Center lease had a base period of five years, from January 1, 2000 to December 31, 2004. The annual lease rental rate was $108,149.00 per year. The terms of the lease provided that the lessor, MPO Leasing, would "reimburse Postmaster of Magna MPO for prorata share of utilities," including "Heating System, Air Conditioning Equipment, Light Fixtures, Sewerage System, Electrical System, Water System," and explained that the percentage of usage for the District Training Center space was 33.5%.

Like the Magna Main Post Office lease, as amended, the District Training Space lease was subject to "General Conditions," which included clauses regarding alterations and applicable codes and ordinances. Clause "A.21 ALTERATIONS," stated, in pertinent part:

> The Postal Service shall have the right to make alterations, attach fixtures and erect additions, structures or signs in or upon the premises hereby leased (provided such alterations, additions, structures, or signs shall not be detrimental to or inconsistent with the rights granted to other tenants on the property or in the building in which said premises are located) . . .

(capitalization in original). Clause "A.22 APPLICABLE CODES AND ORDINANCES," stated:

> The Lessor, as part of the rental consideration, agrees to comply with all codes and ordinances applicable to the ownership and operation of the building in which the rented space is situated and to obtain all necessary permits and related items at no cost to the Postal Service.

(capitalization in original). Additionally, attached to the District Training Center lease was a Tax Rider, which explained that the USPS was required to reimburse MPO Leasing 33.5% of the total paid real property taxes.

After the District Training Center lease was executed on January 18, 2000, the fence erected between the Magna Main Post Office space and the previously unoccupied space was removed. As defendant's expert Kenneth Downes explained at trial, "the space was opened up so that the training space had access to the exits and the phase 1 portion of the lease." The parties have stipulated that, once the District Training Center lease was executed, the USPS built out the District Training Center space and constructed walls, including walls intended to partially, but not entirely, separate the Magna Main Post Office space from the District Training Center space. The USPS also constructed the walls that separated the training rooms and offices within the District Training Center space. None of these walls completely separated the Magna Main Post Office space from the District Training Center space. Frederick Stromness stated that the area between the Magna Main Post Office space and the District Training Center space "remained open after the training center occupied the space, with unfettered access" between the spaces.

On July 31, 2002, the USPS and MPO Leasing executed "Lease Amendment No. 1" to the District Training Center lease in order to extend the terms of the lease for a term beginning January 1, 2006 and continuing until December 31, 2012, at an annual rental rate of $108,149.00. As a result, the contract expiration date for the District Training Center lease was extended eight years, from December 31, 2004 to December 31, 2012.

Approximately 10 years after the USPS and MPO Leasing executed the District Training Center lease, in February 2010, the Magna Main Post Office lease, as amended, and the District Training Center lease, as amended, were both assigned to plaintiff, Stromness MPO.

In 2010, two years before the District Training Center lease, as amended, would expire, the USPS began considering whether to renew the District Training Center lease, as amended, upon the expiration of the base period on December 31, 2012. On September 8, 2010, the USPS offered to renew the District Training Center lease with plaintiff for a reduced rental rate of $50,000.00, which would be effective on January 1, 2013, the day after the expiration of the base period. Plaintiff rejected the USPS's offer.

On December 23, 2010, the USPS completed a "node study" concerning the District Training Center. According to trial testimony, a "node study" is an internal USPS study "basically for cost savings. They look at consolidation of facilities to either reduce lease costs or to move people out of lease space in a postal-owned [s]pace. Sometimes it's about downsizing, so it's really all about cost savings." The "node study" recommended termination of the District Training Center lease, as amended, upon its expiration on December 31, 2012 and that the training center be relocated to Draper, Utah. As a result of the "node study," the USPS intended to vacate the District Training Center space when the base period of the lease expired on December 31, 2012, and to relocate the training center to the postal facility in Draper, Utah.

On September 4, 2012, more than two months before the District Training Center lease, as amended, was scheduled to expire, the USPS issued a notice of termination to plaintiff regarding the "MAGNA – DISTRICT TRAINING CENTER," or the Phase II lease agreement. (capitalization in original). The notice explained that "the [District Training Center] Lease will terminate upon its expiration date, 12/31/2012." The notice of termination stated: "[T]he Postmaster will arrange to have the meters read and the utilities disconnected. All postal equipment will be removed by the above date, and the keys will be mailed or delivered to you."

After plaintiff received the notice of termination, plaintiff made efforts to continue the District Training Center lease, as amended, beyond the expiration of the base term. On December 6, 2012, Real Estate Asset Counseling, Inc. (REAC), a consulting firm hired by plaintiff, sent a letter to then USPS contracting officer Candace Kinne offering the space for $70,000.00 a year for a five-year term.[16] In the letter, REAC stated that "[s]eparating the space proposed for termination is a costly venture" and that "[t]he Lessor's architect has developed a cost estimate of $290,590" to divide the training space from the main post office space. The USPS rejected plaintiff's offer.

On December 20, 2012, plaintiff's counsel, Mr. Hughes, wrote to contracting officer Candace Kinne and requested that the USPS reconsider and withdraw its notice of termination or postpone the termination for 90 days so that the parties could "discuss a resolution." In this letter to the contracting officer, plaintiff's counsel alleged that the District Training Center lease, as amended, was created merely to "paper over" a problem created during construction at the Magna Post Office facility. The letter stated that the Magna Post Office facility is "one unitary entity," that "the Phase II lease is not an

---

[16] Contracting officer Candace Kinne was the contracting officer for the termination of the District Training Center lease, as amended.

integrated document," and that "the legal description of the premises to be covered by the Phase I and Phase II leases is substantially identical." In the letter, plaintiff's counsel stated that "the Postal Service, which has complete control of the entire facility, has taken no action to separate the Main Post Office from the space it wishes to vacate by December 31, 2012." The letter asserts that "[b]y proposing to terminate the Training Center lease, the Postal Service leaves the lessor with a landlocked, unusable, uneconomic remnant which, in effect, deprives the lessors of all reasonable use of their property, and amounts to a compensable inverse condemnation."

Plaintiff's efforts to continue leasing the District Training Center space to the USPS were not successful, and the USPS began vacating the District Training Center space on September 26, 2012. The USPS vacated the District Training Center space on or before December 28, 2012.

At trial, the parties jointly submitted into evidence a notice to the Magna Main Post Office Postmaster written "to advise that the Lease for the subject location has been terminated effective Close of Business 12/31/2012." The notice requests that the Postmaster at the Magna facility complete certain actions, including:

(1) Remove or plug the mail drop slot, if any, located in the door of the vacated building; remove all mail drop boxes on the property.

(2) Arrange for removal of all signs which may lead customers to believe the building is still occupied by the post office. Signs owned by the Landlord should be left in the building.

(3) Have all utilities that are metered in the name of the U.S. Postal Service read and disconnected on the effective date of termination.

(4) Leave the existing facility broom cleaned with all debris and postal equipment removed from the premises, consistent with the requirements of the Lease; make all necessary repairs, beyond reasonable and ordinary wear and tear.

(5) Return the keys to the Landlord as directed in the Notice of Termination Letter to the Landlord and attached to this document. Prompt return of the keys is required to avoid additional rent.

The Acting Postmaster at the time the District Training Center lease, as amended, expired was James Kenyon, who testified at the trial. Neither party established at trial whether Mr. Kenyon, the Acting Postmaster at the time the USPS vacated the training center space, received the aforementioned notice intended for the Postmaster. In an e-mail sent on December 28, 2012, James Kenyon confirmed that the District Training Center space was "broom clean" when it was vacated. At trial, Postmaster Kenyon explained that, after ensuring that the vacated space was broom clean, he "put an office divider up" so that the space between the Magna Main Post Office was closed off from the vacated training center space and no one would be able to enter the vacated space from the Magna Main

Post Office. Postmaster Kenyon explained that the partitions he erected were "about 5-and-a-half, 6 feet tall, about 8 feet wide, somewhere around there, 8, 10 feet wide."

Postmaster Kenyon also described three instances that occurred when he was the Acting Postmaster at the Magna Main Post Office, between January 2013 and June 2013, when members of the Stromness family visited the Magna postal facility and asked to see the vacated space. According to Postmaster Kenyon's testimony at trial, he always accommodated requests from the Stromness family with regard to the vacated space and he escorted them through the secure main post office space to the vacated, former training center space, but did not accompany them into the vacated space. At trial, Postmaster Kenyon testified about one occasion on which plaintiff attempted to enter the vacated, former training center space:

Q. So the customer -- the Stromnesses came through the customer lobby and someone knocked on your door?

A. [Postmaster Kenyon] Yes.

Q. And then what happened?

A. I opened the door, and then they wanted to go back to the back area there, so I walked them over so I could move the partition back and they could get back to that other area.

Q. Okay, so you're saying you walked to your office onto the workroom floor?

A. Yes.

Q. Did you walk with them?

A. Yeah, I did. Walked over to the partition there, yes.

Q. So after you walked into the partitions through the workroom floor, what did you do next?

A. Moved the partitions so they could get back to that area.

Q. Did you follow them in?

A. No.

Q. Why not?

A. I would have had no reason to go back in that area.

Q. Why did you walk them through the workroom floor, though?

36

A. It's a secured facility. Like, when we have anybody there, we don't just let them, you know, walk around. It's – the federal mails, everything you got back there, it's a secure location.

Postmaster Kenyon also explained that, during each of these visits to the vacated space, the partitions separating the Magna Main Post Office space and the vacated District Training Center space were in place.

In May 2013, Roland Dalton became the Postmaster at the Magna Main Post Office. At trial, Postmaster Dalton stated that he had been instructed by his predecessor, Postmaster Kenyon, not to access the vacated training center space: "I was briefed by James Kenyon that the phase 2 part of the building was -- we were not to access that, that there was possible pending litigation, and we have it blocked off with two -- they are basically office barriers, cubicle walls that we have blocking the hallway to prevent entry." Similar to Postmaster Kenyon, Postmaster Dalton stated that members of the Stromness family visited the postal facility to see the vacated space. In his testimony, Postmaster Dalton explained an instance in which members of the Stromness family came to the Magna facility to visit the former, vacated training center space. Postmaster Dalton testified that he "brought them [the Stromnesses] into the building," "took them up to where they needed to be," and did not follow them into the vacated training center space. Postmaster Dalton explained that he did not tell the Stromnesses that they could not access their space without a USPS escort and that he never denied them access to their space.

At trial, Frederick Stromness testified that each time he visited the Magna postal facility he was able to visit the vacated space with a postal escort. Frederick Stromness testified:

> [T]o gain access to the space, we would show up to the site -- and this is -- we don't think too much about this because we do maintenance on any of our facilities. We show up; they let us in. But this was a little more rigid in that we went – go in the postal lobby, we wait in line to get up to a clerk and say, We want to access this space, and . . . generally the clerk wouldn't escort us, but he would notify whoever had the higher authority at the Postal Service. Sometimes it would be the postmaster; other times it would be a temporary postmaster. Or, if the postmaster wasn't there, just one of the other employees would let us in, and they would stand there with us while we were in the training center space . . . .

Similarly, Richard Daniel Stromness testified that after the District Training Center lease, as amended, expired he had to be escorted to the vacated training center space by USPS personnel. Richard Daniel Stromness testified that, according to his understanding, the USPS required that he be escorted into the vacated training center space because "the postal service felt that we could compromise their sanctity to the mail."

After the USPS notified plaintiff that it intended to vacate the District Training Center space, the USPS and MPO Leasing began considering how the Magna Main Post

Office space would be separated from the vacated District Training Center space. On September 19, 2012, approximately two weeks after plaintiff received the termination notice, Richard Daniel Stromness sent an e-mail to Wayne Christensen, who was previously a USPS employee:

> I want to specifically ask Wayne what the Post Offices [sic] responsibility is when moving out? As you know Wayne, there is the Post Masters [sic] Office and a break room that are in the training center portion of the building. Will the Post Office be required to construct the dividing wall. [sic] The training center also included 2,000 square feet of parking and I would like to know if we can just take that from the front. What items in the building belong to the landlord and what belong [sic] to the tenant?

Additionally, in October 2012, plaintiff requested quotes from a contractor regarding a possible remodel of the District Training Center space to include a new demising wall and new restrooms. E-mail exchanges admitted into evidence during the trial demonstrate that, in October and November 2012, Richard Daniel Stromness corresponded with an architect to receive an estimate for remodeling the District Training Center space. On May 15, 2013, plaintiff asserted in a letter to the USPS that "if the Postal Services wishes to exclude the lessor from its space, it [USPS] needs to build a wall under its Alterations clause" unless "the lessor subleases the Phase II space." According to plaintiff, Stromness MPO was not required to construct a demising wall unless the former training center space was leased because "that [Magna Main Post Office] lease provides that the lessor [plaintiff] is responsible for installing a demising wall only 'in the event said space is [sub]leased. . . .'" (emphasis in original). In response to plaintiff, the USPS explained that the USPS would build the demising wall. The contracting officer explained that "[n]otwithstanding the Postal Service's belief that the Landlord should have erected the demising wall once the District Training Center Lease expired, the Postal Service plans to erect a demising wall to ensure the security of the Main Office lease space."[17] In an e-mail dated June 14, 2013, from Jeffrey Davis,[18] an architect-engineer, to contracting officer Shirley Wheeler,[19] Mr. Davis explained that to separate the electrical and heating systems between the Magna Main Post Office space and the District Training Center space could cost "between $60k and $80k" and an additional "$40-50K to bring in a

---

[17] The "node study" did not account for any funding to separate or divide the training center space from the Magna Main Post Office after the USPS vacated the space.

[18] Jeffery Davis was an architect engineer who worked for the Salt Lake City Facility Service Office.

[19] While Candace Kinne was the contracting officer who issued the termination notice to Stromness MPO at the expiration of the District Training Center lease, as amended, Shirley Wheeler was the USPS contracting officer who issued a final decision denying plaintiff's supplemental certified claim.

separate water line and put in a restroom in the returned space."[20] Based on testimony received at trial, and the exhibits admitted into evidence, it appears that, while plaintiff and the USPS were contemplating how to separate the Magna Main Post Office and the vacated space, the two areas were separated, for approximately nine months, by the temporary partitions put in place by Postmaster Kenyon in December 2012. It is also evident that, during this nine-month time period, plaintiff was only permitted to access the former, vacated training center space with a USPS escort during USPS business hours.

According to trial testimony, on September 9, 2013, approximately nine months after the USPS vacated the District Training Center space, a demising wall was erected permanently separating the Magna Post Office space from the space that was previously leased for the District Training Center. Postmaster Dalton, who was the Postmaster of the Magna Main Post Office in September 2013, explained that the temporary partitions put in place by Postmaster Kenyon were removed and the demising wall was installed in their place. Postmaster Dalton stated that, in order to secure the Magna Main Post Office space, the USPS had to build the demising wall. According to Postmaster Dalton, during the construction of the demising wall, a member of the Stromness family came to look at the construction and advised Postmaster Dalton that "the wall was in the wrong spot." At trial, Postmaster Dalton explained that when he was told that the demising wall was being constructed in the wrong place he informed the Salt Lake City District Finance Manager, Steven Black, who had previously been in contact with Postmaster Dalton regarding the Magna Main Post Office. Postmaster Dalton testified at trial that he did not talk to anyone at the Denver Facilities Service Office about the statement from plaintiff that the demising wall was in the wrong spot.

The location of the demising wall separating the two areas of the Magna postal facility was discussed at length at trial, and it is undisputed by the parties that the demising wall was not constructed in the correct spot. The parties have stipulated that, "[b]ased on the location of the demising wall and other interior walls, Defendant has retained possession and control over a certain amount of square footage that was included as part of the Phase II Lease." The parties, however, dispute the amount of square footage retained by defendant. At trial, the parties proffered expert witnesses and other evidence to establish the amount of square footage retained by defendant as a result of the demising wall constructed between the Magna Main Post Office and the former training space. According to the report of plaintiff's expert, Birk Larsen, the USPS is retaining 683 square feet. Mr. Larsen explained that he measured the vacated, former training center space to be 4,691 net interior square feet, which is less than the 5,374 net interior square feet identified in the District Training Center lease. Mr. Larsen testified that the difference between the 5,374 net interior square footage identified in the District Training Center lease, and the 4,691 net interior space that he measured, is 683 square feet, thus, he concluded that, by operation of the demising wall being in the wrong location, the USPS

---

[20] The discussions between Shirley Wheeler and Jeffrey Davis concerning the separation of the two spaces continued through March 2014.

was retaining 683 square feet. In contrast, according to defendant's expert, Kenneth Downes, the USPS "is occupying 371 sf of space that was formerly leased under the Training Space lease." At trial, Mr. Downes testified that he measured the entire Magna facility and determined that the actual size of the former training center space was 5,082 square feet, and not 5,374 square feet, as identified in the District Training Center lease, as amended. After measuring the entire size of the facility, Mr. Downes concluded that, following the expiration of the District Training Center lease, as amended, the USPS returned 4,711 square feet of space and is, therefore, continuing to occupy 371 square feet of the training center space.

Evidence received at trial establishes that, as a result of the demising wall constructed between the Magna Main Post Office space and the vacated, former training center space, the vacated space is not compliant with local codes and ordinances because it does not have access to restrooms, electrical panels, or a second means of ingress or egress. The government's expert witness, Kenneth Downes, explained that the demising wall resulted in three deficiencies that rendered the vacated space not code complaint:

> Q. I'd like to talk about code compliance with the district training space. Generally you agree that the district training space as-is is not code compliant, correct?
>
> A. [Kenneth Downes] I do.
>
> Q. Why do you believe that? Why is that your opinion?
>
> A. It's basically three deficiencies. One is the exiting, the two exits are required. To be occupied it needs toilets, and the third issue is the -- any tenant need [sic] to have access to their electrical panels, which all the electrical panels are currently within the postal service, and they don't have free access to that.

Similarly, plaintiff's expert, Birk Larsen, concluded that "[m]odification of the vacant suite within the subject property will be required to make leasable and usable by another tenant." Mr. Larsen stated that the vacated space is not code compliant:

> A. The primary way -- there are two primary ways I see they did not: One is it only contains one egress point; and the other is that it's missing restrooms for any sort of tenant.
>
> . . .
>
> The other code issue I know is that there would need to be electrical separation or at least access to an electrical subpanel for that tenant. Right now the US Postal Service tenant controls access to the electrical for the building.

Additionally, trial testimony established that, after the USPS vacated the District Training Center space on December 31, 2012, it did not deliver keys to the space to plaintiff, notwithstanding the language in the termination notice that the keys would be delivered to plaintiff. At trial, Richard Daniel Stromness explained that the USPS did not provide keys to plaintiff after the termination:

> Q. Now, when -- after -- on or after December 31, 2012, did the postal service ever mail the keys to Stromness?
>
> A. [Richard Stromness] They did not.
>
> Q. Did they ever provide them to you personally?
>
> A. They did not.
>
> Q. Did anyone ever explain to you why they weren't doing that?
>
> A. No. There was no explanation.

Plaintiff obtained the key to the vacated space on September 9, 2013, the same day that the wall was constructed, when plaintiff changed the lock to the exterior door that provided access to the vacated District Training Center space. Plaintiff changed the lock to the exterior door after the USPS informed plaintiff that maintenance personnel would be removing the lock cylinders on September 9, 2013. Postmaster Dalton explained:

> So after the wall was constructed and the construction was complete, the postal service had their maintenance people come out and they pulled all the cylinders, which is the actual lock, out of the doorknob. They said those belong to us and so they pulled those all out. I was told that somebody from the Stromness family had a locksmith coming and that they would change -- that they would key -- put their lock into that slot so that they had access to that building.

Frederick Stromness testified:

> So, in September of 2013, I became aware that the Postal Service was closing off the Phase II space from the Magna main post office space, and I became aware of that because my recollection is that I got a phone call on my cell phone from Magna Post Office. I don't believe it was the postmaster, but it was a postal employee that identified themselves and informed me the Postal Service was removing the cores out of the locks.
>
> . . .
>
> And in this phone call, I wasn't informed about the demising wall, but I was informed that the postal service was removing those cores and, if I wanted to secure the space, we needed to take steps to secure it ourselves, at which point I called my son, Richy, and said, Well, we've got to run out there

and get a locksmith. He called the locksmith, and he proceeded to the site and then observed the construction.

Testimony received at trial from Postmaster James Kenyon and Postmaster Roland Dalton indicated that the Postmaster of the Magna Post Office facility had control over keys to the District Training Center space prior to the lease termination and continuing after the lease terminated on December 31, 2012, until the locks were changed on September 9, 2013. Postmaster Kenyon testified that, while he was Acting Postmaster at the Magna Main Post Office, he never had a conversation about a key. Postmaster Kenyon explained that he did not know whether he possessed a key that would access the front door to the former training center space. He also testified that he never sent anyone a key to the front door of the former training space and he never refused to turn over the keys to plaintiff.

> Q. But you never sent them [Stromness] a key to the front door?
>
> A. [James Kenyon] I never sent anybody a key to the front door.
>
> Q. Did anybody suggest to you that you should send them a key?
>
> A. No, I've never had a conversation about a key.
>
> Q. So nobody from the district ever contacted you and said, "Hey, you need to send the Stromnesses the key"?
>
> A. No.

Postmaster Dalton explained at trial that he did not offer plaintiff the key to the vacated space for security reasons:

> The reason that I didn't offer the key -- well, number one, they never did ask for a key. But until our side of the building got secured, I have to provide security for the post office side of the building. And so I did not offer to give them a key because I had to be in control of all the keys for the building.

Postmaster Dalton stated that he was never instructed to return the keys to the former District Training Center space to plaintiff.

Since the USPS vacated the District Training Center space on December 31, 2012, the USPS has not reimbursed 33.5% of the taxes for the Magna postal facility for 2013 or the following years.

Prior to the construction of the demising wall, on May 15, 2013, plaintiff submitted a certified claim to the USPS seeking a contracting officer's final decision. In the certified claim, plaintiff alleged that the USPS was a holdover tenant keeping complete access and control over the former training center space; that the USPS vacated the wrong portion of the Magna postal facility; that the Magna Main Post Office lease, as amended, and the District Training Center lease, as amended, were a unified lease; that the USPS's

termination of the District Training Center lease deprived plaintiff of reasonable use of the property; that the USPS was unjustly enriched; and that the USPS violated the covenant of good faith and fair dealing. Plaintiff demanded that the USPS pay the annual rental rate for the District Training Center space through 2019; that the USPS pay all heating, air conditioning, lighting, sewage, electrical, and water expenses; and that the USPS reimburse plaintiff for all taxes for the space.

Contracting officer Bradford Meador issued a final decision to plaintiff on August 15, 2013, which denied plaintiff's claim in full.[21] In the final decision, the contracting officer asserted that the "1997 Main Office Lease, as amended, and the 2000 District Training Center Lease, as amended, are not one unified lease." The contracting officer stated that "[t]he two leases are distinct" because they were entered into at different times and with different occupancy dates, that the leased premises were different, and that the leases had separate rental obligations and tax reimbursement obligations. The contracting officer asserted that "[f]rom January 2000 through December 2012, the Postal Service made separate rental payments and tax reimbursements from separate finance numbers for the Main Office and the District Training Center." The contracting officer concluded that "[t]he Postal Service properly terminated the District Training Center Lease and so the Postal Service is not responsible for any further rent, taxes or utilities associated with this [District Training Center] space." Additionally, the contracting officer informed plaintiff that the USPS "plans to erect a demising wall to ensure the security of the [Magna] Main [Post] Office leased space."

On January 21, 2015, plaintiff submitted a supplemental, certified claim to the USPS seeking a contracting officer's final decision. In addition to reasserting plaintiff's claims set forth in the May 15, 2013 certified claim, plaintiff's supplemental certified claim requested a declaration that the USPS be required to move the demising wall to the correct location and to allow plaintiff access to restrooms, hallways, parking, and code-compliant ingress and egress. Plaintiff's supplemental certified claim requested payment for the fair market rental value of the vacated district training center space and parking area. Plaintiff also requested reimbursement of property taxes for 2006-2009 and 2012 and a declaration that plaintiff is entitled to receive property tax reimbursements for the years in which the vacated training center spaced remains "uninhabitable."

In response to plaintiff's supplemental, certified claim, a different contracting officer, Shirley Wheeler, issued a final decision, granting property tax reimbursement for the District Training Center space for the years 2006-2009 and 2012, but denying, in full, the remainder of plaintiff's supplemental certified claim.

At the time the trial occurred in this case, the USPS continued to occupy the Magna Main Post Office space, and the Magna Main Post Office lease, as amended, does not expire until March 31, 2018. Since the USPS vacated the District Training Center space on December 31, 2012, to the time of the trial, plaintiff has not leased the former, vacated training center space to another tenant. Plaintiff has hired a real estate professional to

---

[21] Bradford Meador was not called to testify at the trial held in this case.

market the property, however, plaintiff has been told "that the space is not able to be occupied in its present condition."

Procedural History

Plaintiff filed its complaint in the United States Court of Federal Claims on August 6, 2014, thereafter, plaintiff filed an amended complaint on May 18, 2015, appealing the contracting officers' final decisions on plaintiff's original, certified claim and plaintiff's supplemental, certified claim. In the amended complaint, plaintiff alleges that the USPS breached the Magna Main Post Office lease, as amended, and the District Training Center lease, as amended; that the USPS is a holdover tenant owing holdover rent; that the USPS effected a taking in violation of the Fifth Amendment to the United States Constitution; that the two leases represent a single, unified agreement for the entire Magna Post Office building and should be reformed to reflect the intent of the parties; and that the USPS breached the covenant of good faith and fair dealing implied in both lease agreements. Plaintiff seeks declaratory relief, including a declaration that the USPS's termination of the District Training Center lease, as amended, "was arbitrary, capricious, wrongful, improper and in violation of the parties' rights and obligations"; a declaration "that the leases for the Magna premises be interpreted and/or reformed in conformance with the agreement and intention of the parties"; a declaration that "the Postal Service vacated the wrong portion of the facility;" a declaration that the hallways, restrooms, and parking are to be shared by the USPS with other tenants in the facility; and a declaration that the USPS is contractually obligated to move the walls it erected to the correct location. Plaintiff seeks monetary damages "in an amount to be proven at trial representing the fair market value currently estimated to be $18.00 per square foot" for the USPS's occupancy and use of the former training center space between January 1, 2013 through the date of judgment and continuing after the judgment until the USPS relinquishes control of the former training center space, as well as "damages in the amount of all unreimbursed real property taxes for the entire property up to the date of judgment" and continuing after judgment until the USPS relinquishes control of the former training center space. Plaintiff also seeks to recover monetary damages "for the cost to remediate and restore the facility by removing detrimental alterations, additions or structures" made by the USPS "and to restore the premises to as good condition that existed at the time it entered the premises," which, at the time the amended complaint was filed, amounted to $56,675.00. Plaintiff also demands interest, costs, and attorneys' fees. In response to the amended complaint, defendant filed a motion to dismiss plaintiff's complaint, and the court issued a decision denying defendant's motion to dismiss on April 12, 2016. See Stromness MPO, LLC v. United States, Case No. 14-711C (Apr. 12, 2016). A trial in the above-captioned case was held in Salt Lake City, Utah.

**DISCUSSION**

As a preliminary matter, the jurisdiction of this court is uncontested by the parties, and this court independently concludes that it has jurisdiction over the above-captioned case pursuant to 28 U.S.C. § 1491(a)(2) (2012).

In the instant case, plaintiff puts forth various breach of contract allegations against the USPS, as well as allegations that the USPS violated the Takings Clause of the Fifth Amendment to the United States Constitution. Plaintiff's breach of contract allegations are based on the same facts as those regarding plaintiff's takings claims. Much of the breach of contract and takings allegations arise from a disagreement about the location of the demising wall constructed in September 2013 and the space within the Magna facility over which the USPS has exclusive use and control pursuant to the terms of the Magna Main Post Office lease, as amended, and the District Training Center lease, as amended. Specifically, the parties dispute whether the USPS has the right to exclusive use of the women's bathroom and locker room, a vestibule, corridor space, and a maintenance storage area within the Magna facility, all of which were retained for the USPS's exclusive use when the USPS constructed the demising wall inside the Magna facility to separate the active main post office area from the former training space area.

Plaintiff's principle breach of contract argument alleges that, when defendant constructed the demising wall in the Magna facility and prevented access from the former training space to the women's bathroom and locker room, vestibule, corridor space, and maintenance storage area, the USPS impeded plaintiff's right to lease the former training space to non-postal tenants, as allegedly granted to plaintiff in the Magna Main Post Office lease, as amended. According to plaintiff, the demising wall is a "detrimental alteration" in breach of the amended Magna Main Post Office lease because, as a result of the demising wall, the former training center space is not compliant with local building laws and plaintiff is unable to lease the space to a non-postal tenant. Plaintiff contends that, despite the "written covenant" in the Magna Main Post Office lease, as amended, granting plaintiff the right to lease the unoccupied, former training center space in the Magna facility, the USPS "made that impossible by walling off all restrooms, shutting off the circuit breakers for that space," and "making alterations which render the space non-Code compliant," thereby breaching the Magna Main Post Office lease, as amended. In addition to its allegations that defendant breached the Magna Main Post Office lease, as amended, when it constructed the demising wall, plaintiff alleges that the USPS is liable for a Fifth Amendment taking because the USPS's action have left plaintiff with an "uneconomic remnant," an "isolated, desolate island of useless property, a landlocked remnant lacking any necessities." Additionally, plaintiff argues that "the Postal Service constructed its original walls and the later demising wall in the wrong locations, walling off approximately 400 square feet of the Phase II space.[22]

---

[22] As discussed below, throughout the proceedings in this case, plaintiff has changed the amount of square footage allegedly retained as a result of the incorrect location of the

Additionally, plaintiff argues that the USPS breached the District Training Center lease, as amended, and effected a taking without just compensation by retaining possession and control of the District Training Center space after the termination of the District Training Center lease, as amended, on December 31, 2012, and by removing CCTV equipment from the District Training Center space. Plaintiff also argues that the USPS breached the Magna Main Post Office lease, as amended, by failing to properly reimburse plaintiff for property taxes assessed against the former training center space.

Plaintiff also argues that the USPS breached the implied covenant of good faith and fair dealing by: denying or making delinquent reimbursement payments for property taxes; constructing the demising wall without the mandatory consultation with appropriate State and local officials; constructing the demising wall without advance discussions with plaintiff; disconnecting all utilities to the former training center space upon termination of the District Training Center lease, as amended; blocking the former training center space from necessary utilities and facilities; failing to provide sufficient notice of the USPS's intent to terminate the District Training Center lease, as amended; and failing to postpone the termination of the District Training Center lease, as amended.

In response, defendant argues that plaintiff has failed to prove its allegations, with the exception that the USPS concedes to erroneously retaining 371 square feet of space within the Magna Main Post Office area, based on the measurements of the USPS's expert, as a result of constructing the demising wall in the wrong location, which should have been returned to plaintiff with the former training center space on January 1, 2013.[23] Defendant argues that plaintiff failed to prove that the USPS breached the Magna Main Post Office lease, as amended, or the District Training Center lease, as amended, by building the demising wall and retaining exclusive use of the women's bathroom and locker room, vestibule, corridor space, and maintenance storage area. According to defendant, the Magna Main Post Office lease, as amended, granted the USPS exclusive right to the postal space in the Magna facility, which includes the women's restroom, vestibule, corridor space, and maintenance storage area. Defendant argues that the USPS's construction of the demising wall in September 2013 was in compliance with both the Magna Main Post Office lease, as amended, and the District Training Center lease, as amended, because the former training center space was required to be secured under the amendment to the Magna Main Post Office lease and plaintiff asked the USPS to install the wall pursuant to the Alterations clause in the District Training Center lease, as amended. Moreover, defendant asserts that, under the terms of the District Training Center lease, as amended, the USPS was required to return the former training center space to plaintiff as it was received in January 2000, and, when the space was received, there was a chain-link fence separating the main post office space, including the women's

---

demising wall. Plaintiff has alleged that the USPS is improperly retaining 387.899 square feet, 400 square feet, and 683 square feet.

[23] As discussed, the parties both presented expert witnesses at trial to testify about the amount of square footage improperly retained as a result of the demising wall's incorrect location. These expert witnesses had different conclusions, set forth in more detail below.

bathroom and locker room, vestibule, corridor space, and maintenance storage area, from the space that would later become the training center. Furthermore, defendant argues that, to the extent the court finds the USPS breached the lease agreements by constructing the demising wall, the court should deny plaintiff's request for monetary relief because plaintiff has failed to prove damages.

Additionally, defendant argues that plaintiff's other breach of contract allegations also should be denied. Specifically, defendant argues that, other than the erroneously retained space, the USPS did not improperly retain control over the training center space after the District Training Center lease, as amended, terminated on December 31, 2012, and that the USPS did not improperly remove the CCTV equipment from the former training center space because the USPS continues to pay rent for the CCTV equipment. Defendant also argues that it is not obligated to reimburse plaintiff for the property taxes assessed against the vacated training center space since 2013 because that obligation expired with the District Training Center lease, as amended, on December 31, 2012. To the extent plaintiff seeks equitable relief, defendant argues that the court is without jurisdiction to award such equitable relief because plaintiff is not entitled to monetary damages, other than for the 371 square feet of improperly retained space, for which plaintiff has failed to prove damages.[24]

In response to plaintiff's takings claims, defendant argues that plaintiff's claims are legally barred because the property rights at issue are governed by the District Training Center lease, as amended, or the Magna Main Post Office lease, as amended, thus plaintiff's claims lie in contract alone. According to defendant, plaintiff's alleged rights to the women's bathroom and locker room, vestibule, corridor space, and maintenance storage area are based on the terms of the District Training Center lease, as amended, thus "[b]ased on Stromness' own admissions, the rights at issue" were voluntarily created by contract. Defendant argues that, when a contract between a private party and the government creates the property right subject to a takings claim, the proper remedy for infringement lies in a contract claim, not in a taking claim. Furthermore, according to defendant, because plaintiff leased away its rights to the women's bathroom and locker room, vestibule, corridor space, and maintenance storage area, plaintiff does not have a present possessory interest in the space.

As a threshold issue, the court considers whether plaintiff's claims are based on rights created voluntarily by contract, so as to preclude plaintiff's takings claims. Plaintiff does not articulate whether its taking claims are independent or alternative allegations to plaintiff's breach of contract claims. Indeed, plaintiff did not submit any response to defendant's argument that plaintiff's takings claims are legally barred.

As a general proposition, although a lease concerns property interests, a lease is a contract. See Prudential Ins. Co. of Am. v. United States, 801 F.2d 1295, 1298 (Fed.

---

[24] Defendant asserts that, while plaintiff is entitled to recover for the improperly retained 371 square feet of space, plaintiff has ultimately failed to prove the amount of damages it would be entitled to receive.

Cir. 1986); <u>see also</u> <u>Keydata Corp. v. United States</u>, 504 F.2d 1115, 1123 (Ct. Cl. 1974) ("But though a lease may concern and convey a property interest, it is also very much a contract. . . ."). Pursuant to the precedent established by the United States Court of Appeals for the Federal Circuit, plaintiff is permitted to file a complaint pursuing relief under its breach of contract theory as well as a Fifth Amendment takings theory. <u>See</u> <u>Stockton E. Water Dist. v. United States</u>, 583 F.3d 1344, 1368 (Fed. Cir. 2009). If, however, the court determines that the property rights alleged to have been taken were solely created by the terms of the voluntary lease agreements between plaintiff and defendant, then the proper remedy, if any, lies in contract. <u>See</u> <u>Barlow & Haun, Inc. v. United States</u>, 87 Fed. Cl. 428, 438 (2009). Although plaintiffs are permitted to plead alternative theories of breach of contract and a Fifth Amendment taking, "the concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract." <u>Sun Oil Co. v. United States</u>, 572 F.2d 786, 818 (Ct. Cl. 1978) (explaining that remedies for violation of a lease right must be directed at the United States in its proprietary capacity and not in its sovereign capacity).

While a plaintiff may simultaneously allege in its complaint breach of contract and takings claims, interference with a right created by contract "generally gives rise to a breach claim not a taking claim." <u>Id.</u> at 818. "It is well established that, generally, governmental interference with a contractual right does not give rise to a taking, but instead entitles a plaintiff to seek compensation for breach of contract." <u>Bailey v. United States</u>, 53 Fed. Cl. 251, 256 (2002); <u>see also</u> <u>Barlow & Haun, Inc. v. United States</u>, 87 Fed. Cl. at 438 ("Ordinarily, the Government's interference with contractual rights arising under a contract with the Government will give rise to a breach of contract action, rather than a taking claim."). "[A] Fifth Amendment takings claim is not viable when the parties' rights and obligations are governed by contract." <u>Sonoma Apartment Assocs. v. United States</u>, 124 Fed. Cl. 595, 600 (2015); <u>see also</u> <u>Tamerlane, Ltd. v. United States</u>, 80 Fed. Cl. 724, 738 (2008) ("Although rights existing independently of a contract may be brought pursuant to a takings claim, when a contract between a private party and the Government creates the property right subject to a Fifth Amendment claim, the proper remedy for infringement lies in contract, not taking."); <u>Allegre Villa v. United States</u>, 60 Fed. Cl. 11, 18 (2004) ("When a contract between a private party and the Government creates the property right subject to a Fifth Amendment claim, the proper remedy for infringement lies in a contract claim, not one for a taking.").

The United States Court of Appeals for the Federal Circuit has held "that when the government itself breaches a contract, a party must seek compensation from the government in contract rather than under a takings claim." <u>Piszel v. United States</u>, 833 F.3d 1366, 1376 (Fed. Cir. 2016). "Taking claims rarely arise under government contracts because the Government acts in its commercial or proprietary capacity in entering contracts, rather than in its sovereign capacity. Accordingly, remedies arise from the contracts themselves, rather than from the constitutional protection of private property rights." <u>Hughes Commc'n Galaxy, Inc. v. United States</u>, 271 F.3d 1060, 1070 (Fed. Cir. 2001) (internal citations omitted); <u>see also</u> <u>A & D Auto Sales, Inc. v. United States</u>, 748 F.3d 1142, 1156 (Fed. Cir. 2014) (explaining that remedies available under a breach of contract theory make takings liability redundant); <u>St. Christopher Assocs., L.P. v. United</u>

States, 511 F.3d 1376, 1385 (Fed. Cir. 2008) ("In general, takings claims do not arise under a government contract because, as stated by the Court of Federal Claims, under the government is acting in its proprietary rather than its sovereign capacity, and because remedies are provided by the contract.").

Additionally, when a plaintiff alleges a breach of contract claim and a takings claim, the court first will consider whether a viable contract claim exists because "[i]t has long been the policy of the courts to decide cases on non-constitutional grounds when that is available, rather than reach out for the constitutional issue." Stockton E. Water Dist. v. United States, 583 F.3d at 1368; see also City Line Joint Venture v. United States, 503 F.3d 1319, 1323 (Fed. Cir. 2007) ("When a viable contract claim exists, we should not reach out to decide the takings issue. Clearly, there should not be double recovery, we should not commingle takings compensation and contract damages."). "If the right at issue is not governed by the terms of the parties' contract, plaintiffs may pursue a takings action." Allegre Villa v. United States, 60 Fed. Cl. at 18.

In the instant case, the dispute between the parties arises from a disagreement about the terms in the Magna Main Post Office lease, as amended, and the District Training Center lease, as amended. Plaintiff's claims revolve around the assertion that the USPS breached the terms of the Magna Main Post Office lease, as amended, and the District Training Center lease, as amended, and that the USPS interfered with plaintiff's rights in the facility as set forth in the terms of these lease agreements, including the right to lease non-postal space to a non-postal tenant. Plaintiff's takings claim that the USPS has left Stromness with an "uneconomic remnant" is apparently based on the language in the Magna Main Post Office lease, as amended, that grants Stromness the right to lease unoccupied space in the Magna facility to a non-postal tenant, under certain delineated conditions. Similarly, plaintiff's takings claims that the USPS retained control of the former training center space between January 1, 2013 and September 9, 2013, that the USPS continues to retain control over 2,000 square feet of "parking and maneuvering" space, and that the USPS continues to retain control over 683 square feet of space as a result of the incorrectly placed demising wall are anchored in the rights and obligations of the parties as set forth in the terms of the Magna Main Post Office lease, as amended, and the District Training Center lease, as amended, governing the Magna facility. Because plaintiff's allegations are based on rights and obligations created voluntarily by the parties in these lease agreements, the proper remedy for plaintiff, if any, lies in contract and not pursuant to a takings theory. Accordingly, the court considers plaintiff's numerous breach of contract claims and does not consider plaintiff's takings claims.

It is well settled that "[t]o recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach."[25] San

---

[25] As indicated by a Judge of the United States Court of Federal Claims, "[t]o satisfy this fourth element, the plaintiff also must show that: '(1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable

Carlos Irr. & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir.), reh'g denied (Fed. Cir. 1989); see also Shell Oil v. United States, 130 Fed. Cl. 8, 34 (2017); Barlow & Haun, Inc. v. United States, 118 Fed. Cl. 597, 620 (2014); Cooley v. United States, 76 Fed. Cl. 549, 555–56 (2007) (citing San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d at 959).

The parties in this case do not dispute that the Magna Main Post Office lease, both in its original form and as amended, and the District Training Center lease, in its original form and as amended, are valid contracts between the parties. Instead, as identified above, the dispute between the parties relates to the obligations and rights of the parties pursuant to the original Magna Main Post Office lease, executed on January 27, 1997, the amended Magna Main Post Office lease, executed on January 12, 1998, and the District Training Center lease, executed on January 18, 2000 and amended on July 31, 2002 and, again, amended in February and April of 2010. The parties dispute whether the USPS breached the terms of these lease agreements, how the provisions of these lease agreements should be interpreted, and whether the leases represent a single agreement between the USPS and plaintiff and should be interpreted together, or whether each lease represents a separate and distinct agreement between the parties and should be read independently. To determine if defendant breached the Magna Main Post Office lease, as amended, and the District Training Center lease, as amended, the court must look to the language of the contract documents and the rights, duties, and obligations of the parties, as prescribed therein. Because the parties dispute the terms of the lease agreement documents, the outcome of the above-captioned case turns on the interpretation of the language in the Magna facility lease agreement documents entered into by the USPS and plaintiff.

"Contract interpretation starts with the language of the contract." SUFI Network Servs., Inc. v. United States, 785 F.3d at 593 (Fed. Cir. 2015); see also Agility Pub. Warehousing Co. KSCP v. Mattis, 852 F.3d 1370, 1380 (Fed. Cir. 2017); Bell/Heery v. United States, 739 F.3d 1324, 1331 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 824 (Fed. Cir. 2010), cert. denied, 562 U.S. 1178 (2011); LAI Servs., Inc. v. Gates, 573 F.3d 1306, 1314 (Fed. Cir.), reh'g denied (Fed. Cir. 2009); Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004); Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993); Nw. Title Agency, Inc. v. United States, 126 Fed. Cl. 55, 57-58 (2016) (citing Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993)) ("The starting point for any contract interpretation is the plain language of the agreement."); Beard v. United States, 125 Fed. Cl. 148, 158 (2016); Eden Isle Marina, Inc. v. United States, 113 Fed. Cl. 372, 483–84 (2013).

"'"In contract interpretation, the plain and unambiguous meaning of a written agreement controls.'"" Arko Exec. Servs., Inc. v. United States, 553 F.3d 1375, 1379 (Fed. Cir. 2009) (quoting Hercules Inc. v. United States, 292 F.3d 1378, 1380–81 (Fed. Cir.),

---

certainty.'" Shell Oil v. United States, 130 Fed. Cl. at 34 (quoting Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1373 (Fed. Cir. 2005)).

reh'g and reh'g en banc denied (Fed. Cir. 2002) (quoting Craft Mach. Works, Inc. v. United States, 926 F.2d 1110, 1113 (Fed. Cir. 1991))). "Terms must be given their plain meaning if the language of the contract is clear and unambiguous." SUFI Network Servs., Inc. v. United States, 785 F.3d at 593 (citing Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003)); see also Nw. Title Agency, Inc. v. United States, 855 F.3d 1344, 1347 (Fed. Cir. 2017); CanPro Invs. Ltd. v. United States, 130 Fed. Cl. 320, 347 (2017); Beard v. United States, 125 Fed. Cl. at 158 ("If the contract language is unambiguous, then it must be given its plain and ordinary meaning . . . ."). The United States Court of Appeals for the Federal Circuit stated in Massie v. United States:

> In interpreting a contract, "[w]e begin with the plain language." "We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." In addition, "[w]e must interpret the contract in a manner that gives meaning to all of its provisions and makes sense.'"

Massie v. United States, 166 F.3d 1184, 1189 (Fed. Cir. 1999) (quoting McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435, reh'g denied and en banc suggestion declined (Fed. Cir. 1996); (internal citations omitted)); Jowett, Inc. v. United States, 234 F.3d 1365, 1368 (Fed. Cir. 2000) (quoting McAbee Constr., Inc. v. United States, 97 F.3d at 1435 and Harris v. Dep't of Veterans Affairs, 142 F.3d 1463, 1467 (Fed. Cir. 1998)); Harris v. Dep't of Veterans Affairs, 142 F.3d at 1467; see also Coast Professional, Inc. v. United States, 828 F.3d 1349, 1354 (Fed. Cir. 2016); Shell Oil Co. v. United States, 751 F.3d 1282, 1305 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2014) (noting that a contract must be interpreted in context, giving meaning to the document as a whole) (citing NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004); Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin., 169 F.3d 747, 752 (Fed. Cir. 1999)); McHugh v. DLT Solutions, Inc., 618 F.3d 1375, 1380 (Fed. Cir. 2010); Giove v. Dep't of Transp., 230 F.3d 1333, 1340-41 (Fed. Cir. 2000) ("In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense. Further, business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs.") (citations omitted); Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (indicating that a preferable interpretation of a contract is one that gives meaning to all parts of the contract rather than one that leaves a portion of the contract "useless, inexplicable, void, or superfluous"). A Judge of the United States Court of Federal Claims has explained:

> "The words of a contract are deemed to have their ordinary meaning appropriate to the subject matter, unless a special or unusual meaning of a particular term or usage was intended, and was so understood by the parties." Lockheed Martin IR Imaging Sys., Inc. v. West, 108 F.3d 319, 322 (Fed. Cir. 1997). "Under general rules of contract law we are to interpret provisions of a contract so as to make them consistent." Abraham v. Rockwell Int'l Corp., 326 F.3d 1242, 1251 (Fed. Cir. 2003). "[A]n agreement is not to be read in a way that places its provisions in conflict, when it is reasonable to read the provisions in harmony. . . . [T]he provisions must be read together in order to implement the substance and purpose of the entire

agreement." Air–Sea Forwarders, Inc. v. United States, 166 F.3d 1170, 1172 (Fed. Cir. 1999). "A reasonable interpretation must assure that no contract provision is made inconsistent, superfluous, or redundant." Medlin Const. Group, Ltd. v. Harvey, 449 F.3d 1195, 1200 (Fed. Cir. 2006) (internal quotation marks omitted).

Dynetics, Inc. v. United States, 121 Fed. Cl. 492, 512 (2015); see also Marquardt Co. v. United States, 101 Fed. Cl. 265, 269 (2011) ("In interpreting contractual language, the court must give reasonable meaning to all parts of the contract and avoid rendering portions of the contract meaningless." (citation omitted)).

The Federal Circuit also has indicated that "'[t]he contract must be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract.'" Arko Exec. Servs., Inc. v. United States, 553 F.3d at 1379 (quoting Hercules Inc. v. United States, 292 F.3d at 1380–81); see also Nw. Title Agency, Inc. v. United States, 855 F.3d at 1347; LAI Servs., Inc. v. Gates, 573 F.3d at 1314; Gardiner, Kamya & Assocs., P.C. v. Jackson, 467 F.3d 1348, 1353 (Fed. Cir. 2006) (citations omitted); Medlin Constr. Grp., Ltd. v. Harvey, 449 F.3d 1195, 1200 (Fed. Cir. 2006) (reviewing the contract as a whole to determine the meaning of relevant provisions); Hunt Constr. Grp., Inc. v. United States, 281 F.3d 1369, 1372 (Fed. Cir. 2002) ("We begin with the plain language when interpreting a contract . . . . The contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts." (citations omitted)); Beard v. United States, 125 Fed. Cl. at 158 (quoting Pac. Gas & Elec. Co. v. United States, 536 F.3d 1282, 1288 (Fed. Cir. 2008)) ("In construing the meaning of a contractual provision, the court does not interpret the disputed term or phrase in isolation, but "construes contract terms in the context of the entire contract, avoiding any meaning that renders some part of the contract inoperative.").

It has been "'a fundamental precept of common law that the intention of the parties to a contract controls its interpretation.'" Tri-Star Elecs. Int'l, Inc. v. Preci-Dip Durtal SA, 619 F.3d 1364, 1367 (Fed. Cir. 2010) (quoting Beta Sys., Inc. v. United States, 838 F.2d 1179, 1185 (Fed. Cir. 1988) (quoting Firestone Tire & Rubber Co. v. United States, 195 Ct. Cl. 21, 30, 444 F.2d 547, 551 (1971))); Alvin, Ltd. v. United States Postal Serv., 816 F.2d 1562, 1565 (Fed. Cir. 1987) ("In the case of contracts, the avowed purpose and primary function of the court is the ascertainment of the intent of the parties."); see also Flexfab, LLC v. United States, 424 F.3d 1254, 1262 (Fed. Cir. 2005) ("[I]ntent is determined by looking to the contract and, if necessary, other objective evidence. In the absence of clear guidance from the contract language, the requisite intent on the part of the government can be inferred from the actions of the contracting officer. . . ."); see also CanPro Invs. Ltd. v. United States, 130 Fed. Cl. at 347 ("Contract interpretation requires determining the intention of the parties.").

Exclusive Use and Plaintiff's Right to Lease Unoccupied Space to a Non-Postal Tenant

According to plaintiff, the Magna Main Post Office lease, as amended, and the District Training Center lease, as amended, granted plaintiff the right to lease the unoccupied "Phase II" space within the Magna facility to non-postal tenants, but the USPS

"installed an incorrectly located demising wall and closed off doors which cut off all access from the Phase II [former training center] space to bathrooms, circuit breakers, water, sewer, gas, and Code-compliant egress, rendering the Phase II space unleasable to anyone" other than the USPS because it is not Code-compliant space.  Defendant does not dispute plaintiff's assertion that, pursuant to the Magna Main Post Office lease, as amended, Stromness was permitted to lease unoccupied "Phase II" space within the Magna facility to non-postal tenants. As defendant acknowledges, "Amendment No. 1" to the Magna Main Post Office lease stated that "[t]he Salt Lake City District has approved Lessor's request to lease 'Phase II' space" subject to certain conditions. It is apparent from the parties' presentations at trial and their post-trial briefings, however, that the parties disagree as to the definition of Phase II space within the facility that Stromness was granted the right to lease and what space would remain under the exclusive control of the USPS.

The court looks to the language in the lease documents and to the parties' testimony to determine the meaning of "Phase II" space, which plaintiff was permitted to lease to a non-postal tenant pursuant to the amended Magna Main Post Office lease. As discussed above, the original expandable building floor plan contemplated a Phase I area, a Phase II area, and a Phase III area, as depicted below:



Joint Exhibit 67, page 399

While the original Magna Main Post Office lease was for the construction of only the Phase I space, plaintiff proceeded, without authorization, to build out the Phase I and Phase II spaces.

There is nothing in the record to demonstrate a change in the construction plans in the original Magna Main Post Office lease by an authorized contracting officer. In fact, Frederick Stromness acknowledged that Build Inc. did not have authority to construct the Phase II space. Because the United States can only be bound by contract changes administered by an authorized agent, Build Inc. constructed the Phase II space entirely at its own risk.[26] See Winter v. Cath-dr/Balti Jt. Venture, 497 F.3d 1339, 1344 (Fed. Cir. 2007); see also Trauma Serv. Grp. v. United States, 104 F.3d 1321, 1326 (Fed. Cir. 1997)

---

[26] Plaintiff does not put forth a constructive change argument.

("Anyone entering into an agreement with the Government takes the risk of accurately ascertaining the authority of the agents who purport to act for the Government . . ."); S&M Mgmt. Inc. v. United States, 82 Fed. Cl. 240, 247 (2008) ("To modify a contract, a contracting officer or his or her delegate must possess actual authority to bind the government.").

According to the floor plan in the original Magna Main Post Office lease, as depicted in Joint Exhibit 67, page 387, the Phase I space included the entire postal operations area, including the men's and women's restrooms, storage space, and utilities. Following plaintiff's unauthorized construction, however, the parties negotiated "Amendment No. 1" to the original lease for the Magna Main Post Office, which resulted in additional square footage to be leased to the USPS, changes to the floor plan, and changes to the USPS's use of space within the facility.  At trial, contracting officer Edward Bavouset testified that plaintiff's unauthorized construction of the Phase II area "changed the layout of the floor plan," as it was designed and agreed to in the original Magna Main Post Office lease. Specifically, the revised floor plan indicated that the women's restroom and locker room would be located in the space identified as covered parking in the original Magna Main Post Office lease. As a result, the first amendment to the Magna Main Post Office lease provided a new floor plan, depicted below:



Joint Exhibit 73, page 484

"Amendment No. 1" to the Magna Main Post Office lease described the square footage as follows:

> The new net interior sq.ft. will reflect the original number of 6,498, plus 1,500 sq. ft. (additional required footage for postal operations) and 255 sq. ft. (corridor space) for a total net interior square footage of 8,253. It is specifically noted that the net interior square footage available for postal operations is 7,998 net interior square feet. The additional 255 (corridor space) is necessary for the functional use of the facility. Additionally, the Lessor shall provide use of the women's bathroom and locker room (661 sq. ft.), and carrier vestibule (425 sq. ft) and maintenance storage area east of the carrier vestibule. This use is necessary due to Lessor proceeding with Phase II construction, and the fact that the Postal Service has agreed to allow the Lessor to lease the previous controlled enclosed carrier parking, and, is structured to minimize modifications by Lessor.

In addition to describing the revised floor plan and square footage of the Magna Main Post Office lease, "Amendment No. 1" explained that, due to plaintiff's unauthorized construction of the Phase II space, there would be a portion of the building left unoccupied and "not available for postal use." The amendment explained: "Even though this area was included in the original lease, identified as covered enclosed parking, it will not be available since the Lessor proceeded with Phase II construction. However, it is specifically noted that the Postal Service will not be deprived of use as intended in the original lease." This unoccupied space was described in the amendment as "approximately 5,000 net sq. ft." The lease amendment explained that "[t]he area located above the 'new area', and identified by 'red x' on the attached floor plan (exhibit 'A') will not be available for postal use. This area is approximately 5,000 net sq. ft."

As this language explains, at the time "Amendment No. 1" was entered into, after the unauthorized construction of the Phase II space, it was designed to preserve the USPS's functional use of the facility as intended under the original Magna Main Post Office lease, without requiring plaintiff, the lessor, to make significant modifications to the building as constructed, to the benefit of the lessor. As contracting officer Edward Bavouset explained, because plaintiff had constructed the Phase II portion of the building without authorization and changed the floor plan as intended in the original Magna Main Post Office lease, the USPS could have required plaintiff to de-construct the building and re-construct the space so that it conformed to the original floor plan in the initial Magna Main Post Office lease. Contracting officer Edward Bavouset testified: "I mean, because if I wanted to, say, take it back to Phase 1, guess what? All this stuff would have had to have been relocated."

The language in "Amendment No. 1" is central to the parties' dispute about the use of the space within the Magna facility. Plaintiff argues that, according to the language in the amendment, the USPS would be "permitted to use, without leasing it, an additional 1,341 net interior square feet, including the women's bathroom and locker room, a vestibule, corridor space, and a storage area," and that the USPS only had "non-exclusive" use of those four areas. Plaintiff argues that Stromness was "donating" these areas for the USPS to use, but that the space could be "shared" with other non-postal tenants. During the trial, Frederick Stromness testified that the women's restroom was "located in the space that Stromness is donating, for lack of another, better word . . . ." According to plaintiff, "Amendment No. 1" "modified the Magna facility plans to include the 'men's restrooms,' but not the 'women's restroom' within the space the Postal Service was leasing," and, instead, under the lease amendment,  the women's restroom and locker room were moved to the "Phase II space," which plaintiff was granted the right to lease to a non-postal tenant. (internal quotations omitted).  Plaintiff argues that, because the USPS was granted "non-exclusive" use of the additional 1,341 net interior square feet, under the terms of "Amendment No. 1," plaintiff could lease the unoccupied space and the areas of shared use, which included the restrooms, exit, and hallways, to a non-postal tenant. According to plaintiff, its right to lease this "shared" space was confirmed in the subsequent District Training Center lease with the USPS because that lease stated "[h]allways, restrooms, parking" would be "shared by tenants."

Defendant argues that the USPS maintained exclusive use of the additional 1,341 net interior square feet, including the women's bathroom and locker room, vestibule, corridor space, and storage area, under the terms of the original Magna Main Post Office lease, "Amendment No. 1" to the Magna Main Post Office lease, and the District Training Center lease. Defendant explains that the original Magna Main Post Office lease required restrooms and a second egress point to be in the postal space. According to defendant, plaintiff did not construct the Magna facility in accordance with the original plans, which resulted in a change to the location of the restrooms and second egress point. Defendant asserts that, when the USPS amended the Magna Main Post Office lease to accommodate the unauthorized construction performed by plaintiff, the amendment "specifically noted that the Postal Service will not be deprived of use as intended in the original lease." Defendant argues that, because the intent of the original Magna Main Post Office lease "was that the Postal Service would have exclusive use of the bathrooms and the second fire exit" and "Amendment No. 1" expressly preserved that intention, the USPS maintained its right to the exclusive use of the restrooms and second egress point and neither plaintiff, nor plaintiff's non-postal tenant, was not permitted access to that area. To further support its position, defendant points to language in "Amendment No. 1" which contemplated how the USPS would retain exclusive use of its space in the event plaintiff leased the unoccupied space to a non-postal tenant. The lease amendment stated: "in the event said space is leased, Lessor shall install a demising wall separating postal and leased space, said wall shall be constructed to RE5 security requirements, tenant shall not have any access to postal space, including secured parking and maneuvering area."[27] Defendant argues that this language establishes that plaintiff was required to secure and separate the Magna Main Post Office space from the approximately 5,000 square feet of space not available for postal use, and the USPS was entitled to deny access to the restrooms and second egress point by separating the two spaces.

"Amendment No. 1" to the Magna Main Post Office lease describes the square footage intended for the USPS's exclusive use as "6,498, plus 1,500 sq. ft. (additional required footage for postal operation) and 255 sq. ft. (corridor space)" and "the women's bathroom and locker room (661 sq. ft.)," "carrier vestibule (425 sq. ft)," and "maintenance storage area east of the carrier vestibule." The changes to the square footage from the original Magna Main Post Office lease were "structured to minimize modifications by Lessor," in light of plaintiff's unauthorized additional construction, and to preserve the USPS's use of the facility as a secure postal facility as intended under the original Magna Main Post Office lease. At the time the Magna Main Post Office lease was executed in 1997 for the construction of the Phase I space, the USPS was the only anticipated tenant of the facility, and the building plans contemplated a single occupant with exclusive use of the entire space, including the restrooms and second egress point, as depicted in the diagram below:

---

[27] Contracting officer Edward Bavouset explained at trial that the "RE5 Handbook" sets forth security requirements for all postal facilities.



Joint Exhibit 67, page 397

At trial, Frederick Stromness testified about the intended exclusive use of the postal facility when the Magna Main Post Office lease was originally executed:

> Q. Mr. Stromness, as of January '97 when this lease was executed, who were the expected tenants of the facility?
>
> A. [Frederick Stromness] US Postal Service.
>
> Q. Anybody else?
>
> A. Not anticipated at that time.
>
> Q. So if the Postal Service was the only tenant, the Postal Service would have exclusive right to the bathrooms, correct?
>
> A. Yes, sir, at that time.
>
> Q. And if the Postal Service is the only tenant, the Postal Service would have exclusive right to the parking, correct?
>
> A. Yes, sir.
>
> Q. And if the Postal Service is the only tenant, it's your understanding the Postal Service would have exclusive rights to the hallways, correct?
>
> A. Correct.

With regard to the language in the amendment to the Magna Main Post Office lease that stated "the Postal Service will not be deprived of use as intended in the original

lease," contracting officer Edward Bavouset testified that the original lease terms intended for the USPS to have exclusive use of the restrooms, parking, and hallways:

> Q. "However, it is specifically noted that the Postal Service will not be deprived of use as intended in the original lease."
>
> A. [Edward Bavouset] Yes.
>
> Q. Did I read that correctly?
>
> A. Yes, you did.
>
> Q. What was your understanding of what the intention was for the use of the bathrooms of the original lease?
>
> A. They were for exclusive Postal Service use.
>
> Q. What was your -- what was your understanding of the intention of the use of parking and hallway [sic] in the original lease?
>
> A. They were for exclusive Postal Service use.

In agreement with Edward Bavouset's testimony, Frederick Stromness testified that at the time the lease amendment to the Magna Main Post Office lease was executed on October 26, 1998, the USPS agreed to retain exclusive use of the bathrooms, as intended in the original lease:

> Q. As of October '98, the Postal Service agreed to retain the bathrooms as part of the postal space, an exclusive use of those bathrooms, correct?
>
> A. Yes, sir, as of October '98.

This testimony explains the context in which the original Magna Main Post Office lease and the subsequent lease amendment were executed, and unanimously confirms that the USPS intended to have exclusive use of space within the Magna facility under the original Magna Main Post Office lease, and that intention was reiterated and preserved in the amendment to the Magna Main Post Office lease. There is no dispute that the original Magna Main Post Office lease for the Phase I space contemplated a single tenant, with the USPS to enjoy exclusive use of the facility as the only tenant. The language in "Amendment No. 1" demonstrates that, although plaintiff's unauthorized additional construction resulted in changes to the building plan, when signing the amendment, the parties intended to preserve this exclusive and secured use as intended under the original Magna Main Post Office lease for the space to be occupied by USPS operations, despite acknowledging the possibility that the USPS may not be the only tenant in the Magna building.

The language in "Amendment No. 1" to the Magna Main Post Office lease specifically identifies the space intended for postal use as "6,498, plus 1,500 sq. ft.

(additional required footage for postal operations) and 255 sq. ft. (corridor space)" and "the women's bathroom and locker room (661 sq. ft.)," "carrier vestibule (425 sq. ft)," and "maintenance storage area east of the carrier vestibule." Although the lease amendment did not include the square footage for the women's bathroom and locker room, the carrier vestibule, or the maintenance storage area in the "total net interior square footage of 8,253," the lease amendment requires "the Lessor" to "provide use" of this space and notes that "this space was included in the original lease and identified as covered enclosed parking." In its efforts to accommodate plaintiff's significant deviation from the terms of the original Magna Main Post Office lease, it seems unlikely that the USPS would have executed a lease amendment that made the USPS space unsecured or that eliminated any of the rights or space that it enjoyed under the terms of the original Magna Main Post Office lease. It is similarly implausible, notwithstanding plaintiff's suggestion to the contrary, that at the time "Amendment No. 1" was executed the USPS would have intended to lose its exclusive use of the women's restrooms, but continue to maintain exclusive use of the men's restrooms. The language in the amendment to the Magna Main Post Office lease specifically ensures that the USPS would not be deprived of its original bargain for use under the Magna Main Post Office lease.

The court also finds plaintiff's offered testimony and argument that the USPS was "donating" and not leasing the "additional 1,341 net interior square feet, including the women's bathroom and locker room, a vestibule, corridor space, and a storage area" unpersuasive. "Amendment No. 1" to the Magna Main Post Office lease specifically required plaintiff to provide use of the women's restrooms and locker room, vestibule, corridor space, and storage area, and explained that the use was "necessary due to Lessor proceeding with Phase II construction." Because the Magna Main Post Office lease amendment modified and increased the square footage of the Magna Main Post Office space, the USPS was paying approximately $35,000.00 in additional annual rent. Plaintiff has not put forth any lease language to suggest that this additional payment was not intended to account for the additional square footage that the USPS was granted in the lease amendment, including the right to use "the women's bathroom and locker room (661 sq. ft.)," "carrier vestibule (425 sq. ft)," and "maintenance storage area east of the carrier vestibule." Instead, the language in the Magna Main Post Office lease amendment explains that the increased rental rate was exchanged as "good and valuable consideration" for "the mutual covenants and agreements" between the parties to the Magna Main Post Office lease amendment.

Plaintiff asserts, however, that "Amendment No. 1" to the Magna Main Post Office lease did not explicitly use the term "exclusive" in defining the square footage that would be available for use by the USPS. Plaintiff argues that the language of the lease amendment and the interpretation of the contextual circumstances in which it was executed, including allowance of plaintiff to seek other tenants for the remaining space, suggest that the bathrooms and second egress would be available to plaintiff. This clearly was not the intent of the USPS. In addition to the testimony of both parties discussed above, the Magna Main Post Office lease amendment states that, in the event the unoccupied space of approximately 5,000 square feet were to be leased, "Lessor shall install a demising wall separating postal and leased space, said wall shall be constructed to RE5 security requirements, tenant shall not have any access to postal space." This

language, together with the trial testimony, establishes that, at the time the parties executed "Amendment No. 1," the parties understood that plaintiff and a tenant other than the USPS might occupy the 5,000 square feet of non-postal space, but would not have access to any area in the building used by the USPS.  Additionally, the parties agreed that, if the space was leased, plaintiff would build a demising wall separating the postal space from the tenant's space. Although plaintiff argues that this demising wall could have included a door that would allow for shared access to the restrooms and the second egress point, the lease amendment does not implicitly or explicitly contemplate a shared use or constructing a demising wall with a door, which could make the USPS space no longer secure. In contrast, the lease amendment memorialized the parties' intention to separate the USPS from any non-postal spaces within the building and to deny any future tenant access to the USPS's space.[28]

To the extent plaintiff argues that it has a right to lease the women's bathroom and locker room, vestibule, corridor space, and storage area to a non-postal tenant under a shared use arrangement because the Magna Main Post Office lease amendment granted plaintiff the right "to lease 'Phase II' space," that argument misconstrues the meaning of "Phase II" as understood in context. At trial, Keith LaShier testified that the term "Phase II" in the Magna Main Post Office lease amendment was used differently than how "Phase II" was referred to in the original building floor plan for the Magna Main Post Office. Contracting officer Edward Bavouset explained:

> Well, under the original lease and solicitation, the Postal Service solicited for and contracted for exclusive space of the entire location. As a result of the lessor's actions proceeding with Phase 2, which was not authorized, it created some problems for us. So as a result of this lease amendment, we took off what has previously been identified in Exhibit JX-73 as identified by the red Xs on the right side, space that the Postal Service would not occupy. And that's what was covered under this lease addendum.

As discussed above, the Magna Main Post Office lease amendment allowed the lessor, Stromness MPO, to lease the "'Phase II' space" to a non-postal tenant, however circumstances surrounding the Magna Main Post Office lease amendment prove that the reference to "Phase II" in the lease amendment is different than the Phase II area depicted in the original Magna Main Post Office expandable building plan. Specifically, the "'Phase II' space" does not include the additional square footage within the Magna facility that was leased to the USPS in order to accommodate plaintiff's unauthorized, additional construction.

The floor plan attached to the Magna Main Post Office lease amendment represented the parties' changed intention to lease additional square footage to the USPS and to leave the "red x" designated area not available for postal use.  As Frederick

---

[28] As discussed below, when the USPS executed the District Training Center lease it granted shared use of the hallways, restrooms, and parking to the training center function, which was also a USPS entity and function.

Stromness testified, "the bigger yellow box is definitely leased by the Postal Service" and "in the actual lease, there's language that states that Stromness is going to provide that area in order that functional use of Phase I can be obtained by the Postal Service in the Phase I-Phase II combined building." Frederick Stromness confirmed that plaintiff "agreed to provide space that wasn't included specifically in their square foot rental" to the USPS, which included the women's restroom, the carrier vestibule and the maintenance storage area.

Although plaintiff's counsel argues in its post-trial submission that the amendment to the Magna Main Post Office lease granted Stromness the right to lease the entire Phase II space, Frederick Stromness's testimony establishes that plaintiff only anticipated leasing the unoccupied space designated by "red x" to another tenant. During the trial, Frederick Stromness testified that Exhibit A to the Magna Main Post Office lease amendment marked the Phase II space with red "X"s, and that the two red "X"s designate the space that the USPS would not be using. Frederick Stromness also testified that, at the time the Magna Main Post Office lease amendment was executed, he understood that plaintiff would be permitted to lease only the space designated with red "X"s to non-postal tenants:

> Q. It was at this point, as of the signing of this Lease Amendment, you wanted to rent the red X'ed out space which is referred to by the parties as Phase II space to a third party; is that correct?

> A. We wanted to have that ability, that option. In my discussions with Mr. Bavouset, that did include owner use, Stromness' use for the business. We saw that one letter. I'll agree with that. We were in a little bit of a financial bind with the construction of Phase II, and we needed -- we needed some avenue to move. And that included being able to lease to a tenant.

Frederick Stromness's testimony proves that the meaning of "Phase II" space changed between the floor plan attached to the original Magna Main Post Office lease and the floor plan attached to "Amendment No. 1" to the Magna Main Post Office lease, and that, when the Magna Main Post Office lease was amended, the parties understood that "Phase II" space to be only the area marked by red "X"s on the revised floor plan. As further evidence of the new "Phase II" meaning, when plaintiff leased the space to the USPS for the District Training Center, the space was described as 5,374 square feet of "Net Floor Space," as opposed to the original size of the "Phase II" space, which was 8,390 interior square feet.

The parties further disagree as to whether, after the Magna Main Post Office lease was amended, the subsequent District Training Center lease further modified the Magna Main Post Office lease and granted plaintiff or plaintiff's tenant the right to access restrooms, utilities, parking, or adequate egress located in the space used by the USPS. In its post-trial submission to the court, plaintiff argues that all of the leases, and their amendments, should be interpreted as a single agreement in order to effectuate what plaintiff argues is the parties' mutual intent to allow plaintiff to lease the unoccupied portion of the building to non-postal tenants. Plaintiff alleges that the Magna Main Post Office lease, as amended, "explicitly created the right for the Plaintiff to lease to other tenants"

and the subsequent District Training Center lease made it possible for plaintiff to lease to non-postal tenants "by providing for access to restrooms, hallways, and parking by other non-postal tenants." According to plaintiff, at the time of the amendment to the Magna Main Post Office lease, the parties "necessarily understood" that plaintiff's right and ability to lease the unoccupied space to a non-postal tenant "was unavoidably contingent on Code-compliant access to restrooms, utilities, parking, and most importantly, adequate egress," as evidenced by the language in the later, executed District Training Center lease. According to plaintiff, when the parties executed the subsequent District Training Center lease, that lease "functioned more as an amendment than as a true, separate lease," which made it possible for plaintiff to lease the unoccupied space to non-postal tenants "by providing for access to restrooms, hallways, and parking by other non-postal tenants."

Although defendant does not directly address plaintiff's argument in its post-trial submission that the two leases should be interpreted as a single, unified agreement, defendant argues that the District Training Center lease did not modify or change the Magna Main Post Office lease, as amended, which provides that the USPS would have exclusive use of the women's bathroom and locker room, vestibule, corridor space, and maintenance storage area. Defendant argues that the District Training Center lease "in no way suggests that Stromness would have access to the bathrooms."

Notwithstanding plaintiff's assertion that the Magna Main Post Office lease, as amended, and the District Training Center lease, as amended, should be considered a single, integrated lease, there is no evidence to support such an interpretation. The District Training Center lease, as amended, was executed approximately three years after the original Magna Main Post Office lease and does not refer to the Magna Main Post Office lease directly or indirectly. The District Training Center lease, as amended, is identified with an independent project number and the facility name is "SALT LAKE CITY – DISTRICT TRAINING CENTER." (capitalization in original). Evidence submitted at trial demonstrates that the parties did not originally intend for the leases to represent a single agreement at the time the lease agreements were executed, but that plaintiff subsequently pursued integration of the leases after the District Training Center lease expired. In an e-mail from Richard Daniel Stromness to the USPS on August 9, 2015, approximately fifteen years after the leases were executed, he stated:

1) Renewal and integration of the Magna, Utah Post Office leases. Despite the litigation, this is the right thing to do if the Postal Service wants to act in a moral and honest manner. That the Postal service papered-over their mistakes in the past, should not adversely affect the Lessor in the future. The Lessor did as the Postal Service requested and the internal political fumbling should not become Lessor [sic] responsibility. Nor should the current financial situation of the USPS serve as a rationalization to act iniquitously. Integrating the leases is a win-win for both parties, considerable money on both sides will be saved and a long standing relationship will be preserved.

64

At trial, Richard Daniel Stromness testified that, at the time the e-mail was written, he believed "[t]here were two leases." He stated:

> Right. I thought the leases should be reformed. I felt like it's a single building built for a single tenant, and it should have a single lease. In my opinion, those spaces are not meant to be separate.

When asked why he suggested integrating the leases in his e-mail, Richard Daniel Stromness explained: "My intent in writing this was to get a single lease for that facility. That was my hope." Richard Daniel Stromness's e-mail and subsequent testimony regarding the e-mail suggest that he and his organization understood that there were multiple leases and that, even as late as 2015, neither of the parties believed that the leases represented a single agreement.

The evidence in the record does not support plaintiff's position that the Magna Main Post Office lease, as amended, and the District Training Center lease, as amended, were integrated or should be reformed to reflect the parties' intention at the time the leases were executed. Plaintiff "seeks reformation of the terms of the agreement" based on the allegation that the parties were "mistaken in their perception or belief regarding the mutually intended ability of the Plaintiff to lease the Phase II space to non-postal tenants." Plaintiff alleges the "possibility that the Postal Service and Stromness were mistaken in their basic assumptions regarding the intended ability of Stromness to lease its Phase II space to non-postal tenants in light of the Postal Service's security restrictions" for the Magna Main Post Office space. According to plaintiff, these mistaken beliefs constitute basic assumptions underlying the lease agreements and "had a material effect on the bargain intended by the parties." Plaintiff alleges that, as a result of this mutual mistake, "the leasing documents do not accurately reflect" the intent of the parties.

The record does not support either of plaintiff's assertions. Defendant did not choose to integrate the lease documents or reform the legal relationship between the parties. Defendant argues that the Magna Main Post Office lease, as amended, and the District Training Center lease, as amended, should not be reformed because plaintiff has not proven a mutual mistake and defendant does not agree that a mutual mistake occurred. The United States Court of Appeals for the Federal Circuit has held:

> [A] party seeking reformation under the doctrine of mutual mistake must allege: "(1) the parties to the contract were mistaken in their belief regarding a fact; (2) that mistaken belief constituted a basic assumption underlying the contract; (3) the mistake had a material effect on the bargain; and (4) the contract did not put the risk of the mistake on the party seeking reformation."

Bank of Guam v. United States, 578 F.3d 1318, 1330 (Fed. Cir. 2009) (quoting Atlas Corp. v. United States, 895 F.2d 745, 750 (Fed. Cir. 1990)); see also Nat'l Australia Bank v. United States, 452 F.3d 1321, 1329 (Fed. Cir. 2006) ("An erroneous mutual belief about the contents of a written agreement is sufficient to constitute a 'mistake' for this purpose. . . ."). "A 'mistake' that can support reformation is a belief that is not in accord

with the facts." <u>Atlas Corp. v. United States</u>, 895 F.2d at 750. "To satisfy this element of a reformation claim, a plaintiff must allege that he held an erroneous belief as to an existing fact." <u>Id.</u>

Plaintiff's request for reformation fails because plaintiff's claim rests on bare assertions. As defendant asserts, plaintiff does not cite any evidence to support its assertion that the lease agreements should be reformed. Plaintiff does not allege a mistake as to an existing fact at the time the lease amendment to the Magna Main Post Office lease was executed, but, instead alleges the "bare possibility that the Postal Service and Stromness were mistaken in their basic assumptions regarding the intended ability of Stromness to lease its Phase II space to non-postal tenants in light of the Postal Service's security restrictions for the Phase I space it was leasing." Plaintiff states that "[t]hese mistaken beliefs constitute basic assumptions underlying the Magna leasing agreements and had a material effect on the bargain intended by the parties," however, plaintiff does not explain why the alleged mistaken beliefs were basic assumptions underlying the lease amendment, or explain the material effect the mistaken beliefs had on the Magna Main Post Office lease, as amended. Moreover, plaintiff alleges the possibility of a mistake, but does not even allege that a mistake in fact occurred. Furthermore, plaintiff's alleged mistake does not involve a mistake of fact, but, instead, describes a misunderstanding on the part of plaintiff about the rights granted to the parties under the lease amendment. Whether Stromness had the ability to lease the unoccupied space to a non-postal tenant, and which areas would be available to a non-postal tenant, are not issues of fact, but rather issues concerning interpretation of the legal rights granted to plaintiff under the terms of the Magna Main Post Office lease, as amended. Moreover, it is difficult to find that what plaintiff alleges were mistaken beliefs had a material effect on the parties' bargain because the alleged misunderstanding appears to have been identified nearly fifteen years after the parties executed the lease agreements. Given plaintiff's unsupported and sparse allegation that the Magna Main Post Office lease amendment should be reformed, the court finds no basis to take the significant step of reforming the lease agreements.

Furthermore, the use of the term "tenants" in the District Training Center lease did not grant non-postal tenants access to the hallways, restrooms, and parking. Plaintiff argues that the reference to "tenants" in the District Training Center lease confirmed that non-postal tenants could have access to the hallways, restrooms, and parking used by the USPS under the Magna Main Post Office lease, as amended. Defendant, however, argues that the District Training Center lease did not change the exclusive use of the restrooms, hallways, and parking as intended in order to have secure postal operations under the Magna Main Post Office lease, as amended, and that the reference to "tenants" is a reference to the USPS personnel who could constitute the "training center function and post office function which where the respective tenants of the facility" when the District Training Center lease was executed.

At trial, Frederick Stromness testified that the reference to "tenants" in this sentence within the District Training Center lease referred to the two tenants occupying the facility, the Magna Main Post Office and the District Training Center:

Q. I'm asking you what your understanding is, Mr. Stromness. Does "tenants" mean the main post office function on one hand and the training center function on the other hand? Yes or no.

A. [Frederick Stromness] Yes.

Therefore, according to Frederick Stromness's testimony, at the time the District Training Center lease was executed, plaintiff also did not understand the reference to "tenants" in the District Training Center lease to refer to any possible non-postal tenant, but, instead, to refer to the two, actual tenants that would occupy the facility, both of which were USPS entities. Under the terms of the District Training Center lease, these two tenants, both related to the USPS, would have shared access to the restrooms, hallways, and parking. This shared use was not in contravention to the exclusive, secure USPS use intended in the Magna Main Post Office lease, as amended, because the District Training Center function is a part of the USPS organization, and the USPS, as the lessee enjoying exclusive use of the Magna Main Post Office space, was within its discretion to share that exclusive use with another USPS tenant. Plaintiff's argument that, by sharing the space with another postal tenant, the USPS amended the Magna Main Post Office lease and surrendered its right to exclusive use of the restrooms, hallways, and parking is without support. Instead, Frederick Stromness's testimony works to counter plaintiff's position later put forth in its post-trial submission to the court.

In further support of its position, plaintiff argues that the "Manager of its Denver Facilities Service Office testified that 'tenants' was not limited to postal tenants." Plaintiff is referring to Keith LaShier, who was the Manager of the Denver Facilities Service Office when the District Training Center lease was executed. When asked at trial about the reference to "tenants" in the District Training Center lease, however, Keith LaShier testified that it referred to the Magna Main Post Office and the District Training Center:

Q. I want to ask you about this provision on page 39 where it states: Hallways, restrooms and parking shared by tenants. Do you see that?

A. [Keith LaShier] I do.

Q. The tenant that -- the word "tenants," that reference is to the Magna post office and the district training center lease, correct?

A. That's correct.

Q. So Tenant 1 is the Magna Main Post Office, and Tenant 2 is the district training center, correct?

A. The tenant would be the party under the district training center. They would be the tenant.

Q. There's a phrase, "tenants," though. I'm trying to understand what that means. The first tenant is the Magna -- Magna Post Office function, which

is on the other part of the facility, and the second function is the -- the second tenant is the district training center function, correct?

A. That is correct. Without knowing the intent of the writer, typically that section only pertains to the occupants of the space particularly identified in a specific lease, which would be this lease.

Q. So either it's the district training center function alone, or it's the Magna Post Office and the district training center function?

A. Yeah.

Although plaintiff tries to rely on Mr. LaShier's testimony as support for its argument that "'tenants' was not limited to postal tenants," Mr. LaShier's testimony supports the opposite conclusion.

Considering the language of the District Training Center lease, and the context in which it was executed, the lease intended to grant shared use of the bathrooms, hallways, and parking to the USPS-operated Magna Main Post Office and to the Postal Service operated District Training Center, and there is no indication in the language of the District Training Center lease that the USPS intended to grant shared use to future non-postal tenants. Plaintiff does not cite to any additional evidence to support its argument that the USPS intended to amend the Magna Main Post Office lease through the District Training Center lease in order to allow shared access to the restrooms, hallways, and parking for non-postal tenants. After reviewing all of the evidence in the record, the court does not find support for the conclusion that the District Training Center lease altered the exclusive USPS use intended and granted to the USPS in the Magna Main Post Office lease, as amended.

A review of the plain language in the Magna Main Post Office lease, as amended, and the District Training Center lease, as amended, establishes that plaintiff has failed to prove that the USPS breached the Magna Main Post Office lease, as amended, by interfering with plaintiff's right to lease the "Phase II" space, or the part of the building previously occupied by the District Training Center, to a non-postal tenant by simply constructing the demising wall in September 2013. As discussed below, however, the issue of where the demising wall was constructed and plaintiff's rights based on the square footage remaining is at issue. Plaintiff's right to lease the "Phase II" space did not include the right to shared access of the hallways, restrooms, parking, vestibule, maintenance storage area, or any other area reserved for exclusive, secure postal space in the Magna Main Post Office lease, as amended. Thus, in constructing the demising wall, the USPS did not "block all access to bathrooms, water, sewer, gas, and means of egress" from the Phase II space, because such access was not available to plaintiff with or without the demising wall separating the Magna Main Post Office space from the former training center space. To the extent plaintiff alleges that the demising wall was detrimental or inconsistent with plaintiff's right to lease the "Phase II" space to another party or to use the space for its own purposes, that argument fails because the demising wall did not impermissibly effect plaintiff's right to access the facilities and utilities within the Magna

Main Post Office space because plaintiff's right to lease the "Phase II" space does not include the right to access the Magna Main Post Office space.

Additionally, in a one-sentence paragraph, plaintiff alleges that, when the District Training Center lease, as amended, expired on December 31, 2012, the USPS shut off the circuit breakers for the former training center space, thereby halting electrical service to the area. Plaintiff alleges that depriving the former training center space of electrical service access "also breached the Postal Service's agreement that Stromness could lease the Phase II space to non-postal tenants." In response, defendant argues that the USPS would have given plaintiff temporary access to the electrical panels in order to address the code-compliance issues, however, plaintiff "has not requested for such access." Defendant also argues that the electricity to the former training center space could be turned back on if plaintiff secures a tenant for the space.

As discussed at length above, plaintiff's right to lease the Phase II space within the Magna facility to a non-postal tenant originally arises from the Magna Main Post Office lease, as amended.  Plaintiff's allegation does not cite to any provision in that lease obligating the USPS to maintain electrical service to the entire Magna facility. In fact, the Magna Main Post Office lease, as amended, stated that "[a]ll systems, utilities, and access supporting the unoccupied postal space shall not affect, or be a part of this lease." This language specifically excluded the electrical service for the Phase II space from the Magna Main Post Office lease.

Plaintiff also does not explain how turning off electricity to the former training center space impeded its ability to lease the space to a non-postal tenant because there is no evidence that plaintiff attempted to access the circuit breakers or return electrical service to the vacated space after the USPS moved out of the space in December 2012. Plaintiff argues that, because the circuit breakers are located within the Magna Main Post Office, "the circuit breakers are entirely in the Postal Service's control." Plaintiff itself, however, built the facility and placed the circuit breakers in the Magna Main Post Office space. Subsequently, plaintiff executed the amendment to the Magna Main Post Office lease which granted the USPS exclusive use and access to the main post office space. Thus, the location of the circuit breakers and plaintiff's inability to freely access them is a problem of plaintiff's own creation. Because plaintiff does not fully address each of the factors necessary to successfully allege that the USPS breached the Magna Main Post Office lease when it turned off the circuit breakers for the former training center space, or submit evidence to support this allegation, plaintiff's claim with regard to the circuit breakers fails.

The court recognizes that without access to the restroom facilities and utilities, the "Phase II" space is not code-compliant, in accordance with the 2000 International Building Code (IBC), as acknowledged by expert witnesses for both plaintiff and defendant at trial. The court also acknowledges that plaintiff has been unable to lease the space to another non-postal tenant, however, this situation is the result of plaintiff's unauthorized construction in 1998 of a facility twice as large as agreed to under the original Magna Main Post Office lease. As plaintiff emphasized at trial and in its post-trial submissions, plaintiff is a sophisticated business entity, which has held many lease contracts with the

United States government over several decades. Thus, plaintiff knew or should have known the risks associated with performing work without receiving proper contracting officer authority for construction. Moreover, the lease agreements explicitly placed the burden of code-compliance on plaintiff, including section A.22 in the original Magna Main Post Office lease, language that also was included in the District Training Center lease. That language obligated plaintiff, as the lessor, "to comply with all codes and ordinances applicable to the ownership and operation of the building in which the rented space is situated and to obtain all necessary permits and related items at no cost to the Postal Service."

<u>Construction of the Demising Wall</u>

Plaintiff also alleges that the USPS breached the Magna Main Post Office lease, as amended, when it constructed the demising wall because, according to plaintiff, building the demising wall was "purely the right and responsibility of the Lessor." Plaintiff asserts that the Magna Main Post Office lease, as amended, does not "provide for a postal-constructed demising wall, but only for one constructed by the 'Lessor,' should the Phase II space ever be leased to a third party." In defense of plaintiff's breach of contract allegation, defendant offers several theories to support its construction of the demising wall in September 2013, all of which relate to securing the Magna main post office space and preserving the USPS's exclusive use in order to protect the integrity of the USPS functions.

The Alterations clause included in the Magna Main Post Office lease, as amended, and the District Training Center lease, as amended, states, in pertinent part:

> The Postal Service shall have the right to make alterations, attach fixtures and erect additions, structures or signs in or upon the premises . . . which fixtures, additions or structures so placed in, upon or attached to the said premises shall be and remain the property of the Postal Service and may be removed or otherwise disposed of by the Postal Service. Prior to expiration or termination of this lease the Postal Service may remove such alterations and improvements and restore the premises to as good condition as that existing at the time of entering upon the same under the lease, reasonable and ordinary wear and tear and damages by the elements or by circumstances over which the Postal Service has no control, excepted. If however, at the expiration or termination of the lease or any renewal or extension thereof, the Postal Service elects not to remove such alterations and/or improvements, said alterations and/or improvements shall become the property of the Lessor and any rights of restoration are waived.

Defendant states that, pursuant to the Alterations clause, the USPS was required to return the space as the USPS received it, except for reasonable wear and tear. According to defendant, when it received the training center space in January 2000, the Magna Main Post Office area was separated from the training center space by a chain-link fence. Defendant asserts that, in accordance with the requirement in the Alterations clause to "restore the premises to as good condition as that existing at the time of entering upon

the same under the lease," the USPS installed the demising wall and returned the training center space to plaintiff as it had been received.

Defendant also argues that it was permitted to install the demising wall pursuant to the language in the amendment to the original Magna Main Post Office lease, which required plaintiff to "secure the unoccupied space in any manner he deems appropriate." Defendant asserts that plaintiff failed to secure the space as required by the Magna Main Post Office lease, as amended, and, as a result, the USPS was entitled to install the demising wall to maintain a secure postal facility.

Although plaintiff argues that only the lessor was permitted to construct a demising wall within the Magna facility, the provisions in the Magna Main Post Office lease, as amended, also provided authority for the installation of a demising wall by the USPS. Plaintiff is correct that the amendment to the Magna Main Post Office lease specifically required the lessor to install a demising wall "separating postal and lease space" if the unoccupied space was leased, however, the language in the amendment does not limit the installation or construction of a demising wall to only that circumstance. Indeed, as set forth above, the Alterations clause granted the USPS the right to make alterations and erect structures on the premises during the tenancy period.

As defendant asserts, upon the termination of the District Training Center lease, as amended, the USPS was obligated to "restore the premises to as good condition as that existing at the time" the District Training Center lease was executed. At trial, contracting officer representative Michael Long testified that, when he inspected the Magna Main Post Office space prior to the USPS taking beneficial occupancy, he saw a chain-link fence separating the Magna Main Post Office space from the unoccupied space, which would later become the District Training Center. Plaintiff disputes the existence of the fence. At trial, Frederick Stromness testified that he "never saw a fence," nor did he "see any indication of a permanent-type separation being fastened to the floor with any bolts." Although neither party submitted photographic evidence to prove or deny the presence of a fence between the two spaces, defendant submitted an exhibit into evidence which documented a request for a fence through a "Design Variation/Clarification Request" issued to Build Inc. This DVCR stated: "The 'extra' space not leased by the USPS, must be enclosed – this can be done with an 8' high chain-link fence." At trial, Michael Long explained that the architectural engineering firm Frank Murdock & Associates issued the DVCR, and that the firm was contracted by the USPS to "look after . . . the design of this project as well as the construction." According to Michael Long, "Build Inc. constructed the fence" as "part of their modified contract." The court finds the testimony of Michael Long, as corroborated by the documentary evidence, credible and persuasive. Even if Frederick Stromness never saw a fence separating the spaces, that would not prove a fence never existed, and his self-serving testimony is less-credible. Because the fence between the Magna Main Post Office space and the unoccupied space appears to have been in place at the time the parties executed the District Training Center lease, when that lease terminated, the USPS was permitted to re-install a fence or wall to re-separate the spaces and return the space to the same condition in which it was received.

Additionally, the USPS was permitted to construct the demising wall for security purposes. Plaintiff is not incorrect that Stromness, as the lessor, had a right to construct a demising wall in the event the former training center space was leased to another tenant, however, Stromness also had an obligation to secure the unoccupied space even if the space was not leased to another tenant and failed to do so for the nine-month period between the termination of the District Training Center lease, as amended, on December 31, 2012, and the construction of the demising wall on September 9, 2013. Also, plaintiff did not submit any evidence to establish that it held the exclusive right to construct a demising wall between the spaces. As discussed at length above, the Magna Main Post Office lease granted the USPS exclusive use of the postal space, as identified in the original Magna Main Post Office lease and the lease amendment, and the USPS could reasonably rely on the Alterations clause to construct a demising wall in order to secure the main post office space.  Accordingly, the court finds that the USPS did not breach either the District Training Center lease, as amended, or the Magna Main Post Office lease, as amended, in constructing the demising wall. As discussed below, however, the parties do not dispute that the USPS built the demising wall in the wrong location and improperly retained as part of the main post office space a portion of the former training center space that should have been returned to plaintiff upon the expiration of the District Training Center lease, as amended.

<u>Square Footage Retained by Erroneous Placement of the Demising Wall by the USPS</u>

Plaintiff alleges that, "by the construction and incorrect placement" of the demising wall, the USPS "continues to retain net interior square footage" in the Magna Main Post Office space, "which it [defendant] admits should have been returned to Plaintiff" as part of the former training center space. Plaintiff's position as to the amount of square footage retained has shifted throughout the course of this case. Plaintiff's amended complaint alleges that defendant has "walled off and impermissibly retains 400 interior square feet of space properly belonging to Plaintiff" as part of the former training center space. During discovery, plaintiff stated in an interrogatory response that "the Postal Service has retained a total of 387.899 interior square feet" of the former training center space "belonging to the lessor." At trial, however, plaintiff's expert testified that the USPS continues to retain 683 square feet. Finally, in its post-trial submission to the court, plaintiff argues that "[d]efendant has retained 683 square feet of the space" previously occupied by the District Training Center.

Defendant concedes that "[b]ased on the location of the demising wall and other interior walls, the Postal Service has retained possession and control over a certain amount of square footage that was included" as part of the District Training Center lease, as amended, "after the wall was installed in September 2013." In its post-trial submission to the court, defendant acknowledges that "[r]egrettably, the location of the demising wall led to the Postal Service mistakenly retaining a small portion of the former training center space – specifically, 371 square feet."

When the government, in its role as a lessee, holds over after the expiration of the lease term and fails to vacate the property, it "can be held liable to the lessor either (i) under a contractual theory for breach of the implied duty to vacate the premises at the

expiration of the lease, or (ii) under a takings theory for temporarily taking the lessor's property without just compensation." See Reunion, Inc. v. United States, 90 Fed. Cl. 576, 581 (2009) (citing Prudential Ins. Co. of Am. v. United States, 801 F.2d at 1299, 1300 n. 13). As a general principle, the court will consider first the lessor's breach of contract claim, and, only when a contractual remedy is unavailable, will the court consider granting relief to the lessor under a takings theory. See City Line Joint Venture v. United States, 503 F.3d at 1323 ("When a viable contract claim exists, we should not reach out to decide the takings issue. Clearly, there should not be double recovery, we should not commingle takings compensation and contract damages."); see also Reunion, Inc. v. United States, 90 Fed. Cl. at 581 (explaining "ordinarily contractual claims take precedence and it is only when a contractual remedy is unavailable that the court will grant relief under the Takings Clause").

It is a well-established principle that, "an implied duty to vacate is an inherent part of every fixed term lease agreement unless the parties explicitly express an intention to the contrary," including lease agreements between private parties and the United States.[29] Prudential Ins. Co. of Am. v. United States, 801 F.2d at 1299 ("A general rule of landlord-tenant law, as applied between private parties, is that the expiration or termination of a lease agreement terminates all rights of the lessee in the premises, and it becomes the lessee's duty to surrender possession of the leasehold to the lessor."); see also Reunion, Inc. v. United States, 90 Fed. Cl. at 583 (explaining that there is an implied duty to vacate the premises upon expiration of a lease); Allenfield Assocs. v. United States, 40 Fed. Cl. 471, 486 (1998) ("The general rule is that 'an implied duty to vacate is an inherent part of every fixed term lease agreement unless the parties explicitly express an intention to the contrary.'" (citing Prudential Ins. Co. of Am. v. United States, 801 F.2d at 1299)). "When a lessee has a contractual duty to vacate the property at the end of the lease term, it necessarily follows that such a failure to vacate is a breach of that contractual duty, which will subject the breaching party to liability for holding over." Allenfield Assocs. v. United States, 40 Fed. Cl. at 486. Whether the government in its role as a lessee or tenant is holding over is a question of fact. See Asset 42302 LLC v. United States, 77 Fed. Cl. 552, 562 (2007).

In the instant case, defendant concedes that it is "retaining" square footage that should have been returned to plaintiff when the District Training Center lease, as amended, expired. As noted above, the parties disagree as to the amount of square footage that is being retained. At trial, both parties presented expert witnesses to testify about the amount of square footage improperly retained by the USPS as a result of the incorrectly placed demising wall. Plaintiff's expert, Birk Larsen, testified that the USPS is retaining 683 square feet of space as a result of the incorrectly placed demising wall. Mr. Larsen testified that he measured the former training center space to be 4,691 net square feet, and that he then compared that size to the 5,374 net interior square feet identified in the District Training Center lease, as amended. Mr. Larsen calculated the difference between his measurement of the space and the square footage identified in the District

---

[29] There is no dispute in the instant case that the District Training Center lease did not include an express intention contrary to the implied duty to vacate.

Training Center lease, as amended, to be 683 square feet, and, thus, concluded that the USPS was retaining 683 square feet, "most likely due to the construction of demising and other walls by the USPS tenant prior to and during 2013, before returning vacant suite over to Owner." In his expert report, Mr. Larsen explained that he "determined the Net Interior Space for the vacant suite to be **4,691 NET interior square feet**" and that "**[t]his area is less than the 5,374 square feet of NET floor space identified in the Phase II lease by 683 square feet.**" (emphasis in original). Mr. Larsen's report explains that he "took field measurements and photos of the vacated suite and exterior of the building." Mr. Larsen's expert report is five pages in length and does not include his curriculum vitae or, more importantly, any attachments to support his measurements of the space. At trial, however, Mr. Larsen did testify as to his prior experience:

> I worked some construction jobs through college, but professionally I started working for Ark-ology Architects as an intern in 2006. In 2008 I switched firms, and I started working for Gary Francis & Associates Architects out of Park City. And while he [I] was with Gary Francis & Associates, I completed my internship hours, I completed licensing exams and received by architectural license.
>
> . . .
>
> I worked for Gary Francis & Associates from 2008 until 2012. And on January 20, 2012, I founded Innovate Architecture, focusing primarily on design, and then in November of 2012 I began consulting for a company called Property Condition Assessments, LLC, doing property condition assessments and work in support of commercial due diligence transactions – or commercial real estate transactions. And I worked for Property Condition Assessments until September of 2016.

Defendant's expert, Kenneth Downes, concluded that the incorrect placement of the demising wall resulted in the USPS retaining 371 square feet of space that should have been returned to plaintiff upon the expiration of the District Training Center lease, as amended. Mr. Downes testified that he measured the square footage of the entire Magna facility, as well as each space within the facility. According to Mr. Downes, the total size of the entire Magna facility is 15,939 square feet, with the Magna Main Post Office currently occupying 10,818 square feet. Mr. Downes testified that, based on his measurements of the entire facility and of the spaces within the facility, when the USPS took occupancy of the District Training Center space in January 2000, the USPS only received 5,082 square feet, and not the 5,374 square feet identified in the District Training Center lease. Based on Mr. Downes measurements, defendant argues that the court should find that the square footage identified in the District Training Center lease, as amended, is incorrect, and that the USPS is only retaining 371 square feet.

Mr. Downes testified that he has 40 years of experience measuring spaces and that he has measured "hundreds of buildings" for the USPS. Mr. Downes explained that, in order to reach his opinion, he "looked at the drawings, the construction drawings. I went out and measured the space. I looked at the lease amendment, I read the lease." Mr.

Downes' expert report is 355 pages in length and includes his curriculum vitae, an explanation of his findings, and numerous attachments and exhibits to support those findings. In his report, Mr. Downes explains that he has practiced architecture for 19 years as a Project Architect, and for the previous 20 years he has "been working with the Facilities group for the USPS." He asserts that, during those 20 years, he "has been the project manager on hundreds of projects during that time which include updating or renovating every functional portion of postal facilities."

The parties' dispute about the amount of square footage improperly retained as a result of the incorrectly placed demising wall is a question of fact for the court to determine based on the evidence submitted at trial. To succeed on its claim that the USPS is retaining 683 square feet, plaintiff has the burden to prove this fact by a preponderance of the evidence. See D&S Universal Mining Co., Inc. v. United States, 4 Cl. Ct. 94, 97 (1983) ("Suffice it to say that such factual issues should be resolved and the true facts determined at trial on the basis of the preponderance of the evidence."). To determine this issue of fact, the court relies on the testimony and reports of the parties' expert witnesses. Based on the testimony of both expert witnesses and their expert reports, it appears that Mr. Larsen and Mr. Downes used the same tools to complete their measurements, a laser tape measure and a steel tape measure. While both experts measured the size of the former training center space, only Mr. Downes measured the size of the entire Magna facility. Based on his measurements of the entire facility, Mr. Downes concluded that the square footage identified in the District Training Center lease did not accurately reflect the size of the space that the USPS actually received in January 2000 when the parties executed the District Training Center lease. Although the District Training Center lease identified the "Net Floor Space" as 5,374 square feet, Mr. Downes concluded that the USPS actually received 5,082 square feet of net interior space.

Unfortunately, there does not appear to be any evidence other than the terms of the District Training Center lease to document the amount of space the USPS received in January 2000 for the training center space. It appears that the space after construction was not measured by either party until 2017, as a result of the ongoing dispute between the parties, and if the space was previously measured, no such measurements were introduced into the record. Although the District Training Center lease provides for 5,374 of net interior square feet, and, in fact, the evidence establishes that the USPS accepted the space provided by plaintiff at the time without raising any concerns about the amount of square feet, the court cannot disregard the size of the space based on the actual measurements of Mr. Downes.  In the face of evidence questioning that the District Training Center space received by the USPS in January 2000 may not have been 5,374 square feet, the court cannot rely solely on the 5,374 square feet identified in the District Training Center lease, as amended, as the basis for determining how much square footage the USPS is retaining as a result of the demising wall.

Although Mr. Larsen's approach to determining the amount of square footage retained by the demising wall is reasonable, he only relied on the square footage identified in the District Training Center lease and did not conduct more comprehensive measurements of the facility, which detracts from the credibility of his finding that the USPS is retaining 683 square feet of space. Mr. Larsen's conclusion assumes the

accuracy of the square footage identified in the District Training Center lease, which was convincingly undermined by the more experienced Mr. Downes' much more thorough expert report and testimony. The court finds that Mr. Downes' conclusion is more persuasive because it is based on the actual size of the entire Magna facility, as well as the different spaces within the facility. Moreover, Mr. Downes provided detailed graphs to illustrate his measurements, while Mr. Larsen only provided a four-page summary of his findings. Certainly, length of an expert report or the years of relevant experience are not alone conclusive in this case, however, based on the record presented, the court finds Mr. Downes to be a more reliable and credible expert than Mr. Larsen on the issues they addressed for the court. Based on the evidence submitted, the court finds that plaintiff has failed to prove, by a preponderance of the evidence, that the USPS has retained 683 square feet of space as a result of the incorrect location of the demising wall. Defendant concedes to retaining 371 square feet of space and Mr. Downes provided a detailed explanation and basis for that finding. The court, therefore, concludes that, as a result of the USPS constructing the demising wall in the wrong physical location, the USPS is retaining 371 square feet of space that should have been returned to plaintiff upon the expiration of the District Training Center lease, as amended.

The parties dispute the amount of damages to which plaintiff is entitled as a result of the USPS improperly retaining 371 square feet of space. Plaintiff argues that the terms of the District Training Center lease, as amended, apply to the duration of the USPS's holdover. Plaintiff cites <u>Yachts America, Inc. v. United States</u>, 230 Ct. Cl. 26, 39 (1982) for the proposition that "when a lessee holds over without new agreement after the expiration of his lease, the terms of the old lease agreement apply." <u>Id.</u>; <u>see also Asset 42302 LLC v. United States</u>, 77 Fed. Cl. at 562 ("If the USPS was a holdover tenant at the time of the damages to the premises, the terms of the original lease agreement apply, and the USPS is liable for the damage."). According to plaintiff, the annual lease rate provided in the District Training Center lease, as amended, for the period from January 1, 2013 to December 31, 2017 is set at $121,668.00, or $22.64 per square foot, and this lease rate should apply to defendant's holdover that began when the demising wall was constructed in September 2013. Alternatively, plaintiff argues that the appropriate market rent was estimated by its expert, Troy Lunt, to be $12.75 per square foot.

Defendant argues that the damages for a temporary holdover under a breach of contract theory is measured by the fair market rental value of the property, and that plaintiff has failed to establish the fair market rental value of the former training center space between September 2013 and January 2017. Defendant cites to <u>Allenfield Associates v. United States</u>, 40 Fed. Cl. at 486, to support its position on damages, which held that "[t]he rental obligation of a tenant at sufferance is not based on the rent provisions set forth in the original lease between the parties, but is the 'reasonable rental value of the property he occupies.'" <u>Id.</u> (citing Am. Jur. 2d <u>Landlord and Tenant</u> § 369, at 326 (1995)). According to defendant, plaintiff only has proven damages for the period of time between February 2017 to the date of judgment in this case, because the effective date of plaintiff's property appraisal is February 2, 2017. Defendant argues that "the market rent and market value provided by Stromness represent amounts as of February 2, 2017, or after that date," therefore, the court should not rely on the property appraisal to quantify plaintiff's damages for years 2013 to 2016.

As plaintiff asserts, this court's predecessor, the Court of Claims, established that "when a lessee holds over without new agreement after the expiration of his lease, the terms of the old lease agreement apply." Yachts Am., Inc. v. United States, 673 F.2d at 365. In Garrity v. United States, 67 F. Supp. 821, 822 (1946), the Court of Claims held:

> It is a well settled general principle of law that when a tenant holds over after the expiration of his lease with the express or implied consent of the landlord and without any new or different agreement as to rent, the terms of the old lease will apply.

Id.; see also Raymond Commerce Corp. v. United States, 93 Ct. Cl. 698, 703–04 (1941) ("If one person occupies the property of another for a period under an express agreement as to the terms of his occupancy, and, after the end of the period he continues to occupy without any indication that he contemplates a change in terms, and if the other accepts rent, thus consenting to continued occupancy, and without indicating that he contemplates a change in terms, their continued relation is consensual. They have, as plainly as if they had put it into words, shown their mutual willingness to continue the existing arrangement."). In Modeer v. United States, 68 Fed. Cl. 131, 142 (2005), aff'd, 183 F. App'x 975 (Fed. Cir. 2006), a Judge on this court cited to the Court of Claims decision in Garrity v. United States to hold:

> On the subject of holdover tenancies, controlling precedent states that: "It is a well settled general principle of law that when a tenant holds over after the expiration of his lease with the express or implied consent of the landlord and without any new or different agreement as to rent, the terms of the old lease will apply."

Id. (quoting Garrity v. United States, 67 F. Supp. at 822); see also Asset 42302 LLC v. United States, 77 Fed. Cl. at 562 (explaining that, when the USPS is a holdover tenant, the terms of the original lease that preceded the holdover shall apply). A holdover tenancy is governed by the terms of the expired lease, unless it is replaced by statute, a new agreement, or an express holdover provision in the original lease. See Modeer v. United States, 68 Fed. Cl. at 143. "Each leasehold period, and the rent due for that period, is calculated in the same fashion as under the expired lease." Id.

Notwithstanding the decision in Garrity v. United States, and the subsequent cases citing to that decision, defendant relies on Allenfield Associates v. United States, 40 Fed. Cl. at 487, to assert that damages should be based on the reasonable market value of the property. The court in Allenfield, however, did not address the previous and controlling precedent established in Garrity v. United States or cite to other cases for support.[30] In

---

[30] The United States Court of Appeals for the Federal Circuit adopted the body of law established by its predecessor court, the United States Court of Claims, as binding precedent in South Corp. v. United States, 690 F.2d 1368, 1370 (Fed. Cir. 1982); see also Mercier v. United States, 786 F.3d 971, 973 (Fed. Cir. 2015) (explaining that the decisions of the Court of Claims are binding on panels of the Federal Circuit).

its submissions to the court, defendant also does not address the decision in Garrity v. United States or discuss the decision in Yachts America, Inc. v. United States, on which plaintiff relies in its post-trial submission.

Because the weight of the case law precedent instructs that the terms of the expired lease apply to a holdover tenancy, and because defendant has not provided an explanation as to why the decision in Allenfield might be more applicable to the facts of the case currently before the court, the court concludes that the terms of the District Training Center lease, as amended, apply to the period of time during which the USPS has retained 371 square feet of space that the USPS should have returned to plaintiff.[31] Although plaintiff argues that the applicable annual rental rate should be based on the renewal rate for the term beginning on January 1, 2013 and continuing until December 31, 2017, the parties did not execute a renewal of the District Training Center lease, and, thus, the law leads the court to apply the terms of the expired District Training Center lease, which provided that the annual rental rate for the space was $108,149.00, or $20.12 per square foot.

Accordingly, because the demising wall was constructed in September 2013 and continued to stand as of the date of the trial in this case, and presumably to the date of this opinion, plaintiff is entitled to recover damages according to the following formula: $22.64 per square foot per annum for the 371 square feet of space improperly retained beginning on September 9, 2013 and continuing until March 31, 2018, upon which date the Magna Main Post Office lease, as amended, is currently scheduled to expire according to the terms of the Magna Main Post Office lease, as amended, unless the USPS deconstructs and relocates the demising wall prior to that date, in which case plaintiff is entitled to recover damages for the period beginning on September 9, 2013 and continuing until the space is returned to plaintiff.

January 1, 2013 to September 9, 2013 Holdover Tenancy

Plaintiff contends that, prior to constructing the demising wall in September 2013, the USPS held exclusive physical control of the District Training Center interior space from the date of its termination of the District Training Center lease, December 31, 2012, through September 9, 2013, when the demising wall was constructed. Plaintiff alleges that the USPS failed to fully vacate the District Training Center space following the termination of the District Training Center lease, as amended, kept the keys to that space, and barred plaintiff from entering the space without a USPS escort, until September 9, 2013, when the wall was built between the Magna Main Post Office space and the former

---

[31] The facts indicate that Stromness MPO implicitly permitted this holdover tenancy to occur, and plaintiff did not put forth evidence demonstrating that Stromness MPO contested the USPS's exercise of control over the former training center space following the expiration of the District Training Center lease, as amended, on December 31, 2012, other than noting to the USPS one time that the demising wall was in the wrong location. There is no additional evidence that plaintiff challenged the placement of the demising wall until it filed a claim to the contracting officer, which initiated this litigation.

training center space and the USPS advised plaintiff to change the key to the vacated space. Plaintiff seeks to recover holdover rent to account for this alleged holdover period of the former training center space, in addition to recovery for the space accounted for above as a result of the improper placement of the demising wall.

Defendant argues that plaintiff's claim must fail because the USPS was not a holdover tenant. According to defendant, on December 31, 2012, the USPS completely vacated the training center space, and the space was made available to plaintiff. With regard to plaintiff's arguments that the USPS did not return the keys and required plaintiff to have a USPS escort to visit the vacated space, defendant argues that the USPS escorted plaintiff through the secure postal space in order to access the vacated space and that the USPS left plaintiff to visit its space unescorted. Defendant argues that the USPS kept the key to the exterior door of the training center space for security reasons because the key could have opened all of the doors in the post office and that retaining the key to the space is not sufficient to prove that the USPS was a holdover tenant. Defendant also argues that plaintiff never asked for the key to the exterior door of the vacated training center space and that plaintiff could have re-keyed the lock at any time. According to defendant, even if the court finds that the USPS was a holdover tenant, plaintiff has failed to establish damages with reasonable certainty.

As stated above, it is a well-established principle that, "an implied duty to vacate is an inherent part of every fixed term lease agreement unless the parties explicitly express an intention to the contrary," including lease agreements between private parties and the United States.[32] See Prudential Ins. Co. of Am. v. United States, 801 F.2d at 1299.

As previously described, the USPS entered into a lease with plaintiff for 5,374 square feet of unoccupied space in the Magna facility on January 18, 2000, which is referred to by the parties as the District Training Center lease or the "Phase II" lease. The term of the lease was initially January 1, 2000 to December 31, 2004, but the lease was extended later for a term beginning January 1, 2006 and continuing until December 31, 2012, at an annual rate of $108,149.00.  During the lease period, the USPS issued a notice of termination indicating that the USPS intended to vacate the training center space upon the expiration of the District Training Center lease, as amended, on December 31, 2012. The notice of termination stated: "The Postmaster will arrange to have the meters read and the utilities disconnected. All postal equipment will be removed by the above date, and the keys will be mailed or delivered to you."

During the trial in the instant case, witnesses for both plaintiff and defendant testified about the actions of the USPS following the termination on December 31, 2012 of the District Training Center lease, as amended. Postmaster James Kenyon testified that, as of December 28, 2012, the USPS had removed "all the desks and everything that were [sic] there at one time," and that the training center space was "broom clean" and

---

[32] There is no dispute in the instant case that the District Training Center lease did not include an express intention contrary to the implied duty to vacate.

separated from the Magna Main Post office space by an office divider that Postmaster Kenyon installed so that no one would enter the vacated space through the Magna Main Post Office. Postmaster Kenyon explained that "broom clean" meant the USPS had to "make sure everything's cleaned up, there's nothing left there, building is completely empty and cleaned up." There is no evidence in the record that the space was not "broom clean" after December 28, 2012, as testified to by Postmaster Kenyon. Additionally, the testimony received at trial and the admitted exhibits establish that there was an office divider installed to separate the two areas of the Magna facility. Thus, the court concludes that, on or before the expiration of the District Training Center lease, as amended, the USPS had removed all of its furniture and equipment and was no longer physically occupying the space leased to the USPS as the District Training Center, and that the space was "broom clean" as of December 28, 2012.

The court heard testimony from Richard Stromness and Postmasters James Kenyon and Roland Dalton regarding the key to the vacated training center space, and each of those witnesses confirmed that, following the termination of the District Training Center lease, as amended, the USPS did not deliver a key to plaintiff, even though the Termination Notice issued to plaintiff stated "All postal equipment will be removed by the above date [December 31, 2012], and the keys will be mailed or delivered to you." As determined above, Postmasters James Kenyon and Roland Dalton indicated in their testimony that the Postmaster of the Magna Post Office facility had control over keys to the District Training Center space prior to the lease termination, which continued after the lease terminated on December 31, 2012, until the locks were changed on September 9, 2013. While Postmaster Kenyon, who was the Acting Postmaster at the Magna Main Post Office facility between January 2013 and May 2013, testified that, during his tenure, he did not know whether he possessed a key that would access the exterior door to the former training center space, Postmaster Dalton testified that the keys he possessed, which he obtained from Postmaster Kenyon, opened all of the doors at the Magna facility. Both Postmasters testified that they did not deliver to plaintiff a key to the front exterior door to the former training center space, and that they were never instructed to return the keys to the training center space to plaintiff. Postmaster Dalton testified further that he did not offer plaintiff a key to the space because he had "to provide security for the post office side of the building" and, until the Magna Main Post Office side of the building was secured, he "had to be in control of all the keys for the building."

The testimony received at trial establishes that plaintiff did not obtain a key to the former training center space until plaintiff hired a locksmith to install a new lock on the exterior door on September 9, 2013. During the trial, Frederick Stromness explained:

> So in September of 2013, I became aware that the Postal Service was closing off the Phase II space from the Magna main post office space, and I became aware of that because my recollection is that I got a phone call on my cell phone from Magna Post Office. I don't believe it was the postmaster, but it was a postal employee that identified themselves and informed me the Postal Service was removing the cores out of the locks.

. . .

And in this phone call, I wasn't informed about the demising wall, but I was informed that the postal service was removing those cores and, if I wanted to secure the space, we needed to take steps to secure it ourselves, at which point I called my son, Richy, and said, Well, we've got to run out there and get a locksmith.

Between December 31, 2012 and September 9, 2013, while plaintiff did not possess a key to the exterior door of the former training center space, plaintiff conducted numerous visits to the Magna facility to see the vacated space. During these visits, if plaintiff wished to see the interior space formerly occupied by the training center, plaintiff had to enter the Magna Main Post Office, ask a USPS representative for access to the space, and be escorted through the Magna Main Post Office secure space to the vacated space. As discussed above, Postmaster Kenyon testified at trial that he always accommodated requests from the Stromness family with regard to the vacated space and he escorted them through the secure main post office space to the vacated, former training center space, but did not accompany them into the vacated space. Postmaster Kenyon testified that plaintiff had to be escorted through the Magna Main Post Office secure space because "[i]t's a secured facility. Like, when we have anybody there, we don't just let them, you know, walk around. It's -- the federal mails, everything you got back there, it's a secure location." At trial, Frederick Stromness testified that each time he visited the Magna postal facility he was able to visit the vacated space with a postal escort. Frederick Stromness testified:

> [T]o gain access to the space . . . we went – go in the postal lobby, we wait in line to get up to a clerk and say, We want to access this space, and . . . if the postmaster wasn't there, just one of the other employees would let us in, and they would stand there with us while we were in the training center space . . . .

Similarly, Richard Daniel Stromness testified that after the District Training Center lease expired he had to be escorted to the vacated training center space by USPS personnel.

The testimony received at trial and the other evidence submitted for the record leads the court to conclude that, although the USPS had physically vacated the training center space on or before December 28, 2012, the USPS continued to exercise the right to control access to the space after the expiration of the District Training Center lease, as amended, thereby breaching the implied duty to vacate the premises. Upon the termination of the District Training Center lease on December 31, 2012, the USPS did not surrender all of its rights in the space that it enjoyed as the lessee, as it indicated it would, and as required by the expiration of the District Training Center lease, as amended. Because the USPS did not deliver a key to the space to plaintiff, as explicitly stated in its Notice of Termination, plaintiff had to rely on the USPS to gain access to the space. Although defendant argues that merely retaining the key to the property is not sufficient to establish that the USPS was a holdover tenant, the court does not rely solely on the USPS's failure to deliver a key to plaintiff as the basis for finding that the USPS was a holdover tenant in breach of the District Training Center lease agreement, as amended. The USPS's failure to deliver a key to plaintiff is part of a larger context in which the USPS

continued to exercise rights over the former training center space. Plaintiff's ability to access the space was hindered and plaintiff was not back in full control of the space. Because plaintiff did not have a key to the exterior door of the former training center space, which was the fault of the USPS, plaintiff was able to access the space only by entering the Magna Main Post Office lobby and get to the space with a USPS escort through the secure postal area. Notwithstanding defendant's argument that plaintiff never was denied access to the space, because the USPS required that plaintiff be escorted to the space, plaintiff only was able to access the space during the USPS's regular business hours. Logically, because the USPS's rights to the space terminated with the expiration of the District Training Center lease, as amended, plaintiff, as the property owner, assumed all rights in the property, including the right to access that property at any date and time of its choosing. Furthermore, although defendant argues that plaintiff could have asked for the key or could have "re-keyed the locks at any time," in the Notice of Termination defendant assumed the obligation to turn over the space and return control of the space back to plaintiff by delivering a key to plaintiff.  Moreover, based on the testimony of Postmaster Kenyon, it was clear that he felt the USPS kept the key to deliberately control access to all doors in order to keep the Magna Main Post Office a secure facility and to protect the United States mail.

The evidence before the court indicates that, in order to protect the security of the mail, the USPS intended to exert control over the training center space because there was not a permanent, secure separation between the former training center space and the non-public Magna Main Post Office space. Not until the USPS erected the demising wall between the two areas in September 2013, thereby better securing the non-public Magna Main Post Office space, did the USPS remove the lock on the exterior door to the former training center space and notify plaintiff that it could install a new lock on that door. Had plaintiff changed the lock on the exterior door to the former training center space prior to the construction of the demising wall, plaintiff would have had unfettered access to the secure Magna Main Post Office space, with only the temporary office partitions that Postmaster Kenyon installed, which Postmaster Dalton testified was not sufficient as a security barrier and did not secure the mail to block entry to the main post office space. Indeed, after plaintiff installed a new lock on the exterior door on September 9, 2013, the USPS acknowledged that the mail was not secure unless a demising wall was constructed to separate the Magna Main Post Office and the former training center space. In an internal e-mail on September 9, 2013, the day the lock was changed, the contracting officer sent an e-mail to a USPS architect/engineer that stated: "We need to brainstorm what we can do if the wall isn't going to be completed quickly, since the LL [landlord] changed the locks and has access to our side. We need to secure the mail." (emphasis added).

Because the USPS breached the duty to vacate the leased premises that was implicit in the District Training Center lease, as amended, plaintiff is entitled to recover damages for the period of time that the USPS held over the entire former training center space, specifically from January 1, 2013 until the removal of the lock on the exterior door on September 9, 2013. The District Training Center lease, as amended, states that the USPS would pay plaintiff an annual rent of $108,149.00 "payable in equal installments at the end of each calendar month," and that "[r]ent for a part of a month will be prorated."

Accordingly, defendant shall pay damages to plaintiff for the period between January 1, 2013 and September 9, 2013 in the amount of $9,012.42 per month, with September 2013 prorated to account for the partial month holdover tenancy between September 1, 2013 and the changing of the lock on September 9, 2013, but not thereafter, in accordance with the rental rate set forth in the expired District Training Center lease, as amended.

2,000 Square Feet of Parking and Maneuvering Space

        In addition to the internal square footage that the USPS continued to assert control over after the expiration of the District Training Center lease, as amended, plaintiff alleges that defendant was in breach of the District Training Center lease, as amended, because the USPS continues to control 2,000 external square feet of parking and maneuvering space granted to the USPS under the District Training Center lease. Defendant disagrees and argues that, since the termination of the District Training Center lease, as amended, the USPS has made the 2,000 square feet of parking available to the public, including any future tenant of the former training center space, and there are no signs restricting the use of the space to USPS customers.

        The parties dispute the meaning of the term in the District Training Center lease, as amended, that granted to the USPS 2,000 square feet to be used as "Parking and Maneuvering" area. Specifically, the parties do not agree on the location of the 2,000 square feet described in the amended District Training Center lease. The Magna facility includes two parking lots, a public parking area in the front, South side of the building, as well as a secured parking area on the East side of the building surrounded by a perimeter fence. Plaintiff interprets the 2,000 square feet for parking and maneuvering described in the District Training Center Lease as "almost certainly enclosed within the Postal Service's security fencing [on the East side of the building] and is unavailable to Stromness or to any potential non-postal tenant." At trial, Frederick Stromness testified that he understood the 2,000 square feet of parking and maneuvering space "to be in the secure parking area just to leave spaces open for postal patrons, the public that visits the Postal Service." In contrast, defendant interprets the 2,000 square feet for parking and maneuvering identified in the District Training Center lease as "necessarily within the public parking area [on the South side of the building] and not the secured parking and maneuvering area." Defendant argues that plaintiff's claim is based on "the erroneous assumption that the 2,000 square feet of parking is within the secured parking and maneuvering area." To determine if the USPS breached its implied duty to vacate the parking and maneuvering space, the court must determine the meaning of the term 2,000 square feet of "Parking and Maneuvering" area in the District Training Center lease, as amended.

        As stated above, "[c]ontract interpretation starts with the language of the contract." SUFI Network Servs., Inc. v. United States, 785 F.3d at 593. ""In contract interpretation, the plain and unambiguous meaning of a written agreement controls."" Arko Exec. Servs., Inc. v. United States, 553 F.3d at 1379 (quoting Hercules Inc. v. United States, 292 F.3d at 1380–81). By its plain language, the District Training Center lease, as amended, granted to the USPS 5,374 square feet of "Net Floor Space" and 2,000 square feet of

"Parking and Maneuvering" area. According to the District Training Center lease, the "**Total Site Area**" was 7,374 square feet. (emphasis in original). The District Training Center Lease also provided that parking would be shared by tenants. There is no further description of the parking and maneuvering area in the District Training Center lease, and the lease does not identify where the 2,000 square feet for parking and maneuvering are located within the leased premises. Additionally, the floor plan attached to the District Training Center lease does not depict or identify the area for parking and maneuvering. Given that the location of the "Parking and Maneuvering" area is not identified in the District Training Center lease, the court must consider the circumstances which led to the District Training Center lease and whether the language in the District Training Center lease, as amended, is susceptible to more than one reasonable interpretation.

As the preceding discussion illustrates, there was an extensive history and lack of appropriate coordination between the parties with regard to the construction and lease of the Magna facility prior to the execution of the District Training Center lease. Approximately three years before the parties entered into the District Training Center lease, Build Inc. and the USPS executed a lease for the Magna Main Post Office, which, later, would occupy the same building as the District Training Center. The Magna Main Post Office lease granted the USPS 13,860 square feet of "Parking and Maneuvering" area, but the lease did not provide a further description of the specific area or identify the location of the area. The building plans included in the solicitation indicate that the facility would have 43 customer parking stalls available for public use.

As discussed above, after the Magna Main Post Office lease was executed, Build Inc. proceeded to construct a building that was "twice as big" as was intended by the original Magna Main Post Office lease. As a result of this unauthorized additional construction, the parties amended the Magna Main Post Office lease. The lease amendment modified the original Magna Main Post Office lease to include "perimeter security fencing" and "change from asphalt to concrete in all paved areas." The Magna Main Post Office lease, as amended, stated that, in the event Build Inc. leased the 5,000 square feet of unoccupied space within the Magna facility to another tenant, that "tenant shall not have any access to postal space, including secured parked and maneuvering area," and that "up to 10 parking spaces shall be available for tenant in public customer parking area." The lease amendment did not further describe or identify the "secured parking and maneuvering area" or the "public customer parking area." Frederick Stromness testified that, according to the amended Magna Main Post Office, the secured parking and maneuvering area was exclusively available to the USPS, and that the USPS was paying for the secured parking and maneuvering area under the amended lease. Similarly, Keith LaShier, the contracting officer who executed the amendment to the Magna Main Post Office lease, testified that the USPS would have exclusive use of, and entire control over, the secured parking and maneuvering area under the amended Magna Main Post Office lease.

At trial, defendant's counsel asked Frederick Stromness about the 2,000 square feet of parking and maneuvering space granted to the USPS in the District Training Center lease. In contrast to plaintiff's post-trial submissions, Frederick Stromness testified that the 2,000 square feet of parking identified and included in the District Training Center

lease could not be the secured parking and maneuvering area in the amended Magna Main Post Office lease.

> Q. And so, in other words, the Postal Service is already paying for the secured parking and maneuvering area under the Phase I Lease Amendment, correct?

> A. [Frederick Stromness] Correct.

> Q. So this parking [the 2,000 square feet] could not be for the secured parking and maneuvering because the Postal Service was already paying for it, correct?

> A. That's correct. So -- but it doesn't -- it doesn't indicate that this doesn't modify what they intended in the Phase I lease, and it also doesn't preclude that the parking is the public parking, either, in addition to the ten stalls.

Although plaintiff alleges in its post-trial submission that the 2,000 square feet of parking and maneuvering space in the District Training Center lease was "almost certainly enclosed within the Postal Service's security fencing," the testimony offered by Frederick Stromness at trial runs counter to that interpretation. According to the testimony of Frederick Stromness, the 2,000 square feet of parking and maneuvering area in the District Training Center lease was separate from the secured parking area surrounded by a perimeter fence.

To the extent plaintiff argues that the District Training Center lease modified the parking area granted to the USPS in the Magna Main Post Office lease, as amended, that argument is lacking support in in the record. The evidence before the court indicates that, at the time the parties entered the District Training Center lease, the parties intended that the main post office function would continue to have use of the secured parking area and that the newly leased space for the training center function could share the parking area. The District Training Center lease explained that parking would be "shared" by tenants. As discussed above, the District Training Center lease was not a modification to the terms of the existing Magna Main Post Office lease, as amended, and, upon the termination of the District Training Center lease, as amended, the USPS's exclusive use of the secured parking and maneuvering area continued pursuant to the terms of the amended Magna Main Post Office lease.  After the expiration of the District Training Center lease, as amended, the USPS continued to pay to lease the secured parking and maneuvering area under the amended Magna Main Post Office lease.

The precise location of the 2,000 square feet for parking and maneuvering space granted in the District Training Center lease, as intended by the parties, remains unclear to date, however, the court need not determine the meaning of that lease term to resolve plaintiff's allegation that the USPS has breached the District Training Center lease, as amended, by failing to vacate the secured parking and maneuvering area on the East side of the Magna facility. When the District Training Center lease, as amended, expired on December 31, 2012, the Magna Main Post Office lease term continued, and the USPS

continued to have the right to exclusive use and control of the secured parking and maneuvering area under the terms of the Magna Main Post Office lease, as amended. As noted above, the Magna Main Post Office lease term continues to run until March 31, 2018. Because the USPS has exclusive use and control of the secured parking and maneuvering area pursuant to the terms of the Magna Main Post Office lease, as amended, it was not obligated to vacate that portion of the Magna property when the District Training Center lease, as amended, expired, and the USPS will continue to have exclusive use and control of the secured parking and maneuvering area until the Magna Main Post Office lease term expires, or the parties amend or terminate the Magna Main Post Office lease. Accordingly, the court finds that plaintiff has failed to prove that the USPS breached the duty to vacate or is otherwise unlawfully in possession of the secured parking and maneuvering area on the East side of the Magna facility.

Closed Circuit Television System

Plaintiff alleges that the USPS required Stromness MPO to purchase and install a closed CCTV system in the entire Magna facility during construction. Plaintiff further alleges that, following the termination of the District Training Center lease, as amended, "postal employees removed the CCTV system" from the former training center space "and did not return that equipment." Plaintiff does not indicate what lease terms the USPS allegedly breached in removing the CCTV equipment, nor does plaintiff point to a provision in either the Magna Main Post Office lease, as amended, or the District Training Center lease, as amended, preventing the USPS from moving the CCTV equipment.

Defendant does not dispute that, after the USPS vacated the training center space, it removed some CCTV cameras from that space. Defendant argues that plaintiff cannot prove defendant's actions were a breach of contract because "Stromness had to prove, among other things, the Postal Service was contractually required to return the cameras to Stromness and that Stromness is now entitled to damages from the removal." According to defendant, the USPS still continues to pay rent for those CCTV cameras under the terms of the Magna Main Post Office lease, as amended. Defendant asserts that, because the USPS is paying rent for the CCTV cameras, it "is entitled to exclusive possession thereof during the term" of the amended Magna Main Post Office lease.

The CCTV system is referenced only in the Magna Main Post Office lease, as amended, and is not addressed in the District Training Center lease, as amended. Specifically, "Amendment No. 1" to the Magna Main Post Office lease stated that the original lease was amended to include "CCTV Inspection Service system and Criminal Investigation Room," and explained that the "Lessor's lease cost for the CCTV & Criminal Investigation Room are based on $175,000, which is included in the new amortized lease rate." This provision in the amendment to the Magna Main Post Office lease establishes that the USPS is paying rent for the CCTV system as part of the "new amortized lease rate" for the Magna Main Post Office space. Although plaintiff argues that paying rent for the CCTV system does not entitle the USPS to remove or destroy the property, plaintiff does not cite any provision in either the Magna Main Post Office lease, as amended, or the District Training Center lease, as amended, that obligates the USPS to leave the CCTV system untouched or prohibits the USPS from moving, adjusting, or otherwise

handling the CCTV cameras. Thus, plaintiff has failed to establish what duty or obligation was breached when the USPS removed CCTV cameras from the vacated training center space.

Additionally, to the extent plaintiff alleges that the USPS stopped paying rent for the CCTV cameras and equipment in the former training center space when the amended District Training Center lease expired and the USPS vacated the space, there is no support in the language of either lease for plaintiff's assertion. As stated above, the lease amendment to the Magna Main Post Office lease specifically accounted for the "CCTV Inspection Service System" and included the cost for renting the system in the "new amortized lease rate." There is no indication in the language of the District Training Center lease, as amended, that the lease rate included the cost of the CCTV system for that space. Moreover, Frederick Stromness testified to the opposite position:

Q. Do you see the "whereas" clause references a CCTV and criminal investigation room? Do you see that?

A.[Frederick Stromness] I do.

Q. And the C -- this CCTV was baked into the rent that the Postal Service was paying to Build Inc.; is that correct?

A. Yes, sir.

Q. And the Postal Service is continuing to pay amounts under the Phase I Lease Amendment; is that correct?

A. Yes, sir.

Q. And Stromness is claiming damages for some CCT cameras -- some CCTV cameras; is that correct?

A. Yes, sir.

Q. And those are the same CCTV cameras that are promised under this lease agreement, correct?

A. Yes, sir.

Q. So the Postal Service is still paying for the CCTV cameras even though Build Inc. may have removed them; is that correct?

A. Yes, sir.

As Frederick Stromness testified, the USPS is continuing to pay rent for the CCTV cameras under the Magna Main Post Office lease, as amended, and plaintiff has failed to establish that either the District Training Center lease, as amended, or the Magna Main Post Office lease, as amended, prohibited the USPS from relocating any CCTV cameras

it was renting. Accordingly, plaintiff has failed to prove that the USPS breached either lease agreement when it relocated some CCTV cameras from the former training center space.

Taxes

Plaintiff also alleges that the USPS has breached the Magna Main Post Office lease, as amended, by failing to make full and proper reimbursement of property taxes for the entire Magna facility. Plaintiff seeks to recover reimbursement of 33.5% of the property taxes assessed against the Magna facility for 2013 and the subsequent years, which reflects the portion of the facility that was previously the District Training Center. According to plaintiff, the USPS is obligated to reimburse plaintiff for all of the property taxes for the entire Magna facility, including the former, vacated training center space. Plaintiff argues that the USPS is responsible for the property taxes for the vacated training center space because the space is not leased to a third party. Defendant argues that it is not obligated to reimburse plaintiff for the property taxes assessed against the former training center space because the District Training Center lease, as amended, which held the USPS responsible for 33.5% of the taxes for the Magna facility, expired by its own terms on December 31, 2012. The parties do not dispute that the USPS has not reimbursed plaintiff for the property taxes on the former, vacated training center space since the District Training Center lease, as amended, expired on December 31, 2012.

The original Magna Main Post Office lease required the USPS to reimburse plaintiff "for all general real estate taxes applicable to any period of time within the term" of the lease. As discussed above, after Build Inc. constructed the Phase II space without authorization, the USPS negotiated an amendment to the Magna Main Post Office lease which added square footage to the Magna Main Post Office space, but left a portion of the building unoccupied. As a result of the amendment, the Magna Main Post Office lease was modified to state:

> In the event unoccupied space is leased by Lessor, reimbursement of taxes for the property shall be prorated according to the following formula: tenant leased space (5,000 net sq.ft.) divided by 16,007 net sq. ft. = 31 percent of tax bill that the Lessor shall be responsible. Additionally, since the Postal Service has the benefit of the additional Phase II items, as stated above, the Lessor percentage responsibility shall be reduced an additional 10 percent to reflect this benefit.

Thus, pursuant to this amendment, the USPS was obligated to reimburse plaintiff for 100% of the general property taxes applicable to the Magna facility, unless the 5,000 square feet of "unoccupied space" not included in the Magna Main Post Office lease, as amended, was leased to a third party tenant. Pursuant to the amendment, if the 5,000 square feet of space that the USPS was not occupying was leased to a third party tenant, then the USPS would reimburse 79% of the property taxes to plaintiff, which reflected the percentage of square footage that the Magna Main Post Office occupied.

Thereafter, on January 11, 2000, the USPS and plaintiff entered into the District Training Center lease, under which the USPS would occupy the previously unleased space. As a result of the District Training Center lease, the USPS occupied the entire Magna facility. The Tax Rider to the District Training Center lease obligated the USPS to reimburse plaintiff 33.5% "of the total paid Real Property Taxes" for the property. As a result of the Tax Rider in the District Training Center lease, in combination with the Tax Rider in the Magna Main Post Office lease, as amended, the USPS was obligated to reimburse plaintiff more than 100% of property taxes on the Magna facility. In order to avoid reimbursing plaintiff for more than 100% of the property taxes, the USPS executed a second lease amendment to the Magna Main Post Office lease on January 11, 2001.

The second lease amendment to the Magna Main Post Office lease, executed on January 11, 2001, amended the existing Tax Rider and reduced the USPS's obligation to reimburse plaintiff for property taxes. Through the amendment, the parties agreed to "[c]hange the existing Reimbursement Tax Rider to a Percentage Reimbursement Rider, to more accurately reflect Main Office occupancy of Parcel #14-20-379-006-000." The amendment explained that the Magna Main Post Office occupied 66.5% of the facility, and changed the USPS's reimbursement obligation to 66.5% to reflect the "[p]ercentage of usage." At trial, Frederick Stromness testified that this amendment to the Magna Main Post Office lease changed the percentage of tax reimbursement to 66.5%:

Q. The Postal Service here is proposing an amendment to the Phase I lease to address the inconsistencies of the property tax riders in both of those leases, correct?

A. [Frederick Stromness] That's how I understand it. I don't think they're correcting the training center lease. I think they're desiring to change the percentage of tax reimbursement the Magna Main Post Office is required to make.

Q. So after the – and ultimately, the amendment was signed, correct?

A. Yes, sir.

Q. And after the amendment, the property tax percentage for the main post office was 66.5, correct?

A. Yes, sir.

Q. And in the Phase II Lease, the requirement for property taxes payment for the Postal Service was 33.5 percent, correct?

A. That's my understanding, yes.

Q. And what is 66.5 plus 33.5?

A. That's a hundred percent, sir.

Q. So after the amendment was executed, the property tax obligations for the Postal Service for the main post office function was 66.5, correct?

A. Correct.

Thus, pursuant to the January 11, 2001 amendment, under the Magna Main Post Office lease, the USPS was obligated to reimburse plaintiff for 66.5% of the property taxes on the Magna facility. Similarly, under the District Training Center lease, the USPS was obligated to reimburse plaintiff for 33.5% of property taxes on the Magna facility. As a result, during the period in with both leases were active, the USPS was obligated to reimburse plaintiff for 100% of the property taxes on the Magna facility.

When the District Training Center lease, as amended, expired on December 31, 2012, the USPS was no longer obligated to reimburse plaintiff for 33.5% of the property taxes for the Magna facility because the terms of the District Training Center lease, as amended, were terminated and no longer controlling on either party.  Although plaintiff argues that the language in the original Magna Main Post Office lease is controlling and obligates the USPS to pay 100% of the real property taxes, that language was modified by the first amendment to the Magna Main Post Office lease on October 26, 1998, and modified again by the second amendment to the Magna Main Post Office lease on January 11, 2001. Although the first amendment still required the USPS to reimburse plaintiff for 100% of the property taxes if the unoccupied space was not leased to a third party, the second amendment explicitly changed the Tax Rider so that the USPS was obligated to reimburse plaintiff for 66.5% of property taxes on the Magna facility, which reflected the Magna Main Post Office's occupancy of the facility. The obligation to reimburse plaintiff for 66.5% of the property taxes for the Magna facility was not contingent or qualified by any terms, including whether the other area within the facility was leased to a third party. Given the language in the January 11, 2001 amendment to the Magna Main Post Office lease, and because the terms of the District Training Center lease, as amended, expired on December 31, 2012, plaintiff cannot establish that defendant is obligated to reimburse plaintiff for 33.5% of the property taxes assessed against the Magna facility since 2013.[33]

Yet, to the extent this court has determined that the USPS was a holdover tenant for the period beginning January 1, 2013 and continuing until September 9, 2013, defendant was obligated to reimburse plaintiff for property taxes assessed against the Magna facility during that period. Accordingly, in addition to the 66.5% of property taxes for which plaintiff was entitled to be reimbursed for the Magna Main Post Office portion of the Magna facility, plaintiff is entitled to reimbursement for 33.5% of the property taxes assessed against the Magna facility between January 1, 2013 and September 9, 2013.

---

[33] Plaintiff does not allege that the USPS has failed to reimburse plaintiff for 66.5% of property taxes against the Magna facility, which the USPS is obligated to pay under the terms of the Magna Main Post Office lease, as amended.

Breach of the Covenant of Good Faith and Fair Dealing

Finally, plaintiff alleges that the USPS, by its actions, has breached the covenant of good faith and fair dealing implied in both the Magna Main Post Office lease, as amended, and the District Training Center lease, as amended. Specifically, plaintiff alleges that, in building the demising wall, disconnecting the utilities, failing to return interior and exterior square footage upon the termination of the District Training Center lease, as amended, and blocking plaintiff's effort to remediate and restore the former training center space, the USPS has "completely interfered with" plaintiff's ability to lease the unoccupied space to a non-postal tenant and "destroyed the reasonable expectations" of plaintiff. Plaintiff also alleges that the USPS's failure to notify plaintiff of its intent to vacate the District Training Center space until September 2012 was "more than mere negligence, lack of cooperation or diligence required for a breach of the duty of good faith and fair dealing." Plaintiff appears to contend that the USPS should have notified Stromness of the USPS's intent to vacate soon after January 14, 2011, when the USPS had final approval to let the District Training Center lease, as amended, expire at the end of its term on December 31, 2012. Additionally, plaintiff alleges that the USPS's late reimbursement of owed property tax reimbursement breached the covenant of good faith and fair dealing. As with a number of plaintiff's other breach of contract allegations, plaintiff does not identify which lease agreement the USPS breached, thus, the court considers the USPS's actions under both the Magna Main Post Office lease, as amended, and the District Training Center lease, as amended.

In response, defendant denies any breach of the implied duty of good faith and fair dealing. Defendant argues that the construction of the demising wall was consistent with the terms of the Magna Main Post Office lease, as amended, and, thus, cannot be a violation of the implied duty. Defendant asserts that the USPS was not obligated to notify plaintiff regarding the decision to vacate the District Training Center space under the terms of the District Training Center lease, as amended, and that plaintiff was aware of the possibility that the USPS could vacate the space two years prior to the termination. Defendant also denies plaintiff's allegation that the USPS has prevented Stromness from remediating and restoring the former training center space. According to defendant, plaintiff has made no efforts to make the vacated space independently Code-compliant without also demanding money from the USPS. Defendant also indicates that the USPS has responded through telephone calls and e-mail correspondence to plaintiff's communications with regard to making the space Code-compliant.

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." Alabama v. North Carolina, 560 U.S. 330 (2010) (quoting Restatement (Second) of Contracts § 205 (1981)). "Failure to fulfill that duty constitutes a breach of contract, as does failure to fulfill a duty 'imposed by a promise stated in the agreement.'" Metcalf Constr. Co. v. United States, 742 F.3d 984, 990 (Fed. Cir. 2014) (quoting Restatement (Second) of Contracts § 235). "The covenant of good faith and fair dealing . . . imposes obligations on both contracting parties that include the duty not to interfere with the other party's *performance* and not to act so as to destroy the *reasonable expectations* of the other party regarding the *fruits of the contract*." Metcalf Constr. Co. v. United States, 742 F.3d at 991 (quoting Centex Corp. v. United States, 395 F.3d 1283,

1304 (Fed. Cir. 2005) (emphasis in <u>Metcalf Constr. Co. v. United States</u>)); <u>see</u> <u>also</u> <u>Agility Public Warehousing Co. KSCP v. Mattis</u>, 852 F.3d 1370, 1383-84 (Fed. Cir. 2017). As explained by the Federal Circuit, "while the implied duty exists because it is rarely possible to anticipate in contract language every possible action or omission by a party that undermines the bargain, the nature of that bargain is central to keeping the duty focused on 'honoring the reasonable expectations created by the autonomous expressions of the contracting parties.'" <u>Metcalf Constr. Co. v. United States</u>, 742 F.3d at 991 (quoting <u>Tymshare, Inc. v. Covell</u>, 727 F.2d 1145, 1152 (D.C. Cir. 1984)); <u>see</u> <u>also</u> <u>CanPro Invs. Ltd. v. United States</u>, 130 Fed. Cl. at 350.

"Both the duty not to hinder and the duty to cooperate are aspects of the implied duty of good faith and fair dealing." <u>Metcalf Constr. Co. v. United States</u>, 742 F.3d at 991 (quoting <u>Precision Pine & Timber, Inc. v. United States</u>, 596 F.3d at 820 n.1); <u>see</u> <u>also</u> <u>Baistar Mechanical, Inc. v. United States</u>, 128 Fed. Cl. 504, 525 (2016). Notably, "[i]t is well settled that the parties' duty of good faith and fair dealing must be rooted in promises set forth in the contract." <u>Helix Elec., Inc. v. United States</u>, 68 Fed. Cl. 571, 587 (2005). Thus, "[t]he implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." <u>Precision Pine & Timber, Inc. v. United States</u>, 596 F.3d at 831 (citing <u>Centex Corp. v. United States</u>, 395 F.3d at 1304–06); <u>see</u> <u>also</u> <u>Agility Public Warehousing Co. KSCP v. Mattis</u>, 852 F.3d at 1384; <u>Jarvis v. United States</u>, 43 Fed. Cl. 529, 534 (1999) ("The implied duty of good faith and fair dealing does not form the basis for wholly new contract terms, particularly terms which would be inconsistent with the express terms of the agreement.").

As indicated by a Judge of the United States Court of Federal Claims, "[t]he court applies a reasonableness standard in assessing whether a party breached its duty to cooperate, which requires a factual inquiry that depends upon 'the particular contract, its context, and its surrounding circumstances.'" <u>Baistar Mechanical, Inc. v. United States</u>, 128 Fed. Cl. at 525 (quoting <u>Axion Corp. v. United States</u>, 75 Fed. Cl. 99, 121 (2007)).

In <u>Precision Pine & Timber, Inc.</u>, the United States Court of Appeals for the Federal Circuit indicated that "[n]ot all misbehavior, however, breaches the implied duty of good faith and fair dealing owed to other parties to a contract." <u>Precision Pine & Timber, Inc. v. United States</u>, 596 F.3d at 829. The Federal Circuit further explained that:

Cases in which the government has been found to violate the implied duty of good faith and fair dealing typically involve some variation on the old bait-and-switch. First, the government enters into a contract that awards a significant benefit in exchange for consideration. Then, the government eliminates or rescinds that contractual provision or benefit through a subsequent action directed at the existing contract. <u>See</u>, <u>e.g.</u>, <u>id.</u> at 1350–51; <u>Centex Corp. v. United States</u>, 395 F.3d 1283, 1304–07 (Fed. Cir. 2005); <u>see</u> <u>also</u> <u>Hercules</u>, 516 U.S. 417, 116 S. Ct. 981, 134 L.Ed.2d 47. The government may be liable for damages when the subsequent government action is specifically designed to reappropriate the benefits the

other party expected to obtain from the transaction, thereby abrogating the government's obligations under the contract.

Precision Pine & Timber, Inc. v. United States, 596 F.3d at 829 (citing Centex Corp. v. United States, 395 F.3d at 1311). The Federal Circuit subsequently expanded on the language of Precision Pine & Timber, Inc., after finding a Judge of the United States Court of Federal Claims had read the language of the decision too narrowly. In Metcalf, the Federal Circuit explained that:

> The trial court misread Precision Pine, which does not impose a specific-targeting requirement applicable across the board or in this case. The cited portion of Precision Pine does not purport to define the scope of good-faith-and-fair-dealing claims for all cases, let alone alter earlier standards. The passage cited by the trial court, after saying as a descriptive matter that cases of breach "typically involve some variation on the old bait-and-switch," Precision Pine, 596 F.3d at 829, says that the government "*may* be liable"— not that it is liable *only*—when a subsequent government action is "specifically designed to reappropriate the benefits the other party expected to obtain from the transaction." Id. (emphasis added). Precision Pine then states its holding as rejecting breach for two reasons combined: the challenged government actions "were (1) not 'specifically targeted[' at the contracts,] and (2) did not reappropriate any 'benefit' guaranteed by the contracts." Id.

> As that statement indicates, the court in Precision Pine did not hold that the absence of specific targeting, by itself, would defeat a claim of breach of the implied duty—*i.e.,* that proof of specific targeting was a requirement for a showing of breach. When the court said that specific targeting would have been required for breach of the duty *in that case*, id. at 830, it did so in a context in which the more general bargain-impairment grounds for breach of the duty were unavailable, because the suspension-by-court-order provision expressly authorized the suspension, without limitation on the time of compliance with the order. That is enough to make clear that specific targeting is not a general requirement. In addition, the challenged government conduct in Precision Pine occurred in implementing a separate government authority and duty independent of the contract, namely, enforcement of and compliance with the injunction. In that context—as in the legislative context from which Precision Pine borrowed its reference to specific targeting, 596 F.3d at 830 (citing Centex and First Nationwide Bank)—the "specifically targeted" language protects against use of the implied contract duty to trench on the authority of other government entities or on responsibilities imposed on the contracting agency independent of contracts. The present case involves no such concern.

Metcalf Constr. Co. v. United States, 742 F.3d at 993 (emphasis in original). The Federal Circuit instructed the trial court to focus on the broader language of the Federal Circuit's earlier opinions, and specifically:

> The covenant of good faith and fair dealing . . . imposes obligations on both contracting parties that include the duty not to interfere with the other party's *performance* and not to act so as to destroy the *reasonable expectations* of the other party regarding the *fruits of the contract*." Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed. Cir. 2005) (emphases added). "Both the duty not to hinder and the duty to cooperate are aspects of the implied duty of good faith and fair dealing." Precision Pine, 596 F.3d at 820 n. 1. What is promised or disclaimed in a contract helps define what constitutes "lack of diligence and interference with or failure to cooperate in the other party's performance." Malone, 849 F.2d at 1445.

Metcalf Constr. Co. v. United States, 742 F.3d at 991 & 993 (emphasis in original).

Plaintiff's accusations that the USPS breached the covenant of good faith and fair dealing are unsupported by the evidence before the court. Plaintiff appears to attach an allegation that the USPS breached the implied duty of good faith and fair dealing to each of its several breach of contract allegations. As discussed above, plaintiff failed to prove many of its breach of contract allegations. With regard to the construction of the demising wall, as discussed at length above, plaintiff could cite to no provision in the contract prohibiting the USPS from building the demising wall, although it should have been built in the correct location, and the USPS could reasonably rely on the Alterations Clause to build the demising wall to ensure the security of the mail operations in the main post office area. In alleging that the USPS breached the implied duty of good faith and fair dealing, plaintiff points again to the fact that the demising wall blocked plaintiff's access to utilities, necessary facilities, and a second egress point. As previously explained, however, the Magna Main Post Office lease, as amended, preserved the USPS's right to exclusive use of the space identified in the lease amendment as necessary for postal use, and this space included the area containing the restrooms, utilities, and second egress point. Given the court's conclusion that the Magna Main Post Office lease amendment granted the USPS exclusive use, it necessarily follows that the USPS did not breach the implied duty of good faith and fair dealing in exercising that exclusive use. To the extent plaintiff's ability to lease the unoccupied, former training center space has been frustrated or impeded because the space is not code compliant, that issue is the product of plaintiff's construction beyond the terms of the original Magna Main Post Office lease and, at times, less than specific lease terms to which plaintiff freely bound itself.

Similarly, to the extent the court has already determined that plaintiff failed to prove all of its claims with regard to the taxes, parking, circuit breakers, and CCTV, the court concludes that plaintiff cannot succeed on a theory that the USPS breached the implied duty of good faith and fair dealing. As to the circuit breakers and the CCTV equipment, plaintiff has not cited a contract provision that prohibited USPS's actions or a promise that the USPS has broken. Additionally, because the USPS continues to pay rent for the CCTV system and cameras as part of the Magna Main Post Office lease, as amended, plaintiff's claim that the cameras have not been returned to Stromness MPO is premature.

While the court has determined that the USPS is improperly retaining 371 square feet of space within the former training center area, and the USPS failed to vacate the

training center area until September 9, 2013, there is no evidence that these actions amounted to an additional breach of the implied duty of good faith and fair dealing. It appears that the delay in surrendering control of the training center space after the expiration of the District Training Center lease, as amended, was the result of trying to separate the Magna Main Post Office space from the training center space in order to ensure the security of the postal facility. The evidentiary record before the court includes multiple communications between the parties discussing the separation of the parties and the construction of a demising wall.  Additionally, although the USPS has conceded to the fact that the demising wall was constructed in the wrong location, there is not sufficient evidence to find that this error breached the implied duty of good faith and fair dealing. Moreover, as discussed above, plaintiff was permitted to access the former training center space with a USPS escort, and it does not appear that plaintiff requested keys to the vacated space. Thus, even though the USPS continued to control the former training center space, plaintiff does not cite to any legal support for the conclusion that holding over after the expiration of a lease is, necessarily, a breach of the duty of good faith and fair dealing.

Plaintiff's allegations would have this court find that any errors or breaches on the part of defendant, individually or taken together, constitute a breach of good faith and fair dealing. The United States Court of Appeals for the Federal Circuit has explained, however, that "[n]ot all misbehavior . . . breaches the implied duty of good faith and fair dealing owed to other parties to a contract." See Precision Pine & Timber, Inc. v. United States, 596 F.3d at 829. Although the court has found that plaintiff is entitled to some compensation, it has not found that the USPS breached the duty of good faith and fair dealing. The history of the lease agreements between the parties considered above did not develop without complications or less-than-perfect compliance by both parties. Both parties made mistakes at various times during performance of the leases.


## CONCLUSION

Neither party in this case is completely without fault for the broken down relationship between the parties. For the reasons discussed above, the court finds in partial favor of plaintiff on certain claims included in the complaint. Plaintiff is entitled to recover for defendant's failure to properly vacate the District Training Center space from January 1, 2013 until the removal of the exterior door lock to the former training center space on September 9, 2013, such that plaintiff is entitled to recover a prorated amount of annual rent based on the terms of the now-expired District Training Center lease, as amended, as well as prorated property tax reimbursement for the same period of time. Additionally, the court finds in favor of plaintiff that defendant has improperly retained 371 square feet of space within the Magna facility beginning at the time the demising wall was constructed on September 9, 2013, such that plaintiff is entitled to recover $20.12 per square foot per annum for the 371 square feet of space improperly retained beginning on September 9, 2013 and continuing until March 31, 2018, upon which date the Magna Main Post Office lease, as amended, is currently scheduled to expire, unless the USPS deconstructs and properly relocates the demising wall prior to that date or terminates the

Magna Main Post Office lease, as amended  . All other claims in plaintiff's complaint are **DENIED**.

   **IT IS SO ORDERED**.

                                                      s/Marian Blank Horn
                                                      **MARIAN BLANK HORN**
                                                              **Judge**