# In the United States Court of Federal Claims

### No. 14-711C
### Filed: October 15, 2018

```
* * * * * * * * * * * * * * * * **   *
                                     *
                                     *
STROMNESS MPO, LLC,                  *
                                     *
                 Plaintiff,          *
                                     *
        v.                           *
                                     *
UNITED STATES,                       *
                                     *
                 Defendant.          *
                                     *
* * * * * * * * * * * * * * * * *    *
```

**Attorneys' Fees; Equal Access to Justice Act; 28 U.S.C. § 2412; Itemized Statement; Net Worth; Prevailing Party; Substantially Justified.**

**Stephen B. Hurlbut**, Akerman LLP, Washington, D.C., for plaintiff. With him was **Harold J. Hughes**, Ford and Hugh, LLC, Lehi, UT.

**Meen-Geu Oh**, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., for defendant.  With her were **Jessica L. Cole**, Trial Attorney, Commercial Litigation Branch, **Anand R. Sambhwani**, Trial Attorney, Commercial Litigation Branch, **Martin F. Hockey, Jr.**, Deputy Director, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Joseph H. Hunt**, Assistant Attorney General, Civil Division, Department of Justice, Washington, D.C.  Of counsel was **Shoshana O. Epstein**, Office of the General Counsel, United States Postal Service.

## O P I N I O N

### HORN, J.

After the court issued its Opinion in the above-captioned case, see Stromness MPO, LLC v. United States, 134 Fed. Cl. 219 (2017), plaintiff Stromness MPO, LLC (Stromness MPO) filed a motion for attorneys' fees and costs pursuant to Rule 54(d) (2018) of the Rules of the United States Court of Federal Claims (RCFC), requesting that this court award attorneys' fees and costs to Stromness MPO under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412 (2012).[1]

---

[1] The facts of the above-captioned case are fully set forth in Stromness MPO, LLC v. United States, 134 Fed. Cl. 219, which is incorporated into this Opinion. Facts relevant to plaintiff's request for attorneys' fees and costs under EAJA are repeated and discussed below.

**FINDINGS OF FACT**

The parties' dispute in the above-captioned case revolves around a postal facility in Magna, Utah, which Stromness MPO constructed and leased to the United States Postal Service (the USPS). See Stromness MPO, LLC v. United States, 134 Fed. Cl. at 224. On September 4, 2012, the USPS issued a notice of termination to plaintiff regarding the "'MAGNA – DISTRICT TRAINING CENTER,'" which explained that "'the [District Training Center] Lease will terminate upon its expiration date, 12/31/2012.'"See id. at 246 (capitalization and alteration in original). On September 26, 2012, the USPS began vacating the District Training Center space, and, as of December 28, 2012, the USPS had vacated the District Training Center space, had removed all of its furniture and equipment from the District Training Center space, had ceased physically occupying the District Training Center space, and had left the District Training Center space in a "broom clean" condition. See id. at 247, 280-81. Thereafter, when a member of Stromness MPO wanted access the District Training Center space, the member needed to enter the Magna Main Post Office, inform a USPS clerk that the member of Stromness MPO wanted access to the District Training Center space, and then be escorted to the District Training Center space by a USPS employee. See id. at 248-49. According to Postmaster James Kenyon's testimony at trial, as well as Postmaster Roland Dalton's testimony at trial, neither Postmaster denied a member of Stromness MPO access to the District Training Center space and the Stromness MPO member was not followed into the District Training Center space.[2] See id. at 248-49.

On May 15, 2013, plaintiff submitted a certified claim to the USPS requesting a contracting officer's final decision on plaintiff's certified claim. Id. at 252. In the May 15, 2013 certified claim, plaintiff asserted that the USPS was a holdover tenant when it maintained complete access and control over the former District Training Center space; that the USPS vacated the incorrect section of the Magna postal facility; that the Magna Main Post Office lease, as amended, and the District Training Center lease, as amended, were a unified lease; that the USPS's termination of the District Training Center lease had deprived plaintiff of the reasonable use of plaintiff's property; that the USPS was unjustly enriched; and that the USPS had violated the covenant of good faith and fair dealing. Id. In its May 15, 2013 certified claim, plaintiff requested that the USPS pay plaintiff the annual rental rate for the District Training Center space through 2019, as well as all heating, air conditioning, lighting, sewage, electrical, and water expenses and for all taxes associated with the District Training Center space. Id. On August 15, 2013, Bradford Meador, a contracting officer with the USPS, issued a contracting officer's final decision denying plaintiff's May 15, 2013 certified claim in its entirety. Id. Mr. Meador stated that the USPS was not a holdover tenant because the USPS's failure to return a key to plaintiff does not "in and of itself" create a holdover tenancy. Mr. Meador also argued that plaintiff "could easily have regained control of the space" by rekeying the exterior door to the

---

[2] Postmaster Kenyon was the Acting Postmaster at the time the Districting Training Center lease, as amended, expired. See Stromness MPO, LLC v. United States, 134 Fed. Cl. at 247-48. Postmaster Dalton became the Postmaster in May 2013. See id. at 248.

District Training Center space or by building a demising wall separating the vacated District Training Center space and the Magna Main Post Office space, which Mr. Meador contended plaintiff was required to do under the "Main Office Lease provisions."

On September 9, 2013, approximately nine months after the USPS vacated the District Training Center space in December 2012, USPS built a demising wall separating and securing the Magna Main Post Office space and the United States mail from Stromness MPO's District Training Center space. See id. at 250. That same day, on September 9, 2013, the USPS informed plaintiff that it would be removing the lock cylinders on the exterior door that provided access to the District Training Center space. See id. at 251. Also on September 9, 2013, Stromness MPO changed the lock cylinders on the exterior door to the District Training Center space. See id.

On June 18, 2014, an attorney with the USPS sent an email message to an attorney representing Stromness MPO, which stated, in full:

The Postal Service has determined that it does not have a need to lease the space formerly used as the District Training Center in Magna, UT. The Postal Service believes that it properly terminated the District Training Center lease as set forth in the Contracting Officer's Final Decision.

In an effort to reach a resolution without litigation, however, the Postal Service is willing to offer $100,000 to settle this matter in Full. In addition to this payout, the Postal Service would agree to amend the Main Office Lease to remove the current Postal Service right to approve a new tenant in the terminated space, and replace it with language that allows Landlord to lease that space without Postal approval so long as the new tenant is not one whose business would be in competition with the Postal Service and would not unreasonably interfere with the Postal Service's quiet enjoyment of its space.

The $100,000 offer was roughly calculated using the following elements and accounting for the Postal Service's belief that it has more than a 50% chance of being successful in any litigation, but that using a 50% figure would be a reasonable compromise:

1) Portion of the Rent: The Postal Service terminated lease effective 12/31/12. There is a factual dispute regarding why the keys were not returned to the Landlord at that time. Regardless, by end of 9/13, the Postal Service had secured its remaining space and tendered the keys to Landlord. Annual Rent for period ending 12/12 was $108,149. The Postal Service compromise for 9 months with 50% discount: $40,555.

2) Portion of Real Estate Taxes: Similar analysis to rental obligation above. Taxes annually for district training space share, for 9 months with 50% discount: $6,760.

3

> 3) Portion of the Cost to Upgrade Terminated Space: The Postal Service obtained an estimate of $97,000 to add a restroom, separate utility meters, add a 2nd point of ingress/egress, and move the fence to provide parking to the terminated space. Landlord, who I believe is also in the general contracting business, may even be able to complete this work for less. Postal Service compromise with 50% discount: $48,500.
>
> Please discuss this Settlement Offer with your clients and let me know if we can reach an agreement.[3]

The parties, however, were unable to reach a settlement agreement resolving plaintiff's claims included in its May 15, 2013 certified claim.

Subsequently, plaintiff filed a fifteen-count complaint in this court in the above-captioned case. Id. at 253. In the civil cover sheet attached to plaintiff's complaint, plaintiff indicated that the "Amount Claimed" by plaintiff was "$2,964,300.00 (ESTIMATED)." (capitalization in original). Defendant then filed a partial motion to dismiss plaintiff's complaint, in which defendant argued that this court should dismiss plaintiff's claims included in the complaint that had not been presented to the contracting officer for a final decision and that plaintiff's implied-in-fact contract claim and plaintiff's claims sounding in tort as asserted in plaintiff's complaint were outside of this court's jurisdiction. On January 10, 2015, plaintiff submitted a supplemental, certified claim to the contracting officer for a final decision. See id. at 253. In plaintiff's January 15, 2015 supplemental certified claim, plaintiff requested a declaration that the USPS be required to move the demising wall to the correct location and that the USPS allow plaintiff access to restrooms, hallways, parking, and code-compliant ingress and egress. Id. Plaintiff also requested payment from the USPS for the fair market rental value of the vacated District Training Center space and parking area and requested reimbursement of property taxes for 2006–2009 and for 2012, as well as a declaration that plaintiff was entitled to receive property tax reimbursements from USPS for the years in which the vacated District Training Center space remains "uninhabitable." Id. On March 18, 2015, Shirley Wheeler, a different contracting officer, issued a contracting officer's final decision granting plaintiff's request for property tax reimbursement for the years 2006–2009 and 2012, but denying, in full, the remainder of plaintiff's supplemental, certified claim. Id.

On May 18, 2015, plaintiff filed a six-count, amended complaint in this court, appealing the contracting officer's August 15, 2013 final decision denying plaintiff's certified claim and the contracting officer's May 18, 2015 final decision denying plaintiff's supplemental certified claim. Id. In Count I of plaintiff's amended complaint, plaintiff asserted a breach of contract action against the USPS, alleging that defendant

---

[3] At trial, plaintiff and defendant submitted the June 18, 2014 settlement offer as a joint exhibit, and both plaintiff and defendant waived privilege regarding the June 18, 2014 settlement offer.

has breached its duties under its contracts, including in the following ways:

> a. Preventing non-postal tenant or lessor from access to, or sharing of bathrooms, parking, and hallways.

> b. By construction of improperly located interior walls, built without any permits, approvals, or inspections, Defendant has made alterations which are not Code compliant and which are "detrimental or inconsistent" with the Plaintiff's right to lease the Phase II space to another party or to use the space for its own purposes.

> c. By failing to make full and proper reimbursement of property taxes.

> d. By keeping possession and control of the Phase II space following Defendant's purported termination of its lease for that space.

> e. Defendant has vacated the wrong portion of its Magna facility by walling off and moving from the easterly portion of that facility, instead of from the "Westerly most" portion.

> f. Defendant's Postmaster shut off the circuit breakers for the Phase II space, depriving that space of electrical service.

> g. Defendant has walled off and impermissibly retains 400 interior square feet of space properly belonging to Plaintiff as part of the Phase II space.

> h. Defendant retains, and continues to use and control 2,000 square feet of exterior "Parking and Maneuvering" space included in the Phase II lease, which the Defendant claims to have terminated.

> i. Defendant has not made available "up to 10 parking spaces" for Plaintiff or any tenant in the "public customer parking area…."

> j. Despite its written covenant granting Plaintiff the right to lease the Phase II space to others, the Defendant has made that impossible by walling off all restrooms, shutting off the circuit breakers for that space, making alterations which render the space non-Code compliant, and requiring and maintaining security fencing which makes lawful ingress and egress unavailable for the Phase II space.

In Count II of plaintiff's amended complaint, plaintiff asserted that defendant was a holdover tenant maintaining "exclusive physical control" of the District Training Center space and the "2,000 square feet of 'Parking and Maneuvering' area," and, in Count III, plaintiff asserted that defendant's actions constituted a "*per se* physical taking because it has interfered with the Plaintiff's right to exclude the Postal Service and the right to use

the space or lease it to other non-postal tenants." In Count IV of plaintiff's amended complaint, plaintiff asserted that "it is clearly more appropriate and reasonable to treat the leases as two parts of a single lease," and, in Count V, plaintiff asserted that the court should reform "the terms of the agreement consistent with the intent of the parties to allow the Phase II space to be leasable by non-postal tenants." Additionally, in Count VI of plaintiff's amended complaint, plaintiff argued that "Defendant's actions have not only violated its contracts, but also have violated the covenant of good faith and fair dealing."

On June 18, 2015, defendant filed a partial motion to dismiss plaintiff's amended complaint, arguing that the plaintiff lacked standing because the "Phase I and II leases" were "executed by Build, Inc. and MPO Leasing, respectively," and that plaintiff had failed to state a claim in Count IV of its amended complaint because "the Phase II lease expired by its own terms and the Postal Service does not have any continued obligations thereunder." Plaintiff filed an opposition to defendant's partial motion to dismiss and a motion for partial summary judgment, in which plaintiff asserted that "Stromness is entitled to partial summary judgment finding that it has standing to bring this action." On December 18, 2015, after the parties had briefed defendant's motion to dismiss, the court issued an Order directing the parties to file supplemental briefs on several issues raised in defendant's partial motion to dismiss and instructing plaintiff to discuss whether the leases at issue in defendant's partial motion to dismiss were explicitly assigned to Stromness MPO. On January 22, 2016, plaintiff filed a response to the court's December 18, 2015 Order, attached to which, for the first time, were the documents assigning the leases at issue to Stromness MPO. On February 3, 2016, defendant submitted a filing to this court, arguing that plaintiff had "committed procedural error by failing to submit the assignments with its initial papers," but stating:

> Notwithstanding the procedural error, the assignments establish that Stromness assumed the obligations of the Phase I and II leases such that there is privity of contract with the Government. Based on the language of assignments, one appears to have been executed on February 8, 2010. Although the second assignment awkwardly states that it is effective December 31, 2008, suggesting that it was not executed on that date, our follow-up investigation conducted upon receiving copies of the assignments suggests that the second assignment may have been executed on February 8, 2010. Because the assignments provided by Stromness appear to pre-date the filing of this case, and we possess no evidence that calls into question the legitimacy of the assignments, Stromness has established privity of contract as of the filing of this case. As such, we withdraw our RCFC 12(b)(1) challenge to Stromness' amended complaint based on a lack of privity of contract.

(internal references omitted).

On April 12, 2016, the court issued an Order dismissing defendant's challenge to Stromness MPO's standing and finding that plaintiff has standing. Also on April 12, 2016, the court issued an Opinion addressing defendant's motion to dismiss Count IV of

plaintiff's amended complaint, which the court noted was the only open issue remaining regarding the briefing on defendant's June 18, 2015 partial motion to dismiss after defendant withdrew its standing objection. See Stromness MPO, LLC v. United States, 126 Fed. Cl. 195, 199 (2016). In its April 12, 2016 Opinion addressing defendant's June 18, 2015 partial motion to dismiss, the court determined that:

> In the above-captioned case, however, plaintiff alleges facts demonstrating that the parties dispute what agreements or documents represent the intended underlying agreement of the parties. Thus, plaintiff's amended complaint indicates that the parties' dispute involves not only the interpretation of contract terms, but also identifying which document, or documents, contain the full, integrated agreement, or agreements, of the parties. The facts that plaintiff alleges in its amended complaint suggest there is ambiguity in the Phase I and II leases regarding the parties' agreement about the Phase II construction and how that construction was intended to interact with the terms in the Phase I lease and the Phase II lease. Given this apparent, fundamental dispute, dismissal of plaintiff's improper termination claim is not appropriate at this time because it is not certain that plaintiff can prove no set of facts to support its claim.

See id. at 202. The court, therefore, denied defendant's partial motion to dismiss. Id. at 203.

Subsequently, in April 2017, a four-day trial in the above-captioned case was held in Salt Lake City, Utah. On September 8, 2017, this court issued an Opinion, see Stromness MPO, LLC v. United States, 134 Fed. Cl. 219, in which the court rejected plaintiff's allegation that the USPS had effected a taking in violation of the Fifth Amendment to the United States Constitution, "[b]ecause plaintiff's allegations are based on rights and obligations created voluntarily by the parties in these lease agreements," the Magna Main Post Office lease, as amended, and the District Training Center lease, as amended. Id. at 258. Therefore, "the proper remedy for plaintiff, if any, lies in contract and not pursuant to a takings theory." Id.

The court then determined that, although the parties disputed "what space would remain under the exclusive control of the USPS," the testimony at trial

> unanimously confirms that the USPS intended to have exclusive use of space within the Magna facility under the original Magna Main Post Office lease, and that intention was reiterated and preserved in the amendment to the Magna Main Post Office lease. There is no dispute that the original Magna Main Post Office lease for the Phase I space contemplated a single tenant, with the USPS to enjoy exclusive use of the facility as the only tenant.

Id. at 265. The court determined that the evidence submitted at trial demonstrated that the parties did not intend for the Magna Main Post Office lease, as amended, and the

District Training Center lease, as amended, to represent a single, unified lease at the time the lease agreements were executed, "but that plaintiff subsequently pursued integration of the leases after the District Training Center lease expired." See id. at 268. The court stated "there is no evidence to support" plaintiff's assertion that the Magna Main Post Office lease, as amended, and the District Training Center lease, as amended, should be considered a single, integrated lease. See id. The court also rejected plaintiff's claim that the Magna Main Post Office lease, as amended, and the District Training Center lease, as amended, should be reformed, which the court stated "rests on bare assertions," because defendant did not choose to integrate the lease, nor had plaintiff proven a mutual mistake at the time the lease amendment to the Magna Main Post Office lease was executed. See id. at 269. The court then determined that the District Center Lease, as amended, did not grant to plaintiff "shared use of the bathrooms, hallways, and parking to the USPS-operated Magna Main Post Office and to the Postal Service operated District Training Center." Id. at 271. The court's Opinion also stated that plaintiff "does not cite to any additional evidence to support its argument that the USPS intended to amend the Magna Main Post Office lease through the District Training Center lease in order to allow shared access to the restrooms, hallways, and parking for non-postal tenants." See id. Additionally, the court concluded that the USPS's construction of a demising wall did not impermissibly block plaintiff's right to access the facilities and utilities within the Magna Main Post Office space and that the USPS did not breach the Magna Main Post Office lease, as amended, when it turned off the circuit breakers in the District Training Center space. See id. at 271-72. The court stated that:

> A review of the plain language in the Magna Main Post Office lease, as amended, and the District Training Center lease, as amended, establishes that plaintiff has failed to prove that the USPS breached the Magna Main Post Office lease, as amended, by interfering with plaintiff's right to lease the "Phase II" space, or the part of the building previously occupied by the District Training Center, to a non-postal tenant by simply constructing the demising wall in September 2013. As discussed below, however, the issue of where the demising wall was constructed and plaintiff's rights based on the square footage remaining is at issue.

See id. at 271.

The court found that the USPS "did not breach either the District Training Center lease, as amended, or the Magna Main Post Office lease, as amended, in constructing the demising wall," but that, "as a result of the USPS constructing the demising wall in the wrong physical location, the USPS is retaining 371 square feet of space that should have been returned to plaintiff upon the expiration of the District Training Center lease, as amended." See id. at 274, 277. Plaintiff had argued that, as a result of the USPS building the demising wall in the incorrect location, the USPS had improperly retained 683 square feet, and defendant had argued that the USPS had improperly retained 371 square feet. See id. The court determined that plaintiff had failed to prove, by a preponderance of the evidence, that the USPS had improperly retained 683 square feet, and found that the USPS had improperly retained 371 square feet by constructing the demising wall in the

wrong location. See id. The parties, however, disputed the amount of damages to which plaintiff was entitled as a result of the USPS's partial holdover of 371 square feet. See id. at 278. According to plaintiff, the terms of the District Training Center lease, as amended, applied to the duration of the USPS's partial holdover, which plaintiff asserted began when the USPS built the demising wall, or, if the market rental rate was used to measure damages, plaintiff was entitled to $12.75 per square foot for the duration of the partial holdover. See id. Defendant argued that the damages for the USPS's partial holdover involving the demising wall should be measured by the fair market rental value of the property, and that plaintiff had failed to establish the fair market rental value of the former training center space between September 2013 and January 2017 because "plaintiff only has proven damages for the period of time between February 2017 to the date of judgment in this case, because the effective date of plaintiff's property appraisal is February 2, 2017." See id. Citing to Yachts America, Inc. v. United States, the court concluded that "'when a lessee holds over without new agreement after the expiration of his lease, the terms of the old lease agreement apply.'" See id. (quoting Yachts Am., Inc. v. United States, 230 Ct. Cl. 26, 39, 673 F.2d 356, 365 (1982)). The court then determined that, under the terms of the District Training Center lease, plaintiff was entitled to $20.12 per square foot annually as damages for the USPS's partial holdover involving the demising wall beginning on September 9, 2013 when the demising wall was built, and

> continuing until March 31, 2018, upon which date the Magna Main Post Office lease, as amended, is currently scheduled to expire according to the terms of the Magna Main Post Office lease, as amended, unless the USPS deconstructs and relocates the demising wall prior to that date, in which case plaintiff is entitled to recover damages for the period beginning on September 9, 2013 and continuing until the space is returned to plaintiff.

Id.

The court also determined that, "although the USPS had physically vacated the training center space on or before December 28, 2012, the USPS continued to exercise the right to control access to the space after the expiration of the District Training Center lease, as amended, thereby breaching the implied duty to vacate the premises." Id. at 282. The court reasoned that:

> Upon the termination of the District Training Center lease on December 31, 2012, the USPS did not surrender all of its rights in the space that it enjoyed as the lessee, as it indicated it would, and as required by the expiration of the District Training Center lease, as amended. Because the USPS did not deliver a key to the space to plaintiff, as explicitly stated in its Notice of Termination, plaintiff had to rely on the USPS to gain access to the space. Although defendant argues that merely retaining the key to the property is not sufficient to establish that the USPS was a holdover tenant, the court does not rely solely on the USPS's failure to deliver a key to plaintiff as the basis for finding that the USPS was a holdover tenant in breach of the District Training Center lease agreement, as amended. The USPS's failure

9

to deliver a key to plaintiff is part of a larger context in which the USPS continued to exercise rights over the former training center space. Plaintiff's ability to access the space was hindered and plaintiff was not back in full control of the space. Because plaintiff did not have a key to the exterior door of the former training center space, which was the fault of the USPS, plaintiff was able to access the space only by entering the Magna Main Post Office lobby and get to the space with a USPS escort through the secure postal area. Notwithstanding defendant's argument that plaintiff never was denied access to the space, because the USPS required that plaintiff be escorted to the space, plaintiff only was able to access the space during the USPS's regular business hours. Logically, because the USPS's rights to the space terminated with the expiration of the District Training Center lease, as amended, plaintiff, as the property owner, assumed all rights in the property, including the right to access that property at any date and time of its choosing. Furthermore, although defendant argues that plaintiff could have asked for the key or could have "re-keyed the locks at any time," in the Notice of Termination defendant assumed the obligation to turn over the space and return control of the space back to plaintiff by delivering a key to plaintiff. Moreover, based on the testimony of Postmaster Kenyon, it was clear that he felt the USPS kept the key to deliberately control access to all doors in order to keep the Magna Main Post Office a secure facility and to protect the United States mail.

The evidence before the court indicates that, in order to protect the security of the mail, the USPS intended to exert control over the training center space because there was not a permanent, secure separation between the former training center space and the non-public Magna Main Post Office space. Not until the USPS erected the demising wall between the two areas in September 2013, thereby better securing the non-public Magna Main Post Office space, did the USPS remove the lock on the exterior door to the former training center space and notify plaintiff that it could install a new lock on that door. Had plaintiff changed the lock on the exterior door to the former training center space prior to the construction of the demising wall, plaintiff would have had unfettered access to the secure Magna Main Post Office space, with only the temporary office partitions that Postmaster Kenyon installed, which Postmaster Dalton testified was not sufficient as a security barrier and did not secure the mail to block entry to the main post office space. Indeed, after plaintiff installed a new lock on the exterior door on September 9, 2013, the USPS acknowledged that the mail was not secure unless a demising wall was constructed to separate the Magna Main Post Office and the former training center space. In an internal e-mail on September 9, 2013, the day the lock was changed, the contracting officer sent an e-mail to a USPS architect/engineer that stated: "We need to brainstorm what we can do if the wall isn't going to be completed quickly, since the LL [landlord] changed the locks and has access to our side. We need to secure the mail." (emphasis added).

Id. at 282-83. Thus, the court found that plaintiff was entitled to damages for the period between January 1, 2013 and September 9, 2013 in the amount of $9,012.42 per month in accordance with the rental rate established in the expired District Training Center lease, as amended. See id. at 283. The court also stated that, "to the extent this court has determined that the USPS was a holdover tenant for the period beginning January 1, 2013 and continuing until September 9, 2013, defendant was obligated to reimburse plaintiff for property taxes assessed against the Magna facility during that period." Id. at 288.

Additionally, the court determined that "plaintiff has failed to prove that the USPS breached the duty to vacate or is otherwise unlawfully in possession of the secured parking and maneuvering area on the East side of the Magna facility," and that plaintiff "has failed to establish what duty or obligation was breached when the USPS removed CCTV cameras from the vacated training center space." See id. at 285-86. The court also determined that plaintiff had not established that defendant is obligated to reimburse plaintiff for 33.5 percent of the property taxes assessed against the Magna facility since 2013, "[g]iven the language in the January 11, 2001 amendment to the Magna Main Post Office lease, and because the terms of the District Training Center lease, as amended, expired on December 31, 2012." See id. at 288. Finally, the court found that the USPS did not breach the implied duty of good faith and fair dealing, and that plaintiff's allegation that the USPS breached the duty of good faith and fair dealing was "unsupported by the evidence before the court." See id. at 291. In the conclusion of the court's September 8, 2017 Opinion, the court stated:

> Neither party in this case is completely without fault for the broken down relationship between the parties. For the reasons discussed above, the court finds in partial favor of plaintiff on certain claims included in the complaint. Plaintiff is entitled to recover for defendant's failure to properly vacate the District Training Center space from January 1, 2013 until the removal of the exterior door lock to the former training center space on September 9, 2013, such that plaintiff is entitled to recover a prorated amount of annual rent based on the terms of the now-expired District Training Center lease, as amended, as well as prorated property tax reimbursement for the same period of time. Additionally, the court finds in favor of plaintiff that defendant has improperly retained 371 square feet of space within the Magna facility beginning at the time the demising wall was constructed on September 9, 2013, such that plaintiff is entitled to recover $20.12 per square foot per annum for the 371 square feet of space improperly retained beginning on September 9, 2013 and continuing until March 31, 2018, upon which date the Magna Main Post Office lease, as amended, is currently scheduled to expire, unless the USPS deconstructs and properly relocates the demising wall prior to that date or terminates the Magna Main Post Office lease, as amended. All other claims in plaintiff's complaint are **DENIED**.

Id. at 292-93 (capitalization and emphasis in original).

On September 29, 2017, the parties in the above-captioned case submitted a joint status report requesting that the court enter judgment

> effective as of September 30, 2017, in the amount of $132,828.94, together with a declaration that the Government shall pay to plaintiff the to-be-determined pro-rated amount of property taxes that correspond to the Government's partial holdover of 371 square feet (2.3% of the total annual property taxes) for all of 2017 and 3 months of 2018 (Jan-March 2018) when those taxes are assessed by the local authority and the invoices are submitted to the Postal Service by plaintiff.

The parties request of judgment in the amount of $132,828.94 reflected damages totaling $81,352.93 for the "Postal Service's eight-month, eight-day holdover," consisting of $74,502.67 in "principal amount" and $6,850.26 in "interest amount," $12,132.91 total for "[p]roperty tax reimbursement for the eight-month, eight-day holdover," consisting of $11,153.18 in "principal amount" and $979.73 in "interest amount," $35,715.70 total for the USPS's partial holdover involving the demising wall, consisting of $34,050.48 in "principal amount" and $1,665.22 in "interest amount," and $3,627.40 for "[p]roperty tax reimbursement for the partial holdover," consisting of $3,446.74 in "principal amount" and $180.66 in "interest amount."

On October 2, 2017, the court issued an Order directing the Clerk of the United States Court of Federal Claims to enter judgment in the above-captioned case in favor of plaintiff in the amount of $132,828.94. The court also stated in its October 2, 2017 Order that defendant shall pay plaintiff the pro-rated amount of property taxes corresponding to defendant's partial holdover of 371 square feet for all of 2017 and for January to March 2018 when those property taxes are assessed by the local authority and the invoices are submitted to the USPS by plaintiff. On October 10, 2017, the Clerk of the Court entered judgment against defendant in the amount of $132,828.94 and stated that defendant was liable for the property taxes corresponding with defendant's partial holdover of 371 square feet for 2017 and for January to March 2018 when those property taxes are assessed by the local authority and the invoices are submitted to the Postal Service by plaintiff.

Thereafter, plaintiff filed a motion for attorneys' fees and costs under EAJA, which is the motion addressed in this Opinion. Plaintiff's motion claimed $129,608.80 in attorney's fees and $13,438.65 in related expenses,[4] representing "109.3 hours of attorneys' fees and $1,119.91 in expenses" which were incurred during the time period of June 2014 to when defendant filed its partial motion to dismiss plaintiff's amended complaint on June 18, 2015; "315.5 hours of attorney's fees and $1,254.96 in expenses" responding to defendant's partial motion to dismiss during the time period of June 18, 2015 to April 1, 2016; "925.5 hours of attorneys' fees and $33,764.10 in expenses in prosecuting the case to a decision" during the time period of April 1, 2016 to September

---

[4] As discussed below, plaintiff subsequently reduced the amount of attorneys' fees and costs that plaintiff is requesting from this court under the EAJA.

8, 2017; and "11.1 hours of attorneys' fees and $8.24 in expenses in order to obtain entry of a money judgment" during the time period of September 9, 2017 to October 10, 2017. Plaintiff asserts that its attorneys and paralegals are entitled to a cost-of-living-adjustment and that the calculated hourly rate for its request should be $192.08, which is the hourly rate plaintiff used to calculate the amount of attorneys' fees plaintiff requests in its motion for attorneys' fees and costs. Plaintiff states that "Stromness recognizes that it did not prevail on all of its claims," and that "Stromness acknowledges that the number of attorney hours and the expenses incurred should be reduced." According to plaintiff, "Stromness prevailed on two of the six Counts identified in its Amended Complaint: Holdover and Breach of Contract. Stromness was partially successful in obtaining a significant judgment for its holdover rent claim that USPS denied in both of its final decisions and throughout litigation of this case." Plaintiff then argues that plaintiff should be entitled to one-third of the hours and expenses incurred

> prosecuting the case up to the Court's Opinion of September 8, 2017. This reduction excludes the attorneys' fees and expenses incurred by Stromness to successfully oppose Defendant's partial Motion to Dismiss. Stromness claims all of these hours and expenses based on its complete success as to its standing and privity. Moreover, Stromness would have incurred substantially all of the Motion to Dismiss related hours had it only pursued its holdover rent and property tax claims upon which the Court entered judgment.
>
> Stromness is also entitled to all of the attorney hours it incurred subsequent to issuance of the Court's Opinion up to entry of the judgment on October 10, 2017, since these were incurred solely in support of Stromness' successful claims. Stromness further is entitled to recover all of the attorney hours expended to prepare this Motion.

(internal references omitted).

Defendant filed an opposition in response to plaintiff's motion for attorneys' fees and costs. Defendant argues in its opposition that the court should reject plaintiff's request for attorneys' fees and costs under EAJA because Stromness MPO has not demonstrated that it is qualified to seek an EAJA award under the EAJA's net worth requirement. According to defendant, Stromness MPO is ineligible to receive an award under the EAJA because defendant's position in the above-captioned was substantially justified. Defendant further contends that special circumstances in the above-captioned case make an award under the EAJA unjust because Stromness MPO rejected a "generous settlement offer" in order to "prosecute claims it should have known lacked merit." Defendant also asserts that Stromness MPO has failed to establish that it incurred the fees and costs requested by Stromness MPO, and that Stromness MPO's requested fees and costs are unreasonable "because Stromness did not attempt to exclude from its request the fees and expenses that it incurred on its distinct, unsuccessful claims."

Plaintiff filed a reply in support of its motion for attorneys' fees and expenses, in which plaintiff argued it was qualified to receive an award under the EAJA, that defendant had not demonstrated that its position was substantially justified, that defendant has not demonstrated that special circumstances exist in the above-captioned case thereby precluding an award of attorneys' fees and costs under EAJA, and that plaintiff has demonstrated it incurred the fees and costs in its motion.[5] Subsequently, on August 3, 2018, in response to the court's Order to correlate the attorneys' fees claimed to ECF filings, plaintiff filed a supplement to its request for attorneys' fees and costs in which plaintiff revised its claim and added the appropriate ECF number(s) for each time entry and expense claimed listed in Exhibits 1-4 to plaintiff's motion for attorneys' fees and costs. Plaintiff also noted that, "[i]n performing its review of the time and expense entries, Stromness also determined that several time entries and expenses should be removed from the amounts requested in the Motion." Plaintiff now requests that this court award plaintiff $120,269.04 in attorneys' fees and $11,362.79 in costs.

## DISCUSSION

"In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorney's fee from the loser." Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247 (1975); see also Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 602 (2001); Arcambel v. Wiseman, 3 U.S. (Dall.) 306 (1796); Ward v. U.S. Postal Serv., 672 F.3d 1294, 1297 (Fed. Cir. 2012); Nilssen v. Osfam Sylvania, Inc., 528 F.3d 1352, 1357 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2008). "Absent statute or enforceable contract, litigants pay their own attorney's fees." Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. at 257 (citations omitted). This has come to be known as the "American Rule," and the only exceptions to this rule are those created by Congress and a small group of common law equitable exceptions which federal courts lack the power to enlarge.[6] See id. at 269; see also Nilssen v. Osfam Sylvania, Inc., 528 F.3d at 1357; Centex Corp. v. United States, 486 F.3d 1369, 1372 (Fed. Cir. 2007). In addition, litigants seeking to recoup litigation expenses from the United States also face the barrier of overcoming sovereign immunity. See Chiu v. United States, 948 F.2d 711, 714 (Fed. Cir. 1991); see also Gavette v. Office of Pers. Mgmt., 808 F.2d 1456, 1460 (Fed. Cir. 1986); Griffin & Dickson v. United States, 21 Cl. Ct. 1, 4 (1990). Only a statutory directive waiving immunity can make the United States potentially liable in suit. See Lane v. Pena, 518 U.S. 187, 192 (1996); United States v. Testan, 424 U.S. 392, 399 (1976); Soriano v. United States, 352 U.S. 270, 276 (1957); see also

---

[5] In its reply, plaintiff states that "[t]he parties have agreed that, in order to minimize costs, Stromness will file a supplemental request for the cost of preparing and pursuing this motion should the court find entitlement to EAJA fees and expenses," which, as discussed below, becomes moot as a result of this court's decision.

[6] The Supreme Court in Alyeska noted the equitable exceptions of (1) willful disobedience of a court order, (2) bad faith on the part of a losing party, and (3) the common fund or common benefit exception allowing recovery of costs when the prevailing party is a trustee of property or is a party preserving or recovering a fund for the benefit of others in addition to himself. Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. at 257-59.

Hymas v. United States, 810 F.3d 1312, 1817 (Fed. Cir. 2016), cert. denied, 137 S. Ct. 2196 (2017).

Prior to EAJA, different statutes contained specific waivers of sovereign immunity for the United States with regard to recovering attorney's fees.  See Gavette v. Office of Pers. Mgmt., 808 F.2d at 1460. EAJA was enacted to provide a "'uniform rule' which would 'make such specific exceptions unnecessary.'" Id. (quoting the Historical and Revision Notes of 28 U.S.C. § 2412). As indicated by the United States Supreme Court, "Congress enacted EAJA, Pub. L. 96-481, Tit. II, 94 Stat. 2325, in 1980 'to eliminate the barriers that prohibit small businesses and individuals from securing vindication of their rights in civil actions and administrative proceedings brought by or against the Federal Government.'" Scarborough v. Principi, 541 U.S. 401, 406 (2004) (quoting H.R. Rep. No. 96-1005, at 9 (1980)); see also Starry Assocs., Inc. v. United States, 892 F.3d 1372, 1377 (Fed. Cir. 2018) (quoting Scarborough v. Principi, 541 U.S. at 406); Gavette v. Office of Pers. Mgmt., 808 F.2d at 1459 (quoting H.R. Rep. No. 96-1418, at 5 (1980), reprinted in 1980 U.S.C.C.A.N. 4984, 4984 (1980)) (stating that Congress recognized that the American Rule deterred individuals and small businesses "from seeking review of, or defending against unreasonable governmental action because of the expense involved in securing the vindication of their rights"); Hyperion, Inc., v. United States, 118 Fed. Cl. 540, 544 (2014); PCI/RCI v. United States, 37 Fed. Cl. 785, 788 (1997) (quoting H.R. Rep. No. 96-1418, at 5, reprinted in 1980 U.S.C.C.A.N. at 4984). When the House of Representatives considered EAJA, it provided the following rationale:

> For many citizens, the costs of securing vindication of their rights and the inability to recover attorney fees preclude resort to the adjudicatory process. When the cost of contesting a Government order, for example, exceeds the amount at stake, a party has no realistic choice and no effective remedy. In these cases, it is more practical to endure an injustice than to contest it.

H.R. Rep. No. 96-1418, at 9, reprinted in 1980 U.S.C.C.A.N. at 4988.

To address these concerns, in 1980, Congress enacted EAJA. "The Equal Access to Justice Act (EAJA or Act) departs from the general rule that each party to a lawsuit pays his or her own legal fees." Scarborough v. Principi, 541 U.S. at 404-05 (citing Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. at 257). The purpose of EAJA was to "'reduce the deterrents and disparity by entitling certain prevailing parties to recover an award of attorney's fees, expert witness fees and other expenses against the United States.'" Gavette v. Office of Pers. Mgmt., 808 F.2d at 1459-60 (quoting H.R. Rep. No. 96-1418, at 6, reprinted in 1980 U.S.C.C.A.N. at 4984); see also PCI/RCI v. United States, 37 Fed. Cl. at 788. "The primary purpose of the EAJA is to ensure that litigants 'will not be deterred from seeking review of, or defending against, unjustified governmental action because of the expense involved.'" Wagner v. Shinseki, 640 F.3d 1255, 1259 (Fed. Cir. 2011) (quoting Scarborough v. Principi, 541 U.S. at 407) (citations and internal quotation marks omitted in original); see also Starry Assocs., Inc. v. United States, 892 F.3d at 1384; Thompson v. Shinseki, 682 F.3d 1377, 1380 (Fed. Cir. 2012); Phillips v. Shinseki, 581 F.3d 1358, 1367 (Fed. Cir. 2009); Ellis v. United States, 711 F.2d

1571, 1576 (Fed. Cir. 1983) ("EAJA's primary purpose is to eliminate legal expense as a barrier to challenges of unreasonable government action."); Hubbard v. United States, 80 Fed. Cl. 282, 285 (2008), aff'd, 315 F. App'x 307 (Fed. Cir. 2009).

In order to accomplish its purpose, EAJA made two primary changes in the then prevailing law. Gavette v. Office of Pers. Mgmt., 808 F.2d at 1460 (citing H.R. Rep. No. 96-1418, at 9, 1980 U.S.C.C.A.N. at 4987). First, in 28 U.S.C. § 2412(b), EAJA extended the existing common law and statutory exceptions to the American Rule to make the United States liable for attorney's fees just as private parties would be liable. Gavette v. Office of Pers. Mgmt., 808 F.2d at 1460 (citing H.R. Rep. No. 96-1418, at 9, 17, 1980 U.S.C.C.A.N. at 4987, 4996); see also Scarborough v. Principi, 541 U.S. at 406. Second, EAJA authorized "the court to award fees and expenses incurred in the court proceedings," as well as in "'any action for judicial review of an adversary adjudication.'" See Gavette v. Office of Pers. Mgmt., 808 F.2d at 1461 (quoting 28 U.S.C. § 2412(d)(3)). In House Report No. 96-1418, the House Committee on the Judiciary stated that:

> Section 2412(b) permits a court in its discretion to award attorney's fees and other expenses to prevailing parties in civil litigation involving the United States to the same extent it may award fees in cases involving other parties. . . . Thus, under this subsection, cases involving the United States would be subject to the "bad faith," "common fund" and "common benefit" exceptions to the American rule against fee-shifting. The United States would also be liable under the same standards which govern awards against other parties under Federal statutory exceptions, unless the statute expressly provides otherwise.

Gavette v. Office of Pers. Mgmt., 808 F.2d at 1460 (quoting H.R. Rep. No. 96-1418, at 17, 1980 U.S.C.C.A.N. at 4996); see also Centex Corp. v. United States, 486 F.3d at 1372; Knight v. United States, 982 F.2d 1573, 1579-82 (Fed. Cir. 1993) (common fund exception); St. Paul Fire & Marine Ins. Co. v. United States, 4 Cl. Ct. 762, 769 (1984) (bad faith exception); Heger v. United States, 114 Fed. Cl. 204, 210-11 (2014) (bad faith exception); MVM, Inc. v. United States, 47 Fed. Cl. 361, 363-65 (2000) (common benefit).

Section 2412(b) reads:

> Unless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys, in addition to the costs which may be awarded pursuant to subsection (a), to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction. The United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award.

28 U.S.C. § 2412(b). The statute at 28 U.S.C. § 2412(d)(1)(A) provides:

Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

See 28 U.S.C. § 2412(d)(1)(A). The EAJA statute also provides that

"fees and other expenses" includes the reasonable expenses of expert witnesses, the reasonable cost of any study, analysis, engineering report, test, or project which is found by the court to be necessary for the preparation of the party's case, and reasonable attorney fees (The amount of fees awarded under this subsection shall be based upon prevailing market rates for the kind and quality of the services furnished, except that . . . (ii) attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee.).

28 U.S.C. § 2412(d)(2)(A).

As indicated by the United States Court of Appeals for the Federal Circuit, "EAJA is a fee-shifting statute that allows a party who prevails in a civil action brought by or against the government to recover attorney's fees and costs." Davis v. Nicholson, 475 F.3d 1360, 1363 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007); see also Robinson v. O'Rourke, 891 F.3d 976, 980 (Fed. Cir. 2018) ("The EAJA is a fee-shifting statute that allows a party who prevails in a civil action brought by or against the government to recover attorney fees and costs."); Ward v. U.S. Postal Serv., 672 F.3d at 1297. The United States Supreme Court has stated that, "plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." Hensley v. Eckerhart, 461 U.S. 424, 433 (1983) (quoting Nadeau v. Helgemoe, 581 F.2d 275, 278-79 (1st Cir. 1978)) (indicating that the standard is generally applicable in cases for which Congress authorizes an award of fees to a "prevailing party"); see also Astrue v. Ratliff, 560 U.S. 586, 591 (2010); Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. at 603; Dover v. McDonald, 818 F.3d 1316, 1318 (Fed. Cir. 2016) (explaining that the correct legal standard for determining whether a party is a prevailing party is that the party must receive some relief on the merits of his claim); Ward v. U.S. Postal Serv., 672 F.3d at 1297; Brewer v. Am. Battle Monuments Comm'n, 814 F.2d 1564, 1567-69 (Fed. Cir. 1987); Sabo v. United States, 127 Fed. Cl. 606, 634 (2016) (stating that a prevailing party is a party who has been awarded "some relief," including "an enforceable judgment on the merits, a court-ordered consent decree, 'or the equivalent of either of those'" (quoting Rice Servs., Ltd. v. United States, 405 F.3d 1017,

1025 (Fed. Cir. 2005))), aff'd, 717 F. App'x 986 (Fed. Cir. 2017). The United States Court of Appeals for the Federal Circuit has indicated in an EAJA analysis that "[a] party prevails in a civil action if he receives '"at least some relief on the merits of his claim."'" Davis v. Nicholson, 475 F.3d at 1363 (quoting Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. at 603-04 (quoting Hewitt v. Helms, 482 U.S. 755, 760 (1987))); see also Dellew Corp. v. United States, 855 F.3d 1375, 1379-80 (Fed. Cir. 2017); Dover v. McDonald, 818 F.3d at 1318. Because EAJA "exposes the government to liability for attorney fees and expenses to which it would not otherwise be subjected, it is a waiver of sovereign immunity." Ed A. Wilson, Inc. v. Gen. Servs. Admin., 126 F.3d 1406, 1408 (Fed. Cir. 1997) (citing Ardestani v. I.N.S., 502 U.S. 129, 137 (1991)); see also Starry Assocs., Inc. v. United States, 892 F.3d at 1380 (stating that EAJA is a waiver of sovereign immunity); Massie v. United States, 226 F.3d 1318, 1321 (Fed. Cir. 2000) (explaining that EAJA is a waiver of sovereign immunity). "[T]he traditional principle [is] that the Government's consent to be sued 'must be "construed strictly in favor of the sovereign" . . . .'" United States v. Nordic Vill., 503 U.S. 30, 34 (1992) (quoting Ruckelshaus v. Sierra Club, 463 U.S. 680, 685 (1983) (quoting McMahon v. United States, 342 U.S. 25, 27 (1951))); see also Ardestani v. I.N.S., 502 U.S. at 137.

As the United States Supreme Court indicated:

> There is no precise rule or formula for making these determinations [for fee awards]. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment.

Hensley v. Eckerhart, 461 U.S. at 436-37. Although in Hensley v. Eckerhart the United States Supreme Court addressed attorneys' fees available pursuant to the Civil Rights Attorney's Fees Awards Act of 1976, the Supreme Court indicated that similar review and discretion by the trial court was warranted in an EAJA examination when awarding attorneys' fees. See Comm'r v. Jean, 496 U.S. 154, 161 (1990) ("In Hensley, we emphasized that it is appropriate to allow the district court discretion to determine the amount of a fee award, given its 'superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters.' The EAJA prescribes a similar flexibility." (quoting Hensley v. Eckerhart, 461 U.S. at 437)). The United States Court of Appeals for the Federal Circuit also has applied the Hensley approach in EAJA cases. See Hubbard v. United States, 480 F.3d at 1332-33; see also Former Emps. of Motorola Ceramic Prods. v. United States, 336 F.3d 1360, 1364 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); Prochazka v. United States, 116 Fed. Cl. 444, 458 (2014) (explaining that the United States Court of Appeals for the Federal Circuit has held that the Hensley standard is to be used in determining the amount of fees awarded under EAJA); Info. Scis. Corp. v. United States, 88 Fed. Cl. 626, 633 n.3 (2009) (explaining that Hensley has been applied by the United States Court of Appeals for the Federal Circuit in EAJA cases).

The court, therefore, has considerable discretion, which is dependent on the facts

of the particular case before it, when determining the definition of "prevailing party," what a reasonable hourly rate charged by an attorney is and what are the reasonable number of hours which should be compensated. See Wagner v. Shinseki, 640 F.3d at 1261 (explaining that "a court has broad discretion in awarding attorney fees" and that a "litigant is only entitled to 'reasonable' attorney fees"); see also Hubbard v. United States, 480 F.3d 1327, 1334-35 (Fed. Cir. 2007) (stating, in an EAJA context, "[t]he trial court has considerable discretion in determining reasonable attorney fees"); Sabo v. United States, 127 Fed. Cl. at 634; Ulysses Inc. v. United States, 117 Fed. Cl. 772, 785 (2014) ("EAJA provides that the Court, in its discretion, may reduce the amount to be awarded."). Moreover, the court should not award fees "to the extent that the applicant ultimately fails to prove justification for each item of fee claimed." Fritz v. Principi, 264 F.3d 1372, 1377 n.1 (Fed. Cir. 2001).

Under EAJA, eligibility for an award of attorneys' fees and expenses in a civil action requires: (1) that an eligible claimant be a prevailing party; (2) that the government's position viewed over the entire course of the dispute was not substantially justified; (3) that no special circumstances make an award unjust; and (4) that any fee application be timely submitted and supported by an itemized statement. See 28 U.S.C. § 2412(d)(1)(A),(B); see also Scarborough v. Principi, 541 U.S. at 407-08; Comm'r v. Jean, 496 U.S. at 160-61; Norris v. Sec. & Exch. Comm'n, 695 F.3d 1261, 1264 (Fed. Cir. 2012); Ward v. U.S. Postal Serv., 672 F.3d at 1297; Libas, Ltd. v. United States, 314 F.3d 1362, 1365 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2003).

In the above-captioned case, defendant does not dispute that Stromness timely filed its application under EAJA. Defendant, however, asserts that the court should deny plaintiff's request for attorneys' fees and costs under EAJA because Stromness MPO has not demonstrated that it is qualified to seek an EAJA award, defendant's position was substantially justified, special circumstances in the above-captioned case make an award under EAJA unjust, plaintiff has failed to establish that it incurred the requested fees and costs, and plaintiff's requested fees and costs are not reasonable.

Stromness MPO's Qualification to Seek an Award Under the EAJA

In plaintiff's motion for attorneys' fees and costs, plaintiff asserts that Stromness MPO is a qualified private entity under 28 U.S.C. § 2412(d)(2)(B)(ii) because, at the time Stromness MPO filed its complaint on August 6, 2014, Stromness MPO's net worth did not exceed $7,000,000.00 and Stromness MPO did not have more than 500 employees. Stromness MPO attached to its motion for attorneys' fees and costs a January 18, 2018 declaration signed by Frederick Stromness, the managing member of Stromness MPO, in which Frederick Stromness states that Stromness MPO's net worth was "well below $7 million throughout 2014" and that Stromness MPO had less than 500 employees on August 6, 2014. Plaintiff also submitted Stromness MPO's 2014 tax return, which indicates that Stromness MPO had $4,345,664.00 in total assets at the beginning of the 2014 tax year and $4,240,990.00 in total assets at the end of 2014 tax year.

Defendant, however, argues in its opposition in response to plaintiff's motion for attorneys' fees and costs that Stromness MPO has not met its burden of proving that Stromness MPO is qualified under EAJA because Stromness MPO "has not provided an audited financial statement reflecting its net worth, which is what is required under EAJA." According to defendant, Stromness MPO has not established its net worth as of August 6, 2014, when Stromness MPO filed its complaint, because Stromness MPO's 2014 tax return only provides financial information as of January 1, 2014 and December 31, 2014.

In its reply, Stromness MPO, however, argues that defendant does not allege that Stromness MPO had a net worth exceeding $7,000,000.00 or had more than 500 employees, but only that Stromness MPO had not provided the necessary documentation to prove its net worth as of August 6, 2014. Stromness MPO, therefore, attached to its reply "the supplemental reinforcing documentation the Government suggests this Court needs regarding net worth," which consists of a declaration signed by Brent Sandberg, who states that he is a Certified Public Accountant in the State of Utah and a member of Jones Simkins LLC, as well as an "Independent Accountants' Review Report" that was conducted by Mr. Sandberg and his firm. In the declaration signed by Mr. Sandberg, Mr. Sandberg states that the Independent Accountants' Review Report was performed in accordance with the "Statements on Standard for Accounting and Review Services promulgated by the Accounting and Review Services Committee of the AICPA [American Institute of Certified Public Accountants]." Mr. Sandberg states that the Independent Accountants' Review Report indicates that, as of December 31, 2013, Stromness MPO had a net worth of $1,774,055.00 and, as of December 31, 2014, Stromness MPO had a net worth of $1,847,756.00.

In order for a private entity to be included in the EAJA's definition of an eligible "party," the private entity must have had a net worth of less than $7,000,000.00 and must have had less than 500 employees at the time the civil action was filed. See 28 U.S.C. § 2412(d)(2)(B); see also Meyer Grp., Ltd. v. United States, 129 Fed. Cl. 579, 584 (2016) (quoting 28 U.S.C. § 2412(d)(2)(B)). "'Net worth, for the purposes of the EAJA, is calculated by subtracting total liabilities from total assets.'" Lion Raisins, Inc. v. United States, 57 Fed. Cl. 505, 511 (2003) (quoting Scherr Constr. Co. v. United States, 26 Cl. Ct. 248, 251 (1992) (citation omitted)); see also Hyperion, Inc. v. United States, 118 Fed. Cl. at 544 n.2 (citing Lion Raisins, Inc. v. United States, 57 Fed. Cl. at 511). The plaintiff bears the burden of demonstrating that it satisfies the net worth requirements set forth in the EAJA. See Info. Scis. Corp. v. United States, 86 Fed. Cl. 269, 280 (citing Asphalt Supply & Serv., Inc. v. United States, 75 Fed. Cl. 598, 601, appeal dismissed (Fed. Cir. 2007); and Al Ghanim Combined Grp. Co. v. United States, 67 Fed. Cl. 494, 496 (2005)), amended on denial of recons., 88 Fed. Cl. 626 (2009); see also Hyperion, Inc. v. United States, 118 Fed. Cl. at 544. An unaudited, qualified balance sheet that is not prepared in accordance with the Generally Accepted Accounting Principles (GAAP) is not sufficient to establish net worth. See Scherr Constr. Co. v. United States, 26 Cl. Ct. at 251; see also Info. Scis. Corp. v. United States, 86 Fed. Cl. at 280 ("Self-serving affidavits and unaudited balances, alone, are not considered sufficient to establish a plaintiff's net worth."). Although the EAJA's limitation for filing a timely request for attorneys' fees and costs "should be strictly met," a party that meets the jurisdictional requirements of the

EAJA may supplement its request under the EAJA "to set forth a more explicit statement about his net worth." See Bazalo v. West, 150 F.3d 1380, 1384 (Fed. Cir. 1998) (stating that "the content of the EAJA application should be accorded some flexibility"); see also Q Integrated Cos., LLC v. United States, 133 Fed. Cl. 479, 489 (2017) (citing Scarborough v. Principi, 541 U.S. at 416-19).

Stromness MPO's 2014 tax return indicates that Stromness MPO had $4,345,664.00 in total assets at the beginning of the 2014 tax year and $4,240,990.00 in total assets at the end of 2014 tax year. In the declaration signed by Mr. Sandberg, a member of Jones Simkins LLC, a certified public accounting firm, Mr. Sandberg states that he has provided tax and accounting services to Stromness MPO since January 1, 2010, that he prepared and submitted Stromness MPO's 2014 tax return, and that the "income tax basis net worth (assets minus liabilities)" of Stromness MPO was less than $4,500,000.00 at both the beginning and end of the 2014 calendar year. In the declaration signed by Mr. Sandberg, Mr. Sandberg concludes that Stromness MPO's "GAAP basis net worth (assets minus liabilities)" was $1,774,055.00 as of December 31, 2013 and $1,847,756.00 as of December 31, 2014 based on the Independent Accountants' Review Report of Stromness MPO's financials, which was performed by Mr. Sandberg and his firm. Additionally, Mr. Sandberg asserts that "it is not reasonably possible" that Stromness MPO's net worth exceeded $7,000,000.00 during 2014.

The information provided by Stromness MPO is sufficient to establish that Stromness MPO had a net worth under $7,000,000.00 as of August 6, 2014, as Stromness MPO has presented its balance sheets for 2013 and 2014, which were prepared in accordance with GAAP and reviewed by an independent accounting firm, which concluded Stromness MPO had a net worth of less than $7,000,000.00 throughout 2014. Indeed, a review of Stromness MPO's balance sheets indicates that Stromness MPO's net worth for the purposes of the EAJA was less than $7,000,000.00 when Stromness MPO filed its complaint in the above-captioned case on August 6, 2014. According to Stromness MPO's balance sheets, Stromness MPO had $2,720,602.00 in total assets[7] and $946,547.00 in total liabilities as of December 31, 2013, thereby

---

[7] The amount of total assets listed in Stromness MPO's tax return and balance sheets appear to differ, which appears to stem from how Stromness MPO reported its property assets on its tax return. In Stromness MPO's tax return, Stromness MPO lists $3,484,718.00 in "[b]uildings and other depreciable assets" and $806,595.00 in "[l]and (net of any amortization)" for 2013, as well as $3,379,034.00 in "[b]uildings and other depreciable assets" and $806,595.00 in "[l]and (net of any amortization)" for 2014. In Stromness MPO's balance sheets, Stromness MPO listed $2,483,639.00 in "[p]roperty, net" for 2013 and $2,419,898.00 in "[p]roperty, net" for 2014. According to the notes to Stromness MPO's financial statements, in 2013, Stromness MPO had $2,919,180.00 in "[b]uildings and improvements" and $468,737.00 in land, less $904,278.00 in accumulated depreciation, thereby producing net property of $2,483,639.00. The notes state that, in 2014, Stromness MPO had $2,919,180.00 in "[b]uildings and improvements" and $468,737.00 in land, less $968,019.00 in accumulated depreciation, thereby producing net property interests of $2,419,898.00.

producing a net worth of $1,774,055.00 as of December 31, 2013. Stromness MPO's balance sheets indicate that Stromness MPO had $2,665,689.00 in total assets and $817,933.00 in total liabilities as of December 31, 2014, which produces a net worth of $1,847,756.00 as of December 31, 2014. During 2014, Stromness MPO's balance sheets state that Stromness MPO only had $187,916.00 in total cash flows from operating and investing activities, with $184,730.00 in losses of cash flows from Stromness MPO's financing activities. Based on Stromness MPO's cash flows during 2014 and its total assets as of December 31, 2013 and December 31, 2014, Stromness MPO's net worth, during the 2014 calendar year, did not exceed the $7,000,000.00 eligibility limitation set forth in EAJA. Moreover, consistent with Fredrick Stromness MPO's statement that Stromness MPO had less than 500 employees in 2014 and that "Stromness paid no salaries or wages in 2014," Stromness MPO's balance sheets also reflect that Stromness MPO did not pay salaries or wages to employees during 2014,[8] which indicates that Stromness MPO had less than 500 employees when Stromness MPO filed its complaint in the above-captioned case on August 6, 2014. Stromness MPO, therefore, has established that it is a qualified private entity under EAJA eligible to seek reasonable EAJA attorneys' fees and costs, subject to the court's review.

Stromness MPO's Itemized Statement

Plaintiff's counsel of record attached to plaintiff's motion for attorneys' fees and costs itemized time sheets of alleged hours billed to Stromness MPO and alleged costs incurred by Stromness MPO. Plaintiff's counsel of record did not attach to plaintiff's motion for attorneys' fees and costs copies of the monthly invoices sent to Stromness MPO. Defendant, however, argues that the EAJA requires that an applicant submit a contemporaneous, itemized statement of attorneys' fees and costs. Defendant asserts that "Stromness submitted an itemized statement but those records are not contemporaneous," and that, "[b]ecause its itemized statement is not contemporaneous, nor does it attach the contemporaneous invoices, Stromness has failed to meet the first prong of eligibility under EAJA." In plaintiff's reply, plaintiff asserts that "the documentation previously provided, and the invoices concurrently filed with this Reply, show the precise amount charged for each work entry and expense item claimed and incurred by Stromness." In its reply, plaintiff's counsel of record attached 307 pages of monthly invoices, or, in some instances, bi-monthly invoices, billed to Stromness MPO, as well as a supplemental declaration of Frederick Stromness,[9] in which Mr. Frederick Stromness states that the attached invoices

---

[8] In the January 5, 2018 declaration signed by Mr. Frederick Stromness, Mr. Frederick Stromness states that, during 2014, he managed Stromness MPO "without pay because of the burden of servicing the loan on the property. I was also assisted by my son Richard Stromness and my daughter Jamie Sampson who received no compensation from Stromness MPO, LLC."

[9] The first declaration signed by Frederick Stromness was dated January 5, 2018, and the supplemental declaration signed by Frederick Stromness was dated March 29, 2018.

are the monthly invoices for legal services incurred by Stromness for work performed through October 2017, and paid by Stromness MPO, LLC to its counsel in this matter. These invoices were provided on a regular basis to Stromness by our retained counsel and accurately identify the work performed on Stromness' behalf in this matter, the time spent on each entry by the various time keepers, the hourly rate charged, and the amounts due for each work entry. The detailed descriptions provided by my counsel were satisfactory to me and met my expectations of the law firms for this engagement.

Stromness has paid, and is responsible for, the full amounts shown on the attached invoices.

A party seeking attorneys' fees and costs under the EAJA must submit to the court "an itemized statement from any attorney or expert witness representing or appearing in [sic] behalf of the party stating the actual time expended and the rate at which fees and other expenses were computed." 28 U.S.C. § 2412(d)(1)(B). The monthly and bi-monthly invoices attached to plaintiff's reply indicate the service being provided, the date the service was provided, the individual who provided the service, the hours allegedly required to complete that service, and the amount being billed to Stromness MPO. See Gonzalez v. United States, 44 Fed. Cl. 764, 769 (1999) (stating that the Gonzalez plaintiff's "itemized ledger of legal work performed that identified the time period, specific tasks performed, and hours expended on each itemized portion of the work" satisfied EAJA's requirement that an itemized statement be submitted with an EAJA application). Also, according to the supplemental declaration signed by Mr. Frederick Stromness, Stromness MPO has paid for the legal services billed to Stromness MPO. Subsequently, in order to review plaintiff's submissions, and to ensure eligibility for prevailing party legal fees and costs, the court ordered plaintiff to submit a filing which associated time billed for with specific tasks identified in ECF numbers listed on the electronic docket. Plaintiff's submission, therefore, constitutes an itemized statement indicating "the actual time expended and the rate at which fees and other expenses were computed." See 28 U.S.C. § 2412(d)(1)(B).

## Stromness' Prevailing Party Status

Although plaintiff's complaint had indicated that the "Amount Claimed" was $2,964,300.00, as discussed above, on October 10, 2017, the Clerk of the Court entered judgment:

[I]n favor of plaintiff in the amount of $132,828.94. In addition, defendant shall pay plaintiff the pro-rated amount of property taxes that correspond to the defendant's partial holdover of 371 square feet (2.3% of the total annual property taxes) for all of 2017 and 3 months of 2018 (Jan-March 2018) when those taxes are assessed by the local authority and the invoices are submitted to the Postal Service by plaintiff.

As indicated in the court's October 2, 2017 Order directing the Clerk of the Court to enter judgment, the $132,828.94 reflected damages totaling $81,352.93 for defendant's eight-month, eight-day holdover of the District Training Center space, $12,132.91 for property tax reimbursement for defendant's eight-month, eight-day holdover of the District Training Center space, $35,715.70 for defendant's partial holdover involving the demising wall, and $3,627.40 for property tax reimbursement for defendant's partial holdover involving the demising wall. The court also rejected many of the other claims asserted by plaintiff and found that the USPS had not effected a taking in violation of the Fifth Amendment to the United States Constitution; the USPS had the exclusive right to use the Magna Main Post Office; the parties did not intend for the Magna Main Post Office lease, as amended, and the District Training Center lease, as amended, to represent a single, unified lease; the Magna Main Post Office lease, as amended, and the District Training Center lease, as amended, should be not reformed; the District Training Center Lease, as amended, did not "grant shared use of the bathrooms, hallways, and parking;" the USPS's construction of the demising wall did not impermissibly block plaintiff's right to access the Magna Main Post Office space; the USPS did not breach the Magna Main Post Office lease, as amended, when the USPS built the demising wall, when the USPS turned off the circuit breakers for the District Training Center space, or when the USPS removed CCTV cameras from the vacated District Training Center space; that "plaintiff has failed to prove that the USPS breached the duty to vacate or is otherwise unlawfully in possession of the secured parking and maneuvering area on the East side of the Magna facility;" that plaintiff had not established that defendant is obligated to reimburse plaintiff for 33.5 percent of the property taxes assessed against the Magna facility since 2013; and that the USPS did not breach the implied duty of good faith and fair dealing. See Stromness MPO, LLC v. United States, 134 Fed. Cl. at 258, 265, 268, 269, 271-72, 285-86, 288, 291.

In plaintiff's reply in support of its motion for attorneys' fees and costs, plaintiff states that plaintiff "concedes, as it must, that it did not succeed on its claims for reformation, restoration costs, rent on the [District] Training Center subsequent to September 9, 2013, and access to an additional 2,000 external square feet of parking and maneuvering space," but argues that plaintiff did prevail on its partial holdover claim involving the demising wall, as well as plaintiff's eight-month, eight-day holdover claim involving the District Training Center space. Defendant asserts that "Stromness is a prevailing party with respect to the eight-month holdover claim [involving the District Training Center space] but not the partial holdover claim [involving the demising wall]," which defendant identifies as "its partial holdover of 371 square feet" involving the demising wall built by the USPS and as representing "$39,385.10 of the final judgment and future property taxes." Defendant argues that Stromness is not a prevailing party on its partial holdover claim involving the demising wall because defendant conceded that the demising wall was built in the incorrect location. Defendant asserts that the parties disputed the amount of square footage the USPS had improperly retained as a result of the demising wall being built in the incorrect location, and that the court agreed with defendant's argument that the USPS improperly retained 371 square. Plaintiff, however, asserts that plaintiff prevailed on its partial holdover claim involving the demising wall

because the government denied in its answer to plaintiff's amended complaint "that the demising wall it erected excluded Stromness from 'approximately 400 square feet'[10] of its Training Center space," and, even after defendant "admitted" that the demising wall "walled off 371 square feet," defendant "continued to argue that no damages or rent were due for the 371 square feet of space it continues to retain." Because defendant "continued to dispute the damages for that space, even after trial," plaintiff contends that Stromness prevailed on its partial holdover claim involving the demising wall.

In the court's September 8, 2017 Opinion, the court discussed the parties' dispute regarding the amount of square footage improperly retained by the USPS as a result of the demising wall having been built in the incorrect position and concluded that the USPS improperly retained 371 square feet, as defendant had argued, rather than 683 square feet, as plaintiff had argued. See Stromness MPO, LLC v. United States, 134 Fed. Cl. at 274-78. The court also noted that the parties disputed the amount of damages plaintiff was entitled to recover for the partial holdover, with plaintiff asserting that terms of the District Training Center lease, as amended, applied to the duration of the USPS's partial holdover, citing to Yachts America, Inc. v. United States, 230 Ct. Cl. at 39, 673 F.2d at 365, "for the proposition that 'when a lessee holds over without new agreement after the expiration of his lease, the terms of the old lease agreement apply.'" See id. at 278 (quoting Yachts Am., Inc. v. United States, 230 Ct. Cl. at 39, 673 F.2d at 365). Specifically, plaintiff argued that the annual lease rate "provided in the District Training Center lease, as amended, for the period from January 1, 2013 to December 31, 2017 is set at $121,668.00, or $22.64 per square foot, and this lease rate should apply to defendant's holdover that began when the demising wall was constructed in September 2013." See id. Defendant, however, asserted that "the damages for a temporary holdover under a breach of contract theory is measured by the fair market rental value of the property, and that plaintiff has failed to establish the fair market rental value of the former training center space between September 2013 and January 2017." See id. The court concluded in its September 8, 2017 Opinion that:

> [T]he terms of the District Training Center lease, as amended, apply to the period of time during which the USPS has retained 371 square feet of space that the USPS should have returned to plaintiff. Although plaintiff argues that the applicable annual rental rate should be based on the renewal rate for the term beginning on January 1, 2013 and continuing until December 31, 2017, the parties did not execute a renewal of the District Training Center lease, and, thus, the law leads the court to apply the terms of the expired District Training Center lease, which provided that the annual rental rate for the space was $108,149.00, or $20.12 per square foot.

---

[10] As the court noted in its September 8, 2017 Opinion, throughout the proceedings in the above-captioned case, plaintiff had changed the amount of square footage allegedly retained as a result of the incorrect location of the demising wall, arguing that the USPS had improperly retained 387.99 square feet, 400 square feet, and 683 square feet. See Stromness MPO, LLC v. United States, 134 Fed. Cl. at 255 n.22.

Id. at 279 (footnote omitted). The court, therefore, found in plaintiff's favor regarding the method by which the court was to calculate damages as a result of defendant's partial holdover involving the demising wall, an issue directly contested by defendant. See id.

Additionally, the court, in its September 8, 2017 Opinion, found in plaintiff's favor regarding plaintiff's eight-month, eight-day holdover claim involving the District Training Center space. The court stated that plaintiff was

> entitled to recover for defendant's failure to properly vacate the District Training Center space from January 1, 2013 until the removal of the exterior door lock to the former training center space on September 9, 2013, such that plaintiff is entitled to recover a prorated amount of annual rent based on the terms of the now-expired District Training Center lease, as amended, as well as prorated property tax reimbursement for the same period of time.

Id. at 292. On October 2, 2017, the court directed the Clerk of the Court to enter judgment in favor of plaintiff in the amount of $132,828.94, which included damages and property taxes for defendant's partial holdover involving the demising wall and its eight-month, eight-day holdover involving the District Training Center space, as opposed to the "$2,964,300.00 (ESTIMATED)" plaintiff claimed in the cover sheet attached to plaintiff's August 6, 2014 complaint. (capitalization in original). Plaintiff, therefore, has demonstrated that it prevailed on a portion of the case it filed on August 6, 2014, including its partial holdover claim involving the demising wall, as well as its eight-month, eight-day holdover claim involving the District Training Center space and property taxes, although plaintiff was not the prevailing party on the balance of the claims raised in its amended complaint.

Substantial Justification

Defendant, however, argues that "the government's position was substantially justified" in the above-captioned case, and, consequently, that plaintiff is not entitled attorneys' fees and costs under the EAJA. According to defendant, when evaluating whether the government's position was substantially justified, the court is to examine the government's conduct as a whole "and make a single finding as to whether the Government's position was substantially justified." Defendant argues that the USPS's conduct supports a finding of substantial justification" because the USPS's rejection of plaintiff's certified claim had a reasonable basis in law and fact and that the "Court agreed with the Postal Service on five out of the six claims" rejected by the USPS.[11] Defendant

---

[11] Defendant states:

> Specifically, Stromness alleged the following: (i) the Postal Service vacated the wrong portion of the Magna property; (ii) the two leases in reality constituted a unified single lease; (iii) the Postal Service termination of the Training Center lease deprives Stromness of all reasonable use of the property; (iv) the Postal Service was wrongful requiring Stromness to pay for the utilities for the former training center space after termination; (v) the

also asserts that the USPS "offered to resolve the eight-month holdover claim, among others, for a $100,000 payment plus amendments to the Main Post Office lease" by making a settlement to Stromness MPO on June 18, 2014, which defendant argues demonstrates that the USPS's conduct was reasonable. Additionally, defendant argues that, after receiving plaintiff's supplemental certified claim, "the Postal Service reimbursed Stromness for the past due property taxes even though Stromness had not previously submitted a separate request for reimbursement as was required under the Training Center lease" and that the USPS contracting officer reasonably denied the remainder of plaintiff's supplemental certified claim. Defendant asserts that the USPS reasonably denied plaintiff's partial holdover claim involving the demising wall because plaintiff did not provide documentation in its supplemental certified claim indicating where the demising wall should have been placed. Defendant also asserts that its June 18, 2015 partial motion to dismiss plaintiff's amended complaint was reasonable because "it is black letter law that a plaintiff asserting a breach of contract claim against the Government must be in privity of contract with the Government" and that "the issue could have been resolved quickly if Stromness had produced the assignments in its response (it obviously had access to them)." Defendant contends that its argument in its June 18, 2015 partial motion to dismiss that the leases were not integrated and that Count IV in plaintiff's amended complaint should be dismissed was reasonable because the court ultimately held that the leases were not integrated and "relied upon the language of the leases, in part." Defendant argues that "the reasonableness of the Postal Service's trial conduct is demonstrated by the fact that it prevailed on the majority of Stromness' claims." Defendant also contends that its position concerning the demising wall was reasonable because the court agreed with defendant that the partial holdover was limited to 371 feet and, "[a]lthough the Court disagreed with the Postal Service's position on damages for the partial holdover (it used the lease terms as opposed to fair market value), the Postal Service had relied upon cases which support the use of fair market value as the measure of damages for a holdover." Additionally, defendant asserts that its position related to plaintiff's eight-month, eight-day holdover claim involving the District Training Center space was reasonable because:

> [T]he Postal Service introduced evidence and legal support for its assertion that it was not a holdover for that time period. Among other things, the Postal Service brought in the former Postmasters James Kenyon and Roland Dalton who testified regarding the steps they took to not infringe of the former training center space. The Postal Service also provided legal support. The Court, however, found that the Postal Service was an eight-

---

Postal Service violated the covenants of good faith and fair dealing in the Training Center lease; and (vi) the Postal Service was holding over the former training center space because it retained the keys for that space and required an escort for visits by Stromness' representatives.

Defendant asserts that plaintiff only succeeded on claim (vi), as the court found that defendant was improperly holding over the District Training Center space for eight months and eight days. As discussed above, defendant contended that Stromness MPO had not prevailed on its partial holdover claim involving the demising wall.

month holdover because Stromness' access was hindered (*e.g.*, inability to access the space during non-business hours) as opposed to the Postal Service gaining a profit-driven, physical use of the additional space. That implied intent was what the Postal Service strongly disputed. Even though the Postal Service did not prevail, the Court should find that the Postal Service's conduct with respect to the eight-month holdover claim was reasonably based in law and fact and supports a finding of substantial justification.

(internal references omitted).

Plaintiff, however, asserts that the government has not met its burden of showing that the government's position was substantially justified and that the government is liable to pay fees and costs under EAJA to a prevailing party for work on any claim that was not substantially justified. Plaintiff argues that "Stromness, through counsel requested, or suggested, settlement options," which, according to plaintiff, were ignored, with the exception of a "sole affirmative response or offer from the Postal Service," which "'came off the table' once litigation began." Regarding its partial holdover claim, plaintiff argues that defendant initially denied that it was liable for a partial holdover and then "argued that no rent was due for the holdover space; that the lease rate was not an appropriate measure of rent damages; that, 'at most' only $13.21 per foot was due for the retained space; and that no property tax reimbursement is due [sic] Stromness." Plaintiff also asserts that defendant's position respecting plaintiff's eight-month, eight-day holdover claim was not substantially justified because, "after litigation was filed, the Government, in its Answer to the Amended Complaint admitted that while 'the Postal Service informed owners that they could not enter the post office without an escort,' it nonetheless denied that the Service was in breach as a holdover tenant." Plaintiff argues that, "[e]ven as late as its Post-Trial Reply Brief, when all the evidence was in and before it, the Government continued to assert that 'The Postal Service Did Not Holdover The Training Center Space Between January And September 2013.'"[12] (capitalization in original).

"Under the EAJA, a prevailing party in litigation against the government is entitled to recover reasonable attorney fees and expenses 'unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.'" Patrick v. Shinseki, 668 F.3d 1325, 1330 (Fed. Cir. 2011) (quoting 28 U.S.C. § 2412(d)(1)(A)); see also Starry Assocs., Inc. v. United States, 892 F.3d at 1378 ("According to the plain language of [28 U.S.C.] § 2412(d), plaintiffs who prevail in cases brought against the government are entitled to 'fees and other expenses,' in addition to

---

[12] In defendant's response to plaintiff's motion for attorneys' fees and costs, defendant argues that "Stromness failed to allege that the Postal Service's position was not substantially justified" and that plaintiff's motion "focused on two discrete claims and ignored the rest of the case." In a heading in plaintiff's motion for attorneys' fees and costs, plaintiff argues that "Defendant's position was not substantially justified," and, in plaintiff's reply, plaintiff asserts that "Stromness clearly believes that the Postal Service's position was substantially unjustified based on its entire conduct before and during this litigation."

costs, 'unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.'" (quoting 28 U.S.C. § 2412(d)(1)(A))). The government bears the burden of demonstrating that its position was substantially justified. See Scarborough v. Principi, 541 U.S. at 414 ("The burden of establishing 'that the position of the United States was substantially justified,' [28 U.S.C.] § 2412(d)(1)(A) indicates and courts uniformly have recognized, must be shouldered by the Government." (citations omitted)); see also Patrick v. Shinseki, 668 F.3d at 1330 ("The government bears the burden of establishing that its position was substantially justified." (citing Doty v. United States, 71 F.3d 384, 385 (Fed. Cir. 1995))); Cmty. Heating & Plumbing Co. v. Garrett, 2 F.3d 1143, 1145 (Fed. Cir. 1993); Silva v. United States, 138 Fed. Cl. 325, 330 (2018) (citing Doty v. United States, 71 F.3d at 385); Favor TechConsulting, LLC v. United States, 132 Fed. Cl. 292, 302 (2017). That a trial court finds in favor a plaintiff, however, does not establish that the government's position was not substantially justified. See Pierce v. Underwood, 487 U.S. 552, 569 (1988) ("Obviously, the fact that one other court agreed or disagreed with the Government does not establish whether its position was substantially justified."); see also Meyer Grp., Ltd. v. United States, 129 Fed. Cl. at 585 ("While the outcome of a case is indicative of whether the Government's position was substantially justified, it is not determinative of that question, as 'the Government could take a position that is not substantially justified, yet win; even more likely, it could take a position that is substantially justified, yet lose.'" (quoting Pierce v. Underwood, 487 U.S at 569)). "On the other hand, the EAJA 'is not a talisman for permitting the [G]overnment to avoid liability in all cases.'" Favor TechConsulting, LLC v. United States, 132 Fed. Cl. at 302 (alteration in original) (quoting Massie v. United States, 226 F.3d at 1321).

When assessing whether the government's position was substantially justified, "the entirety of the conduct of the government is to be viewed, including the action or inaction by the agency prior to litigation." Chiu v. United States, 948 F.2d at 715; see also Comm'r v. Jean, 496 U.S. at 161-62 (stating that the EAJA "favors treating a case as an inclusive whole, rather than as atomized line-items"); see also Ulysses Inc. v. United States, 117 Fed. Cl. at 778 (quoting Comm'r v. Jean, 496 U.S. at 161-62);Q Integrated Cos., LLC v. United States, 133 Fed. Cl. at 489; Sabo v. United States, 127 Fed. Cl. at 632 ("[T]he court must determine whether, in light of 'the entirety of the government's conduct,' Chiu, 948 F.2d at 715, 'the position of the United States was substantially justified.'" (quoting 28 U.S.C. § 2412(d)(1)(A))); Miles Constr., LLC v. United States, 113 Fed. Cl. 174, 178 (2013); CEMS, Inc. v. United States, 65 Fed. Cl. 473, 477 (2005) ("This court, therefore, approaches the plaintiff's entitlement to EAJA fees by reviewing the government's overall position, without requiring that each and every government position be substantially justified.").

"The Government's 'position' includes both the underlying agency action that gave rise to the civil litigation and the arguments made during the litigation itself." DGR Assocs., Inc. v. United States, 690 F.3d 1335, 1340 (Fed. Cir. 2012) (citing 28 U.S.C. § 2412(d)(1)(B), (2)(D); Comm'r v. Jean, 496 U.S. at 161-62; and Patrick v. Shinseki, 668 F.3d at 1330); see also Int'l Custom Prod., Inc. v. United States, 843 F.3d 1355, 1358 (Fed. Cir. 2016) ("The Government's position includes the prelitigation actions of the

relevant administrative agency, as well as the U.S. Department of Justice's litigation arguments." (citing <u>Smith v. Principi</u>, 343 F.3d 1358, 1361-62 (Fed. Cir. 2003))); <u>Prochazka v. United States</u>, 116 Fed. Cl. at 454. "The Government's position is substantially justified if it is 'justified to a degree that could satisfy a reasonable person' and has a 'reasonable basis both in law and fact.'" <u>Int'l Custom Prod., Inc. v. United States</u>, 843 F.3d at 1358 (quoting <u>Pierce v. Underwood</u>, 487 U.S. at 565-66); <u>see also</u> <u>Norris v. Sec. & Exch. Comm'n</u>, 695 F.3d at 1265; <u>Patrick v. Shinseki</u>, 668 F.3d at 1330 ("The term 'substantially justified' means that the government's position was 'justified in substance or in the main,' and had a 'reasonable basis both in law and fact.'" (quoting <u>Pierce v. Underwood</u>, 487 U.S. at 565)); <u>Silva v. United States</u>, 2018 WL 3062415, at *6; <u>Meyer Grp., Ltd. v. United States</u>, 129 Fed. Cl. at 584. The United States Court of Appeals for the Federal Circuit also has stated that, "'[p]ut another way, substantially justified means there is a dispute over which "'reasonable minds could differ.'"'" <u>See</u> <u>Norris v. Sec. & Exch. Comm'n</u>, 695 F.3d at 1265 (quoting <u>Gonzales v. Free Speech Coal.</u>, 408 F.3d 613, 618 (9th Cir. 2005)).

"Although the Government's position involves both prelitigation and litigation conduct, 'only one threshold determination for the entire civil action is to be made.'" <u>Int'l Custom Prod., Inc. v. United States</u>, 843 F.3d at 1358 (quoting <u>Comm'r v. Jean</u>, 496 U.S. at 159); <u>see also</u> <u>SUFI Network Servs., Inc. v. United States</u>, 128 Fed. Cl. 683, 696 (2016) ("'Only one determination of substantial justification can be made, which may encompass both the agency's pre-litigation conduct and the Department of Justice's subsequent litigation position.'" (quoting <u>Cal. Marine Cleaning Inc. v. United States</u>, 43 Fed. Cl. 724, 729 (1999))). The court has "considerable discretion" when determining whether the government's position was substantially justified. <u>See</u> <u>RAMCOR Servs., Grp., Inc. v. United States</u>, 185 F.3d 1286, 1290 (Fed. Cir. 1999) (discussing substantial justification and stating that the "trial judge enjoys considerable discretion to determine eligibility for an EAJA award" (citing <u>Chiu v. United States</u>, 948 F.2d at 715 n.4)); <u>see also</u> <u>Chiu v. United States</u>, 948 F.2d at 714 (reviewing the United States Court of Federal Claim's determination concerning substantial justification for abuse of discretion); <u>Standard Commc'ns, Inc. v. United States</u>, 106 Fed. Cl. 165, 172 (2012) ("The determination of substantial justification, or the lack thereof, is within the discretion of the court." (citing <u>Chiu v. United States</u>, 948 F.2d at 715 n.4)); <u>Metric Constr. Co., Inc. v. United States</u>, 83 Fed. Cl. 446, 450 (2008).

Regarding the actions of the USPS, the agency involved in the dispute giving rise to the litigation in the above-captioned case, on May 15, 2013, plaintiff submitted its original certified claim to the USPS, in which plaintiff asserted that the USPS was a holdover tenant maintaining complete access and control over the former training center space; that the USPS vacated the incorrect section of the Magna facility; that the Magna Main Post Office lease, as amended, and the District Training Center lease, as amended, were a unified lease; that plaintiff had been deprived of the reasonable use of its property by the USPS's termination of the District Training Center lease; that the USPS was unjustly enriched; and that the USPS had violated the covenant of good faith and fair dealing. <u>See</u> <u>id.</u> at 252. On August 15, 2013, USPS contracting officer Bradford Meador issued a contracting officer's final decision denying plaintiff's original certified claim in its

entirety. Id. In Mr. Meador's August 15, 2013 contracting officer's final decision, the USPS rejected plaintiff's allegations in its May 15, 2013 certified claim that the USPS "vacated the wrong portion of the Magna Main Post Office," the "Phase I and Phase II leases in reality constitute a unified single lease," the USPS's termination of the District Training Center lease, as amended, "deprives the lessor of all reasonable use of that property," and that the USPS was being unjustly enriched. The USPS's position regarding the rejected claims outlined directly above was reasonable, as Mr. Meador's determinations were consistent with this court's determinations that the USPS was entitled to exclusive use of the Magna Main Post Office space, the Magna Main Post Office lease, as amended, and the District Training Center lease, as amended, were not a single unified lease, that the USPS was not unlawfully in possession of the secured parking and maneuvering area, and that the that the USPS did not breach the implied duty of good faith and fair dealing. See id. at 265, 268, 285-86, 291.

Mr. Meador, however, rejected plaintiff's claim that the USPS was a holdover tenant that maintained control over the District Training Center space. Mr. Meador argued that the USPS was not a holdover tenant because the USPS's failure to return a key does not "in and of itself" create a holdover tenancy and that plaintiff "could easily have regained control of the space" by rekeying the exterior door to the District Training Center space or by building a demising wall separating the District Training Center space and the Magna Main Post Office space, which the USPS asserted that plaintiff was required to do "based on the Main Office Lease provisions." Mr. Meador also stated that the USPS intended to build a demising wall in the future "to ensure the security of the Main Office leased space."

Moreover, on June 18, 2014, the USPS now points out that it attempted to settle plaintiff's May 15, 2013 certified claim in exchange for $100,000.00, which is only $32,828.94 less than the $132,828.94 entered in favor of plaintiff more than three years later when the Clerk of the Court entered judgment on October 10, 2017.[13] On June 18, 2014, an attorney with the USPS sent an email message to an attorney representing Stromness MPO, which stated, in full:

> The Postal Service has determined that it does not have a need to lease the space formerly used as the District Training Center in Magna, UT. The Postal Service believes that it properly terminated the District Training Center lease as set forth in the Contracting Officer's Final Decision.
>
> In an effort to reach a resolution without litigation, however, the Postal Service is willing to offer $100,000 to settle this matter in Full. In addition to

---

[13] The October 10, 2017 judgment also stated that

> defendant shall pay plaintiff the pro-rated amount of property taxes that correspond to the defendant's partial holdover of 371 square feet (2.3% of the total annual property taxes) for all of 2017 and 3 months of 2018 (Jan-March 2018) when those taxes are assessed by the local authority and the invoices are submitted to the Postal Service by plaintiff.

this payout, the Postal Service would agree to amend the Main Office Lease to remove the current Postal Service right to approve a new tenant in the terminated space, and replace it with language that allows Landlord to lease that space without Postal approval so long as the new tenant is not one whose business would be in competition with the Postal Service and would not unreasonably interfere with the Postal Service's quiet enjoyment of its space.

The $100,000 offer was roughly calculated using the following elements and accounting for the Postal Service's belief that it has more than a 50% chance of being successful in any litigation, but that using a 50% figure would be a reasonable compromise:

1) Portion of the Rent: The Postal Service terminated lease effective 12/31/12. There is a factual dispute regarding why the keys were not returned to the Landlord at that time. Regardless, by end of 9/13, the Postal Service had secured its remaining space and tendered the keys to Landlord. Annual Rent for period ending 12/12 was $108,149. The Postal Service compromise for 9 months with 50% discount: $40,555.

2) Portion of Real Estate Taxes: Similar analysis to rental obligation above. Taxes annually for district training space share, for 9 months with 50% discount: $6,760.

3) Portion of the Cost to Upgrade Terminated Space: The Postal Service obtained an estimate of $97,000 to add a restroom, separate utility meters, add a 2nd point of ingress/egress, and move the fence to provide parking to the terminated space. Landlord, who I believe is also in the general contracting business, may even be able to complete this work for less. Postal Service compromise with 50% discount: $48,500.

Please discuss this Settlement Offer with your clients and let me know if we can reach an agreement.

Ultimately, the parties were unable to reach a settlement agreement resolving plaintiff's claims in its May 15, 2013 certified claim prior to trial. By making the June 18, 2014 settlement offer to Stromness MPO, the USPS did not concede liability as to plaintiff's partial holdover claim involving the District Training Center space and asserted its liability only at 50 percent, maintaining its belief that based on its analysis the USPS could still persevere at trial. The USPS's settlement offer, however, indicates that the USPS evaluated plaintiff's holdover claim of the District Training Center space, recognized only that there was a factual dispute regarding the USPS's alleged holdover of the District Training Center space, but took into account litigation risk, time, and expense for both parties moving forward. Indeed, after a four-day trial and pre-trial and post-trial filings, plaintiff only recovered $74,502.67 in principal amount for the USPS's eight-month, eight-day holdover and $11,153.18 in principal amount for property tax reimbursement for the

eight-month, eight-day holdover. The $85,655.85 total that plaintiff recovered for its eight-month, eight-day holdover claim is substantially less than the annual rental rate of "$136,877.00 from January 1, 2013, until December 31, 2014, and $153,987.00 until the end of 2019," which plaintiff requested in its May 15, 2013 certified claim.

On January 10, 2015, plaintiff had submitted a supplemental certified claim to the USPS contracting officer for a final decision. See Stromness MPO, LLC v. United States, 134 Fed. Cl. at 253. In plaintiff's January 15, 2015 supplemental certified claim, plaintiff requested a declaration that the USPS be required to move the demising wall to the correct location[14] and to permit plaintiff access to restrooms, hallways, parking, and code-compliant ingress and egress; payment from the USPS for the fair market rental value of the vacated District Training Center space and parking area; reimbursement of property taxes for 2006–2009 and for 2012; and a declaration that plaintiff is entitled to receive property tax reimbursements from USPS for the years in which the vacated training center space remains, according to plaintiff, "uninhabitable." Id. On March 18, 2015, Shirley Wheeler, a different contracting officer with the USPS, issued a contracting officer's final decision on the supplemental certified claim granting plaintiff's claim for $73,156.99 for property tax reimbursement for the years 2006–2009 and 2012, which Ms. Wheeler stated that the USPS did notwithstanding that "you [Stromness MPO] did not provide a separate request for tax reimbursement for each [sic] the Main Office space and the District Training space." Ms. Wheeler denied the remainder of plaintiff's January 10, 2015 supplemental certified claim. Id. Ms. Wheeler's rejection of plaintiff's claim for "costs to remediate or restore alterations made by the Postal Service to the property" is consistent with this court's conclusion that the USPS was not liable for plaintiff's costs to remediate the District Training Center space. See Stromness MPO, LLC v. United States, 134 Fed. Cl. at 291-92.

Ms. Wheeler, however, denied that the USPS built demising wall in the incorrect location. Ms. Wheeler asserted that Stromness MPO "provided no diagram or documentation depicting where the demising wall should have been placed or otherwise supporting your claim that the demising wall is in the wrong location." Indeed, in plaintiff's supplemental certified claim, plaintiff did not include any evidence supporting its claim that the demising wall was built in the incorrect location, but only baldly alleged that the USPS had "incorrectly placed a demising wall it constructed" and that the USPS was "wrongfully taking 400 square feet of the Phase II space." Ms. Wheeler stated that "I find that based upon the Main Office Lease and the District Training Center Lease, in particular, in accordance with each Lease's Exhibit A, that the demising wall is in the correct location between the retained Main Office space and the vacated District Training Center space." Ms. Wheeler also stated that she consulted with the "postal Architect/Engineer who oversaw the project to erect the demising wall," who "confirmed" that the placement of the demising wall corresponded with the "pre-existing line demarking the two demised spaces on Exhibit A." Plaintiff failed to support its claim that

---

[14] The USPS did not build the demising wall until September 9, 2013, after plaintiff had submitted its original certified claim on May 15, 2013 and Mr. Meador of the USPS issued his August 15, 2013 contracting officer's final decision denying plaintiff's May 15, 2013 certified claim.

the demising wall was built in the incorrect location with any documentation, and the record before the court indicates that Ms. Wheeler examined documents pertaining to the location of the demising wall and consulted with an engineer before denying plaintiff's claim involving the demising wall. Additionally, as noted in the court's September 8, 2017 Opinion, the "facts indicate that Stromness MPO implicitly permitted this holdover tenancy to occur," and that Stromness MPO only "not[ed] to the USPS one time that the demising wall was in the wrong location."[15] See Stromness MPO, LLC v. United States, 134 Fed. Cl. at 279 n.31. Based on the lack of evidence offered to support plaintiff's claim involving the location of the demising wall, as well as Ms. Wheeler's independent research into the location of the demising wall, it was reasonable for the USPS, at that time, to deny plaintiff's claim that the demising wall was built in the incorrect location.

Regarding the position of the United States Department of Justice, on August 6, 2014, plaintiff filed a fifteen-count complaint in the above-captioned case. In the civil cover sheet submitted to the court, plaintiff indicated that the "Amount Claimed" by plaintiff was "$2,964,300.00 (ESTIMATED)." (capitalization in original). On May 18, 2015, plaintiff submitted its six-count amended complaint to the court, which included ten breach of contract claims in Count I of plaintiff's amended complaint. Beginning on April 17, 2017, the court held a four-day trial in the above-captioned case. On September 8, 2017, the court issued an Opinion finding that plaintiff was entitled to recover damages for defendant's failure to properly vacate the District Training Center space from January 1, 2013 until September 9, 2013, as well as for property tax reimbursement for that period of time, and that plaintiff was entitled to recover damages because defendant had improperly retained 371 square feet of space as a result of building the demising wall in the incorrect location. See Stromness MPO, LLC v. United States, 134 Fed. Cl. 292-93. The court denied all of plaintiff's other claims. See id.

Although not dispositive, in a case involving multiple claims, such as the above-captioned case, a "string of losses can be indicative; and even more so a string of successes." See Pierce v. Underwood, 487 U.S. at 569. In the above-captioned case, defendant prevailed on the bulk of the claims raised by plaintiff. The court found that, contrary to plaintiff's allegations, the USPS had not effected a taking in violation of the Fifth Amendment to the United States Constitution; the USPS was entitled the exclusive right to use the Magna Main Post Office; the parties did not intend for the Magna Main Post Office lease, as amended, and the District Training Center lease, as amended, to be a single, unified lease; the Magna Main Post Office lease, as amended, and the District Training Center lease, as amended, should be not reformed; the District Training Center Lease, as amended, did not "grant shared use of the bathrooms, hallways, and parking;" the USPS's erecting of the demising wall did not impermissibly prevent plaintiff from accessing the Magna Main Post Office space; the USPS did not breach the Magna Main

---

[15] As noted in the court's September 8, 2017 Opinion, "[a]ccording to Postmaster Dalton, during the construction of the demising wall, a member of the Stromness family came to look at the construction and [orally] advised Postmaster Dalton that 'the wall was in the wrong spot.'" See Stromness MPO, LLC v. United States, 134 Fed. Cl. at 250.

Post Office lease, as amended, when the USPS constructed the demising wall, when the USPS turned off the circuit breakers for the vacated District Training Center space, or when the USPS removed CCTV cameras from the vacated District Training Center space; that "plaintiff has failed to prove that the USPS breached the duty to vacate or is otherwise unlawfully in possession of the secured parking and maneuvering area on the East side of the Magna facility;" that plaintiff had not established that defendant is obligated to reimburse plaintiff for 33.5 percent of the property taxes assessed against the Magna facility since 2013; and that the USPS did not breach the implied duty of good faith and fair dealing. See Stromness MPO, LLC v. United States, 134 Fed. Cl. at 258, 265, 268, 269, 271-72, 285-86, 288, 291.

As discussed above, although the court rejected most of plaintiff's claims, plaintiff did prevail on a limited number of issues, its partial holdover-claim involving the demising wall and its holdover claim involving the District Training Center space. Regarding plaintiff's partial holdover claim involving the demising wall, although defendant denied in its answer to plaintiff's amended complaint that the demising wall was constructed in the incorrect location, prior to trial, defendant did stipulate that the demising wall was constructed in the incorrect position.[16] In the court's September 8, 2017 Opinion, the court agreed with defendant that, "as a result of the USPS constructing the demising wall in the wrong physical location, the USPS is retaining 371 square feet of space that should have been returned to plaintiff upon the expiration of the District Training Center lease, as amended," but disagreed with plaintiff's larger claim of 683 square feet, although plaintiff alleged somewhat varied amounts at various points in the proceeding. Plaintiff's claim of 683 square feet was significantly larger than the conclusion of 371 square feet. See Stromness MPO, LLC v. United States, 134 Fed. Cl. at 277. As noted above, although the court disagreed with defendant regarding the proper measure of damages for the partial holdover and concluded that "the weight of the case law precedent instructs that the terms of the expired lease apply to a holdover tenancy," see Stromness MPO, LLC v. United States, 134 Fed. Cl. at 279, defendant did have legitimate basis for its damages calculation. Defendant, in its post-trial brief, had cited to Allenfield Associates v. United States, 40 Fed. Cl. 471 (1998), and had argued that the proper measure of damages for the partial holdover involving the demising wall was the fair market rental value. Defendant had cited to case law from an Opinion issued by another Judge on the United States Court of Federal Claims which used the fair market rental value as a measure of damages for a holdover tenancy. See Allenfield Associates v. United States, 40 Fed. Cl. at 487. Because defendant conceded liability prior to trial regarding the demising wall, correctly asserting the amount of square footage defendant had improperly retained, and put forth an argument, albeit one found to be incorrect by this court, which cited case law indicating that the proper measure of damages for the partial holdover involving the demising wall was the fair market rental value, defendant's position as to plaintiff's partial holdover claim involving the demising wall was reasonable and substantially justified.

---

[16] In its response to plaintiff's motion for attorneys' fees and costs, defendant indicates that its position regarding the correct location of the demising wall changed after the "Postal Service scheduled two site visits – on January 4 and 31, 2017 – that were attended by the Postal Service's consulting expert and Stromness' representatives, to evaluate the partial holdover claim, among others."

Regarding defendant's assertion that the USPS was not a holdover tenant of the District Training Center space, the court concluded that the USPS was a holdover tenant because:

> The testimony received at trial and the other evidence submitted for the record leads the court to conclude that, although the USPS had physically vacated the training center space on or before December 28, 2012, the USPS continued to exercise the right to control access to the space after the expiration of the District Training Center lease, as amended, thereby breaching the implied duty to vacate the premises. Upon the termination of the District Training Center lease on December 31, 2012, the USPS did not surrender all of its rights in the space that it enjoyed as the lessee, as it indicated it would, and as required by the expiration of the District Training Center lease, as amended. Because the USPS did not deliver a key to the space to plaintiff, as explicitly stated in its Notice of Termination, plaintiff had to rely on the USPS to gain access to the space. Although defendant argues that merely retaining the key to the property is not sufficient to establish that the USPS was a holdover tenant, the court does not rely solely on the USPS's failure to deliver a key to plaintiff as the basis for finding that the USPS was a holdover tenant in breach of the District Training Center lease agreement, as amended. The USPS's failure to deliver a key to plaintiff is part of a larger context in which the USPS continued to exercise rights over the former training center space.

See Stromness MPO, LLC v. United States, 134 Fed. Cl. at 282. Defendant had argued that the USPS's standard security procedure was to escort a non-postal employee through a secure postal space, but that the USPS did not deny plaintiff access to the District Training Center space, did not escort a member of Stromness MPO once the member of Stromness MPO was inside the District Training Center space, and left the member alone in the space. Defendant also pointed out that that a member of Stromness MPO "never asked for the key." Defendant further argued that the USPS "did not holdover the training center space between January and September 2013" because

> we established that the Postal Service: (i) vacated the training center space; (ii) moved offices out of the training center space, removed desks, computers, and other property; (iii) [sic] cleaned the space and installed an office divider to separate the spaces; and (iv) made the space available to Stromness and did not use that space after December 2012.

Defendant argued that, according to Asset 42302 LLC v. United States, 77 Fed. Cl. at 564, "when a tenant 'merely retains the keys to the premises,' the tenant does not become a holdover tenant." See Asset 42302 LLC v. United States, 77 Fed. Cl. at 564 (quoting RESTATEMENT (SECOND) OF PROP. § 14.2 (1977)).

As the court noted in its September 8, 2017 Opinion, "[i]t is a well-established principle that, 'an implied duty to vacate is an inherent part of every fixed term lease agreement unless the parties explicitly express an intention to the contrary,' including lease agreements between private parties and the United States," and that whether "the government in its role as a lessee or tenant is holding over is a question of fact." Stromness MPO, LLC v. United States, 134 Fed. Cl. at 275 (quoting Prudential Ins. Co. of Am. v. United States, 801 F.2d 1295, 1299 (Fed. Cir. 1986)). Defendant's position regarding whether the USPS was a holdover tenant in the District Training Center space, although incorrect, was reasonable, because defendant's position was based on facts developed at trial indicating that the USPS had vacated and ceased using the District Training Center space in December 2012 and case law indicating that maintaining the keys to a vacated premises was not sufficient to establish a holdover tenancy. Defendant submitted evidence indicating that the USPS did not deny members of Stromness MPO access to the District Training Center space when access was requested by a member of Stromness MPO, and that the USPS had not permitted members of Stromness MPO to enter the Magna Main Post Office space unescorted in order to ensure the security of the United States mail. See id. at 281-82. Plaintiff ultimately prevailed on whether defendant was a holdover tenant in the District Training Center space, but defendant did put forth evidence indicating that the USPS had vacated the District Training Center space and was not using the vacated District Training Center space. Whether the USPS was a holdover tenant was a question of fact, and defendant's position was supported by some facts indicating that the USPS was not a holdover tenant. Moreover, the court did not find that defendant's arguments and position were not reasonable or substantially unjustified.

Although the court disagreed with the Department of Justice's positions regarding the amount of damages plaintiff was entitled to recover based on the demising wall being built in the wrong location and whether the USPS was a holdover tenant in the District Training Center space, both of defendant's positions on those claims were supported by facts and some case law and were reasonable positions for defendant to take. See Norris v. Sec. & Exch. Comm'n, 695 F.3d at 1265 ("To be substantially justified, the government's position need not be 'correct,' or even 'justified to a high degree.' . . . Instead, the term 'substantially justified' means that the government's position was 'justified in substance or in the main — that is, justified to a degree that could satisfy a reasonable person.'" (quoting Pierce v. Underwood, 487 U.S at 565)); see also KWV, Inc. v. United States, 113 Fed. Cl. 534, 538 (2013) ("[T]he government's position could have been substantially justified even thought it was ultimately incorrect." (citing Miles Constr., LLC v. United States, 113 Fed. Cl. at 178 (citing Manno v. United States, 48 Fed. Cl. 587, 589 (2001)))). Moreover, whether defendant's position was substantially justified is not an isolated issue that encompasses only defendant's shortcomings in its arguments related to plaintiff's successful claims. Rather, defendant's position is to be viewed as a whole, including the actions of the USPS and the positions taken by the Department of Justice. See, e.g., Chiu v. United States, 948 F.2d at 715. The USPS, after investigating plaintiff's claims, denied plaintiff's certified claim and supplemental certified claim, which contained multiple unsupported claims ultimately rejected by the court, because of factual disputes between the USPS and plaintiff. The USPS also offered plaintiff a settlement of

$100,000.00 to resolve plaintiff's claims before more extensive litigation, which represents 75.28 percent of the $132,828.94 plaintiff recovered more than three-years later after a four-day trial. The Department of Justice then defended against plaintiff's six-count complaint, including Count I of plaintiff's amended complaint, which asserted ten breach of contract claims. Of the "$2,964,300.00 (ESTIMATED)" in damages claimed by plaintiff in the civil cover sheet attached to plaintiff's complaint, judgment was entered in favor of plaintiff in the amount of only $132,828.94, including interest, which represents 4.48 percent of the damages originally sought by plaintiff.[17] Because defendant's position throughout the entirety of the above-captioned case, although not 100 percent correct, was substantially justified, plaintiff's request for attorneys' fees and costs under EAJA fails. See 28 U.S.C. § 2412(d)(1)(A).[18]

## CONCLUSION

Plaintiff's motion for attorneys' fees and costs under EAJA, therefore, is **DENIED**.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

---

[17] In plaintiff's motion for attorneys' fees and costs, plaintiff indicates that its attorneys billed approximately 1,350 hours to plaintiff prior to the issuance of the court's September 8, 2017 opinion. In plaintiff's supplement to its request for attorneys' fees and costs, plaintiffs requests a total of $131,631.83 in attorneys' fees and costs, which only is slightly less than the $132,828.94 plaintiff was awarded in damages.

[18] Because the court has found that defendant's position throughout the relevant proceedings was substantially justified, there is no need to analyze whether special circumstances existed which would "make an award" of attorneys' fees and costs to plaintiff "unjust." See 28 U.S.C. § 2412(d)(1)(A). The court notes, however, that, based on a review of the record before the court, there do not appear to be any such special circumstances which would "make an award unjust." See id.